#06546

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAY 23 2008
U.S. COURT OF FEDERAL CLAIMS

**ENERGY SECURITY OF AMERICA CORP. and ALBERT CALDERON, Plaintiffs**

v.

**UNITED STATES,**
Defendant

No.: 08-373 C

# COMPLAINT

Energy Security of America Corp. ("ESAC"), plaintiff, and Albert Calderon, plaintiff (hereinafter referenced collectively as "Plaintiff," except as otherwise indicated), complaining of the Defendant herein respectfully shows and alleges:

## I. PRELIMINARY STATEMENT

1. This is an action to redress a taking without just compensation of certain intellectual property rights owned by Plaintiff and denominated for convenience as the Calderon Process for Synthetic Gasoline and Power Co-Production (or the "Process"). United States Patent No. 4,927,430 (the '430 patent) and United States Patent No. 5,063,732 (the '732 patent) were issued for this Process.

2. Due to the fact that the government actions and inactions described by this Complaint take place over a relatively long period of two decades, and that this Complaint also arises in an area that requires an understanding of technological issues and background statutes in both the energy and intellectual property areas, as well as the Plaintiff's development history regarding its Process and contracting relationships with the United States Department of Energy, the Plaintiff

has made an effort to be inclusive in this Complaint while still adhering to the pleading requirements of shortness and concision and fair notice of the nature of the case to the Defendant. Plaintiff also believes, after research, that this Complaint raises two issues of first impression for this Court's consideration: (1) whether a patent's temporary monopoly and an inventor's natural right to exploit his invention are property protected by the Fifth Amendment's takings clause, where the taking alleged is regulatory in nature (and not a case of patent infringement against the Government, as in *Zoltek Corporation. v. United States*, 58 Fed.Cl. 688 (2003), affirmed in part, denied in part, and remanded by *Zoltek Corporation. v. United States*, 442 F.3d 1345 (Fed. Cir. 2006)); and (ii) whether government action that is facially in the character of financial assistance to demonstrate innovative technologies, but whose administering agency in providing financial assistance to technologies that were already in commercial use, not new, and inconsistent with binding statutory principles incumbent upon the agency, results in regulation of property for the purposes of the takings clause, where under the facts and circumstances the impact of the agency's actions in repeatedly denying funding to the Process is to preclude and prevent Plaintiff's Process from commercial application in the field, and where the Plaintiff can show uniquely discriminatory conduct on the part of the agency directed specifically at Plaintiff and its Process that prevented commercial-scale demonstration and commercial application.

3. Due to its length, this Complaint has been subdivided for ease of reading by italicized sub-headings throughout in addition to utilizing sequentially numbered paragraphs. A Table of Contents appears as Attachment 1, and references each such subsection by the numbered paragraphs it comprises as well as by the page number of the Complaint on which the subsection

begins. A Comptroller General's Opinion relied upon by this Complaint appears as Attachment 2. A listing of Exhibits appears as Attachment 3 (and its referenced Exhibits follow).

4. A listing of scientific and technical definitional terms used in this Complaint appears as a separate section within the Statement of Facts, under the italicized sub-section entitled *"Glossary of Technical Terms"*; as these definitions contain and relate to factual material, Plaintiff has pled and included them as integral to its Statement of Facts and affirms them as accurately descriptive and representative of the technical matters to which they pertain.

5. As further related by this Complaint's Statement of Facts, the Process is commercially valuable as a method of producing synthetic gasoline and electric power from coal, and is suited for installation in existing coal-fired power plants. Efficiencies as well as emissions reductions are gained by the Process in this application, as well as (if all United States coal-fired power plants were so retrofitted) synthetic gasoline supplies to off-set a significant portion amounting to 35% of today's crude oil imports into the United States and equate to a "major" crude oil find of an unparalleled discovery. The yearly value of such a find at a current crude oil cost of $125/barrel would be more than $190 billion.

6. The Process is protected by a patented invention that is a "subject invention", within the meaning of the Bayh-Dole Act, 35 U.S.C. §§ 200 et seq. (the definition of "subject invention" is at 35 U.S.C. § 201(e)), and by an additional patent not a subject invention. The Bayh-Dole Act states as its Congressional policy and objective, *inter alia*, "to promote the utilization of inventions arising from federally supported research and development," "to encourage the maximum participation of small business firms in federally supported research and development efforts," and "to promote the commercialization and public availability of inventions made in the United States by United States industry and labor." 35 U.S.C. § 200.

7. Plaintiff alleges and shows herein that the defendant United States, through the United States Department of Energy (U.S.DOE), has taken intellectual property comprised by the Process without just compensation, in violation of the Fifth Amendment of the United States Constitution, by way of a series of actions and inactions extending over a two-decade period that restrictively regulated new technology introductions in the coal gasification area. DOE in the conduct of its Clean Coal Technology Demonstration (CCTD) Program ("Advanced Power Gasification" area) selected oxygen-blown entrained flow gasification technology that had been previously commercially demonstrated for chemicals production using coal in an entirely private sector-funded project and also previously received DOE funding for an integrated gasification combined cycle ("IGCC") demonstration project; the only CCTD Program IGCC projects actually constructed and operated for continual periods were two projects utilizing oxygen-blown entrained-flow gasification technology. These two processes essentially demonstrated the same type of gasification technology—oxygen-blown entrained flow gasification—and both utilized a coal slurry as a feed; they differed in introduction of the coal slurry. (A third process utilizing another type of gasifer was constructed but subsequently shut down because, as a DOE technical report explained, "the gasifier and hot gas cleanup system never functioned fully for more than 24 hours at a time"). The two oxygen-blown entrained flow gasification processes did not produce a syngas suitable for liquid fuels production without necessitating a $CO_2$-producing chemical reaction called a "shift reaction," which adds to capital and operating costs as well as inefficiency. DOE's CCTD Program, as carried out in the IGCC area, is inconsistent with the Nonnuclear Energy Act in that the oxygen-blown entrained flow gasification technology constructed and operated did not meet criteria for federal financial involvement at 42 U.S.C. § 5904 (b)(2)(E) (requiring agency consideration of "the degree of risk of loss of investment

inherent in the research is high and the availability of risk capital to the non-Federal entities which might otherwise engage in the field of research is inadequate for the timely development of the technology") and at 42 U.S.C.§ 5904 (b)(2)(F) ("requiring agency consideration of "the magnitude of the investment appears to exceed the financial capabilities of potential non-federal participants in the research to support effective efforts"). The oxygen-blown entrained flow technology is not consistent with 42 U.S.C. § 5904(a)(1) (requiring that "energy conservation shall be a primary consideration in the design and implementation of the Federal nonnuclear energy program") and 42 U.S.C. § 5904 (a)(2) (requiring that "Any program for the development of a technology which may require significant consumptive use of water after the technology has reached the stage of commercial application shall include thorough consideration of the impacts of such technology on water resources pursuant to the provisions of section 13 [42 U.S.C. 5912]"). Oxygen-blown entrained flow gasification processes that use a coal/water slurry require large amounts of relatively pure oxygen to gasify the coal and this oxygen must be produced cryogenically from air in an air separation unit, an energy-intensive operation; also, the high ratio of water (40%) to coal in the coal/water slurry results in energy efficiency penalties in the gasifier's operation. Oxygen–blown entrained flow gasification technology has become DOE's standard for coal gasification. Other public policies (for example, federal environmental agency consideration for potential regulatory incentives, federal loan guarantees, and cost recovery approval by state public utility regulators) are conditioned on the fact that these oxygen-blown entrained flow processes have been demonstrated through commercial scale demonstration projects. Plaintiff's Process, which is congruent with 42 U.S.C. § 5904(a)(1),(3) as well as 42 U.S.C. § 5904 (b)(2) is not able to be commercially applied due to the lack of a commercial-scale demonstration project.

8. The Nonnuclear Energy Act at 42 U.S.C. § 5901, a Congressional statement of findings, states, "[t]he Nation's future energy needs can be met if a national commitment is made now to dedicate the necessary financial resources, to enlist our scientific and technological capabilities, and to accord the proper priority to developing *new* nonnuclear energy options to serve national needs, conserve vital resources, and protect the environment." (Bracketed letter initially capitalized in the original and italics added.) This provision dates from the original enactment date, 1974 (Dec. 31, 1974; P.L. 93-577, §2, 88 Stat. 1879). 42 U.S.C. § 5905(b)(3)(E) requires program elements and activities designed, *inter alia*, "to *accelerate* the commercial demonstration of technologies for producing...liquid petroleum products from coal." *Id.* (Italics added.) The Nonnuclear Energy Act is about nothing if it is not about technological innovation; 42 U.S.C. § 5904 (b)(2)'s requirement that federal financial assistance is limited to high-risk projects (and where the magnitude of investment exceeds the financial capabilities of non-federal participants) must be construed in view of the Act's overall purpose of fostering technology innovation and <u>new</u> non-nuclear energy technologies. DOE may have considerable discretion in selecting program elements, projects, and activities, but it is still required to follow the principles set forth by 42 U.S.C. § 5904(b)(2). See 61 Comp. Gen. 482 (1982); 1982 U.S. Comp. Gen. LEXIS 849 (see Attachment 4, a copy of this opinion, at its page 4) ("The Nonnuclear Energy Act affords the Secretary of Energy considerable discretion in the selection of individual programs, projects, and activities, *so long as those selections are made according with certain principles and criteria set out in section 5, 42 U.S.C. § 5904*.) (Italics added.) DOE's project selections are inconsistent with 42 USC § 5904(b)(2) and transforms the essential nature of its actions from financial assistance to a *de facto* regulation of the participants and processes allowed to compete in the technology market, especially if, as here, the agency selected older

technologies that did not require financial assistance under the standards of 42 U.S.C. § 5904(b)(2) and were not consistent with 42 U.S.C. § 5904(a)(1),(3). As this Complaint will allege and show, the "character of the Government action" in such a case, for takings analysis purposes, is no longer financial assistance—it is direct regulation of technologies and their capability of commercial demonstration and use.

9. In addition, Plaintiff alleges and shows herein that DOE actions directed specifically and intentionally toward the Plaintiff and its Process were geared to prevent the demonstration, and ultimately the commercialization, of the Process as well as critical subsystems, thereby preventing commercial application of the Process. The agency's record of dealings with the Plaintiff, as shown by this Complaint's Statement of Facts, evidences an intent on the part of the agency to preclude Plaintiff from competing for federal commercial-scale demonstration project funding and to prevent and suppress the commercial scale demonstration of the Process. Plaintiff alleges that the agency's attempts to block demonstration and commercial application of the Process were due to the agency's adherence to a *de facto* technology policy that categorically disqualified Plaintiff's meritorious gasification and hot gas cleaning technologies from federal funding. The agency sought, rather, to limit competition within the federally-funded gasification area, despite technical flaws inherent in the oxygen-blown entrained flow processes and their unsuitability for liquid fuels and power co-production. In short, DOE defined the technical field of "coal gasification" as exclusionary of Plaintiff's innovative process technology in its demonstration programs, selection under which has proven to provide not only necessary financial assistance for process demonstration but as a necessary government approval for commercial application.

10. Plaintiff alleges and shows in this Complaint that, under the specialized circumstances of DOE funding and incentive programs operating in the coal gasification area, and due to the DOE's dominance and criticality of its demonstration project funding for commercial application of coal gasification technology, the repeated denial of demonstration project funding by the agency has the same impact on Plaintiff's beneficial use of its property as a permit denial, for example, to mine property or develop land. Further, when repeated funding denials are based on the agency's preclusive technology policy that entrenches previously selected, non-innovative technologies from competition, categorically discriminates against the Plaintiff's Process, and conflicts with statutory mandates in the context of government-funded programs designed to encourage innovation, the repeated denial of funding to a meritorious process technology is action directed toward the intellectual property owned by the process owner and the harm to the property is not a consequential impact or a frustration of purpose, as in, for example, *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923).

11. A patent is a temporary monopoly that provides the patent owner with the exclusive right to practice the invention (see *Bonito Boats v. Thundercraft Boats*, 489 U.S. 141, 150-151; 109 S.Ct. 971; 103 L.Ed.2d 118 (1989) ("The federal system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and non-obvious advances in technology in return for the exclusive right to practice the invention for a period of years." *Id.*). The Federal Circuit has also recognized that, apart from the patent, an inventor has the natural right to exploit his invention (see *King Instruments v. Perego*, 65 F.3d 941, 949-950 (Fed. Cir. 1995)("Inventors possess the natural right to exploit their inventions (subject to the rights of others in a dominant patent) apart from any Government grant"). Government action that precludes and obstructs the commercialization of patented property and rises to the level of a bar

on *any* beneficial use by *any* party (i.e. either the patentee or any third party assignee) not only renders the patent rights valueless, but works an uncompensated appropriation to the Government's benefit: the Government (as well as the public) gains free use of the invention, at the expiration of the patent term, while the patentee receives, during the patent term and as the "benefit" of revealing trade secrets in its patent's invention disclosure, a valueless temporary monopoly. Such Government action undoes the patentee's reasonable investment-backed expectation in the patent system's reward for invention disclosure, and is contrary to his expectations created by the Patent Act and its primary innovatory purpose ("The Patent Act creates an incentive for innovation. The economic rewards during the period of exclusivity are the carrot. The patent owner expends his own resources in expectation of receiving this reward. Upon the grant of the patent, the only limitation on the size of the carrot should be the dictates of the marketplace." *King Instruments v. Perego*, 65 F.3d at 950-951. Moreover, in the context of federally-funded research and development, the Bayh-Dole Act allows small businesses to retain the ownership rights in subject inventions developed with federal assistance (*see* 35 U.S.C. § 202) and in most cases to commercialize them (*see* 35 U.S.C. §203 generally, and in particular 35 U.S.C. § 203 (a)(1)).

12. As in *Cienaga Gardens v. United States*, 331 F.3d 1319 ("Cienaga VIII") (Fed. Cir. 2003) where the enactment of federal legislation eliminating pre-payment rights directly and intentionally abrogated contracts (*id.* at 1335), government action which intentionally precludes and blocks the commercialization of patented property and rises to the level of a bar on *any* beneficial use by *any* party (i.e. either the patentee or a third party assignee) is directed at the patented property and abrogates the inventor's bargain with the government implicit in invention disclosure in exchange for a temporary monopoly. As in *Cienaga Gardens*, the Government's

actions are both directed at the property and have the effect of keeping the property--here, in the form of the invention disclosed in exchange for the patent right--alive for the use of the government (*see id*).

13. Within the coal gasification area, it is not possible to commercially apply gasification technology without having first, as a pre-requisite to commercial application, constructed and operated a first-of-a-kind demonstration project at a commercial or near-commercial scale. Such projects typically cost in the hundreds of millions of dollars, require coordination with governmental agencies to build and operate, and must have a means of funding not only construction costs but of financially covering continued operating costs.

14. Due to the magnitude of the capital required and the technical and financial risks involved, no first-of-a-kind coal gasification project as applied to power generation has *ever* been constructed and operated in the United States without direct grant support from DOE (which typically contributes both construction costs and operating costs, on a cost-shared basis with non-federal project participants). It is widely accepted and it has been the practice within the utility industry that first-of-a-kind commercial-scale gasification projects require federal funding support.

15. The criticality of government grant funding to energy technology development and demonstration in the non-nuclear area is recognized by federal statute. The Federal Nonnuclear Energy Research and Development Act of 1974 (42 U.S.C. §§ 5901 et seq.) at its Section 5904(b)(2)(A)-(F) requires considerations of the inherent risk of the technology endeavor, the means available to potential non-federal participants, and the time otherwise required to develop the technology, absent federal financial assistance.

16. DOE direct funding programs operating in the coal gasification area therefore may be fairly characterized as regulating technology introductions, in a practical sense. The agency's influence in the coal gasification area is pervasive and dominant, and funding by DOE acts not only to provide necessary financial resources but a government imprimatur that the technology is scientifically and technically meritorious. Repeated DOE denials of demonstration project funding have the same impact upon the utilization of a gasification technology and its underlying intellectual property rights as does a permanent government denial of the right to develop land.

17. In the Plaintiff's case, and with the lapse of time, the practical effect of the Government's action has been to preclude the Process's "practical application" (within the meaning of the Bayh-Dole Act at 35 U.S.C. § 201(f)), and for a sufficiently lengthy time that the Plaintiff has been permanently and categorically denied the use and enjoyment of its property, including the ability to license or otherwise obtain any economic value from the Process.

18. Within the past six months, since around November of 2007, there have been multiple cancellations of commercial projects that had proposed utilizing oxygen-blown entrained flow gasification systems of the type that DOE has previously funded. Both technical and cost issues provide reasons for these cancellations.

19. As efficient and cost-effective technical solutions in the coal gasification area are not easy to come by and expensive to test and develop, and as the Process has been demonstrated at a process development unit (PDU) scale (see Exhibit 1 photograph) partially funded by the Government (but DOE has repeatedly refused to fund the Process at a commercial-scale demonstration project level, despite its advantages), Plaintiff is in the position of having disclosed valuable process technology by way of patent disclosures and government-funded work, only to be precluded from commercial use or "practical application" by Government

action. The vulnerability of this position from a property rights standpoint is obvious where the property right has an expiry and Fifth Amendment implications arise where, as in *Yancey v. United States*, 915 F.2d 1534, 1542 (1990), Government action that quarantines property from commercial use also results in the devaluation or destruction of property rights.

20. Plaintiff alleges in this Complaint that, in addition to meeting the tests for an uncompensated taking in violation of the Constitution's Fifth Amendment, under the elements for a *per se* taking as applied to an involuntary transfer of personal property as recognized by the Supreme Court in *Brown v. Legal Foundation*, 538 U.S. 216, 235; 123 S.Ct. 1406; 155 L.Ed. 376 (2003) (*see* Count I of this Complaint); a categorical taking as defined by *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (*see* Count II of this Complaint) and for a regulatory taking as defined by *Penn Central Transportation Co. v. New York City*, 438 U.S. 104; 98 S.Ct. 2646; 57 L.Ed.2d 631 (1978) (*see* Count III of this Complaint), this case also presents a takings situation analogous to that identified by Justice Stevens in his dissenting opinion in *Eldred v. Ashcroft*, 537 U.S. 186, 226 (2003), in which he observed:

> "The issuance of a patent is appropriately considered as a *quid pro quo*--the grant of a limited right for the inventor's disclosure and subsequent contribution to the public domain. See, e.g. *Pfaff v. Wells Electronic, Inc.*, 525 U.S. 55, 63 (""[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time."). It would be manifestly unfair if, after issuing a patent, a representative of the public sought to modify the bargain by shortening the term of the patent in order to accelerate public access to the invention. The fairness considerations that underlie the constitutional protections against *ex post facto* laws and laws impairing the obligation of contracts would presumably disable Congress from making such a retroactive change in the public's bargain with an inventor *without providing compensation for the taking*." (emphasis added)

If, instead of shortening the patent term, Government action precludes *any* commercial or economically beneficial application of an invention during the entire patent term, the temporary monopoly is similarly "shortened" from the inventor's or the assignee patent owner's perspective-

-to the point of its elimination--and just compensation is required (see Count IV of this Complaint).

21. As this Complaint alleges and shows, Plaintiff's reasonable, investment-based expectations under a *Penn Central* analysis have been based on statutory program authority of U.S.DOE, as well as provisions of the Bayh-Dole Act (35 U.S.C.S §§201 et seq.), together with actual reliance on the Government's stated interests in furthering technological innovation in the areas of advanced coal gasification, hot gas cleaning, and liquid fuels and power co-production from coal, according to certain statutory criteria within the Nonnuclear Energy Act at 42 U.S.C. § 5904(a)(1),(3), 42 U.S.C. § 5905(b)(3)(C),(D),(E),and (M) (with which the Plaintiff's Process is highly congruent); so too is Plaintiff's reliance on Congress's stated public policy of fostering the participation of small businesses in U.S.DOE energy technology demonstration programs (*see* 42 U.S.C. § 5901(d)) and, through the Bayh-Dole Act, of allocating patent rights to small businesses that develop inventions—including "processes," "methods," "machines" and "systems" (*see* 35 U.S.C.S § 201 (f))—with federal funds (*see* 35 U.S.C.§ 202).

22. More fundamentally, and with respect to both the '430 patent and the '732 patent (the latter is not a subject invention), Plaintiff's "reasonable, investment-backed expectations" are also based on the *quid pro quo* of the patentee's bargain with the public--trade secret disclosure in exchange for a temporary monopoly--and, as suggested by Justice Steven's observation in his dissenting opinion in *Eldred v. Ashcroft*, the takings implications of Government action that has the same practical effect on the disclosing inventor's (or his assignee patent owner's) temporary monopoly right as would the shortening or elimination of the patent term.

23. The failure of DOE to abide by mandatory directives of Congress applicable to the clean coal technology demonstration project area, and specifically coal gasification, has special

relevance under two *Penn Central* factors in this case: (1) the character of the government action; and (2) the reasonable, investment-backed expectations of the plaintiff property owner. In maintaining that DOE's carrying out of clean coal technology programs was inconsistent with Congressional directives, however, Plaintiff does not maintain that DOE's actions were necessarily unlawful and is not seeking the equivalent of administrative review of DOE's denial of funding applications or other agency actions by way of this takings case (*See Rith Energy v. United States*, 247 F.3d 1355, 1356-1366 (Fed. Cir. 2001), citing to *Del-Rio Drilling Programs v. United States*, 146 F.3d 1358 (Fed. Cir. 1998)). Plaintiff's concern in this case is the impact which Government action has had upon its property rights.

## II. JURISDICTION

24. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 (the "Tucker Act"), as this action concerns a claim for just compensation for a taking of property for a public purpose, under the Fifth Amendment of the United States Constitution. Damages alleged are over the jurisdictional amount of $10,000. This is a suit for money damages (and not a tort action), as it alleges a Fifth Amendment taking of property.

25. Because the United States Supreme Court in *John R. Sands and Gravel v. United States*, 128 U.S. 750, 169 L.Ed.2d 591 (2008) has held that the requirement of 28 U.S.C. § 2501 is a jurisdictional matter for the United States Court of Federal Claims, and this case alleges Government action that constituted a taking starting in 1988 and which this Complaint alleges was completed as of May 1, 1993, this Complaint alleges and discusses facts relating to this case and 28 U.S.C. § 2501 within the last section of this Complaint.

## III. STANDING

26. Plaintiff has standing to bring this takings case as a property owner aggrieved by the Government's *per se*, categorical, and regulatory takings of its property. There is an actual case or controversy, in that Plaintiff's property rights have been taken, under the facts presented by this Complaint and as described by this Complaint's Count I, Count II, Count III, and Count IV, each of which describes a separate analytical basis for the taking of the Plaintiff's property by the Government. Plaintiff has suffered actual harm, in that its property rights have been taken and it has suffered severe economic damage to its property to the extent of worthlessness. The Government action complained of has caused the harm and there is no intervening cause for Plaintiff's harm, in that the Government action's action has denied Plaintiff any economic use of its Process. Compensation as required by the Fifth Amendment of the Constitution is due, and thus the Court's granting of the relief prayed for herein (which is damages as just compensation to the Plaintiff for the taking of its property rights) is both a sufficient and a Constitutionally-mandated relief within this Court's power to grant. This matter is ripe, in that Plaintiff's property rights have been taken and the Government has not compensated Plaintiff for the taking.

## IV. PARTIES

27. Plaintiff Energy Security of America Corporation ("Energy Security of America") is the assignee and owner of the intellectual property that is the subject property that Plaintiff alleges has been taken by the Government.

28. Plaintiff Albert Calderon is the sole shareholder of Energy Security of America Corp. and as of the time of the alleged taking, May 1, 1993, Plaintiff Albert Calderon was the sole shareholder of Energy Security of America Corp.

29. At the time of the alleged taking, May 1, 1993, Plaintiff Albert Calderon was the owner of the '430 patent.

30. At the time of the alleged taking, Plaintiff Albert Calderon owned 92% of the shares of Calderon Automation, Inc. and Calderon Automation, Inc. owned the '732 patent. Calderon Automation, Inc. has since been dissolved.

31. The United States is the Defendant, since this Complaint alleges and claims the taking of private property by the United States government for a public purpose without just compensation.

## V. PROPERTY INTERESTS FOR FIFTH AMENDMENT TAKINGS PURPOSES

32. The property interests taken by the Government are two United States Patents, the '430 patent ("Method of Producing and Treating Coal Gases") and the '732 patent ("Method for Repowering Existing Electric Power Plant").

33. The United States Supreme Court has recognized patents as property interests secured under the Due Process Clause of the Fourteenth Amendment in a case involving the state's unauthorized use of a patented invention in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 627, 642 (1999) ("Patents, however, have long been considered a species of property. See *Brown v. Duchesne*, 19 How. 183, 197 (1857) ("For, by thelaws of the United States, the rights of a party under his patent are his private property."); *c.f. Consolidated Fruit-Jar Co. v. Wright*, 94 U.S. 92, 96 (1877) ("A patent is as much property as a patent for land.") As such, they are surely within "the property of which no person may be deprived by a State without due process of law."") *Id.* A recent, dissenting opinion by Justice Stevens in *Eldred v. Ashcroft*, 537 U.S. 186, 226 (2003), provides conceptual

support for the proposition that patents are protected under the Fifth Amendment's takings clause.

34. An inventor's natural right to exploit his invention has been recognized by the Federal Circuit as a property right independent of a patent. *King Instruments v. Perego*, 65 F.3d 941, 949-950 (Fed. Cir. 1995). As a right created by the common law, the natural right of an inventor to practice his invention is similar to a trade secret for the purposes of protection under the Fifth Amendment's takings clause; the Supreme Court in *Ruckleshaus v. Monsanto,* 467 U.S. 1986 (1984) recognized trade secrets, as property rights created by state law, as protected by the Fifth Amendment's takings clause ("That intangible rights protected by state law are deserving of the protection of the Taking Clause has long been implicit in the thinking of this Court.") *Id.* at 1003). Plaintiff pleads that its natural right to practice its invention has been taken by the Government, under the facts and circumstances related by this Complaint.

## VI. STATEMENT OF FACTS

### *(A) Property Interests Taken -- Ownership of Property and Status of the Property As Protected Under the Fifth Amendment's Takings Clause*

35. A determination of whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings. *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1183 (Fed. Cir. 2004), citing *Alves v. United States*, 133 F.3d 1454, 1456 (Fed. Cir. 1998).

36. As set forth by the Federal Circuit in *Members of the Peanut Quota Holders Association v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005),"To evaluate whether a governmental action effects a taking of private property without just compensation, this court must first determine whether the claimant has established a property interest for the purposes of

the Fifth Amendment. *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002). Once a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public. *Id.*"

37. Plaintiff alleges and shows that the two United States Letters Patent that Plaintiff alleges were taken by the United States Department of Energy were owned by Plaintiff Albert Calderon at the time of the alleged taking, May 1, 1993. These two patents are: (1) United States Patent Number 4,927,430, "Method for Producing and Treating Coal Gases" (the '430 patent); and (2) United States Patent Number 5,063,732, "Method for Repowering Existing Electric Power Plant" (the '732 patent).

38. The '732 patent is a divisional of the '430 patent; both the '430 and '732 patents will expire on May 26, 2008.

39. Plaintiff Albert Calderon, founder and president of Energy Security of America Corp., is the sole inventor of the inventions disclosed and claimed by the '430 patent and the '732 patent.

40. Plaintiff Energy Security of America Corp. (then named Calderon Energy Company of Bowling Green, Inc.) provided a confirmatory subject invention license for the invention disclosed and claimed by the '430 patent to the United States, at the United States Department of Energy's patent counsel's second request, on October 5, 1995 (a first request was made by DOE's patent counsel in 1991) and this confirmatory license was executed by Plaintiff Energy Security of America Corp.'s president and sole shareholder, Albert Calderon (DOE Docket S-85, 212, "Method for Producing and Treating Coal Gases," Grant No. DE-FG21-87MC24138), who is also the sole inventor.

41. The government did not and has not requested a conveyance of title to the '430 patent.

42. Plaintiff Energy Security of America Corp. was the contractor under Grant No, DE-FG21-87MC24138 and a small business entitled to the retention of title to a subject invention under the provisions of the Bayh-Dole Act, 35 U.S.C. §§200 et seq. and the patent clause contained within the grant instrument.

43. Plaintiff provided this confirmatory license for a subject invention even though not all the steps claimed by either of the two independent claims of the '430 patent were actually reduced to practice in the performance of work under the Plaintiff's Cooperative Agreement with the United States Department of Energy and none of the steps of the two main independent claims (including a sorbent regeneration step of claim 1 step (e) and a sorbent regeneration step of claim 12 step (g)) were practiced in an integrated mode, due to insufficient funding, as Plaintiff related in a certain letter dated October 4, 1995 to David Breedon, Esq., Office of Patent Counsel, United States Department of Energy (Oak Ridge Operations) and Plaintiff's letter included patent law literature that indicates that an invention for a process must have been executed in all of its claimed steps in order to qualify for an actual reduction to practice (see, e.g. Nash and Rawicz, *Intellectual Property in Government Contracts, Volume 2 - Patents* (George Washington University National Law Center Government Contracts Program ([1988]), at page 7 ("If it is a... process for generating a composition of matter,...the process must have been executed in all of its steps. In patent law, the invention is embodied in a physical form sufficient to meet the requirements of reduction to practice when every particular of the invention, as claimed in the patent, is found in the physical embodiment. Thus at least a functioning model is necessary.") Nevertheless, Plaintiff provided the confirmatory license as its view of the best practice under the circumstances, given that some but not all of the steps of

the invention claimed by the '430 patent's main claim (1) and (12) had been tested at the PDU, and to cooperate with the DOE.

44. Plaintiff alleges and shows in this Statement of Facts that in the five year period 1981-1986, prior to Plaintiff Energy Security of America Corp.'s execution of grant number DE-FG21-87MC24138 with the United States Department of Energy, that Plaintiff Albert Calderon had conceived and actually reduced to practice through pilot testing conducted at his own expense the steps of the main claims of the '430 patent as were later tested at a larger scale at the process development unit (PDU), and that conception of the '430 claimed invention predated government-funded work; however, in neither case (i.e. the pilot testing nor the PDU testing) were all of the steps of the main claims of the '430 patent practiced.

45. On the set of facts alleged in numbered paragraphs 39-44, Plaintiff Albert Calderon was the owner of the '430 patent as of the alleged date of the taking, May 1, 1993.

46. Plaintiff Energy Security of America Corp. is the current owner of the '430 patent and the '732 patent, which were both assigned by the inventor to Energy Security of America Corp, on January 20, 2003.

47. At the time of the taking described herein, May 1, 1993, a license to commercialize proprietary technologies of Calderon Automation's had been entered into between Calderon Automation, Inc. and Energy Security of America Corp. in 1992, and Albert Calderon owned 100% of the common stock and the entire voting interest in Energy Security of America Corp., as its sole shareholder and 92% of the common stock and 92% of the voting interest of Calderon Automation, Inc.

48. At the time of the taking described herein, which Plaintiff alleges was complete by May 1, 1993, the '732 patent was owned by Calderon Automation, Inc., a related entity to Energy

Security of America Corp., and Albert Calderon owned 92% of the common stock and 92% of the entire voting interest of Calderon Automation, Inc. Calderon Automation, Inc. was subsequently dissolved and Plaintiff Albert Calderon received the '732 patent as a result of liquidation.

49. The '732 patent is not a subject invention.

50. Under the facts alleged at numbered paragraph 47, Albert Calderon had an ownership interest in the '732 patent through his stock ownership in Calderon Automation, Inc.; he was also the president of Calderon Automation, Inc.

51. Further, as Calderon Automation, Inc. and Energy Security of America Corp. had a license agreement in place as of May 1, 1993 for Energy Security of America Corp.'s commercialization of Calderon Automation, Inc.'s proprietary technology, Energy Security of America Corp. also had a property right in connection with the '732 invention, as of the date of the taking (May 1, 1993), by way of its license right.

52. In addition to the two patents above-mentioned, Plaintiff Albert Calderon alleges that his natural right to exploit the '430 invention and '732 invention, has been taken by the government and references numbered paragraph 33 of this Complaint regarding the Fifth Amendment status of said natural right for takings clause purposes.

53. Plaintiffs Albert Calderon and Plaintiff ESAC claim that patent rights are accorded protection against an uncompensated Fifth Amendment taking, as earlier set forth by numbered paragraph 33 of this Complaint.

54. Therefore, Plaintiff alleges that the property interests described by numbered paragraphs 37 and 52 are property interests protected by the Fifth Amendment. In summary, these constitutionally-protected property interests are: (1) the '430 patent; (2) the '732 patent;

and (3) the natural right of the inventor to exploit his invention, recognized as an independent property interest apart from the patent.

55. Plaintiff seeks to clarify that, although this case arises in the setting of DOE financial assistance programs, Plaintiff does not assert any property right in federal financial assistance, and is thus presenting a different situation for this court's consideration than the plaintiffs in *Members of the Peanut Quota Holders Association v. United States,* 421 F.3d 1323 (Fed. Cir. 2005) who maintained a property right in peanut quota allotments created by federal statute as a benefit. 421 F.3d at 1331. While the Federal Circuit agreed that this allotment was a property interest due to its ability to be transferred under state law and its exclusivity (see *id.* at 1331-1332, 1332-1334), it found that a change in the statute to make the allotments less valuable or even worthless did not amount to a compensable taking. *Id.* at 1334. The Federal Circuit reasoned that "the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election." A patent right is not the product of a unilateral extension of government-created benefits, since the patent right is conditioned upon the patent owner's disclosure of a trade secret protected by state law--thus, it represents a bilateral exchange between the government, as the grantor of a temporary monopoly, and the inventor, as the owner of a trade secret. Under the United States' patent system, a patent is a "right, not a matter of grace or favor" *Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 599 (Fed. Cir. 1985) (quoting Johnson & Johnson v. Wallace A. Erickson & Co., 627 F.2d 57, 59 (7th Cit. 1980).

56. As alleged further in this Complaint, the government action constituting a taking of property is the intentional preclusion and obstruction of the Plaintiff from exploiting its patented

property, where the Plaintiff and its property were specifically singled out and uniquely and categorically disqualified by the agency for commercial scale demonstration funding, and a government-funded commercial demonstration plant has proven necessary to commercially apply coal gasification technology in the power industry. The Supreme Court in *Armstrong v. United States* has stated, "The Fifth Amendment guarantee...was designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). This case presents a taking in that the Government has uniquely and categorically disqualified from commercial application a meritorious Process to co-produce liquid fuels and electric power from coal that is highly congruent with the Nonnuclear Energy Act's binding criteria at 42 U.S.C. § 5904(b)(1), (b)(2), as well as with certain technical objectives set forth at 42 U.S.C. § 5905(b)(3)(E) ("to accelerate the commercial demonstration of technologies for producing...liquid petroleum products from coal"), 42 U.S.C. § 5905(b)(3)(M) ("determine the economics and commercial viability of the production of synthetic fuels...such as methanol"); and 42 U.S.C. § 5905(b)(3)(C)(i) ("to demonstrate improved methods for the generation of...electrical energy through (i) advances in...the use of low British thermal unit gas").

*(B) Technological Context of this Complaint*

57. As an understanding of the events of this Complaint and the impact of the Government's actions upon the Plaintiff's property rights--as well as the value of the Plaintiff's Process *as* property--is difficult without a background understanding of technological issues, numbered paragraphs 57 through 56, (appearing under this sub-heading, "*(B) Technological*

*Context of this Complaint"*) present the technological setting of Plaintiff's Process and this Complaint.

58. Plaintiff continues with its relation of factual allegations that amount to an uncompensated taking of its intellectual property at this Complaint's numbered paragraphs 157 through 356, consistent with the requirement of the United States Court of Appeals for the Federal Circuit's two-step takings analysis (*i.e.* (1) whether a claimant has established a property interest for Fifth Amendment takings clause purposes (*see supra* numbered paragraphs 30 through 33 and numbered paragraphs 34 through 54); and (2) whether a part or a whole of that interest has been appropriated by the government for the benefit of the public (*see infra* numbered paragraphs 157 through 356). *Members of the Peanut Quota Holders Association v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005))

59. This subsection (B) has two parts--(i) Glossary of Technical Terms (at numbered paragraphs 61 through 89); and (ii) Technological Setting of Plaintiff's Process (at numbered paragraphs 90 through 156).

*(i) Glossary of Technical Terms*

60. Set forth in numbered paragraphs 61 through 89 is a glossary of technical terms used within this Complaint. Plaintiff, in setting forth and using the technical terms of numbered paragraphs 61 through 89, also pleads and affirms them as accurately descriptive and representative of the technical matters to which they pertain.

61. "Air-blown gasification" is the process by which gas is extracted from coal in a gasifier that uses air, rather than 95% pure oxygen ("industrial oxygen"), to react with the coal.

62. "Carbon dioxide" is a gas containing one carbon atom and two oxygen atoms per molecule.

63. "Carbon monoxide" is a gas containing one carbon atom and one oxygen atom per molecule.

64. "Char gasification" is the gasification of a char or coke remaining after pyrolysis of coal.

65. "Coal gasification" is the general process by which gas is extracted from coal and treated in a manner to render it suitable for end-use. As used within this Complaint, the term "coal gasification" incorporates both the initial production of the coal gas by way of gasification and gas cleaning and treatment.

66. "Coking" is the thermal treatment of a hydrocarbon feed material (such as coal) in the absence of oxygen, to result in devolatilization and cracking of the gas contained within the feed material. The end products of coking operations are carbon (in the form of a coke or a char) and the devolatilized and cracked coal gas.

67. "Combined Cycle Turbine System" ("CCTS") is a gas-fired combustion turbine that recovers waste heat in a waste heat recovery boiler to raise steam, which is fed to an integrated steam turbine for additional power generation. CCTS's are a more efficient method of producing electric power than either a pulverized coal-fired boiler or a "simple cycle" combustion turbine (which does not incorporate a waste heat recovery boiler and steam turbine).

68. "Co-production" is the production from one feed material (such as coal) and within an integrated facility fuels, and/or chemicals and electric power, with the electric power essentially produced as a by-product of the fuels and/or chemicals production.

69. "Cracking" or "Gas Cracking" is the thermal treatment of hydrocarbon-containing gases to rearrange their molecular structure, with the end result that the gas undergoing thermal treatment is constituted essentially of hydrogen and carbon monoxide after the thermal treatment has taken place.

70. "Fischer-Tropsch Liquids" are hydrocarbon-containing liquids produced by the Fischer-Tropsch process.

71. "Fischer-Tropsch Process" is the catalytic process discovered by F. Fischer and H. Tropsch in 1923 that obtains hydrocarbons and other aliphatic compounds from synthesis gas, including hydrocarbon-containing liquids and waxes; the liquids require subsequent refining in a refinery operation to produce finished transportation fuels.

72. "Gasifier" is an apparatus that reacts coal with an oxidant under partially reducing conditions to produce a coal gas.

73. "Gasification" is the process of obtaining gas from coal by reacting the coal with an oxidant (e.g. air or oxygen *per se*) under partially reducing conditions.

74. "Greenhouse gases" are gases that are considered to contribute to global warming; within this Complaint, the two primary greenhouse gases under consideration are carbon dioxide ($CO_2$) and nitrogen oxides ($NO_x$).

75. "Hot gas cleaning" is the desulfurization and cracking of coal gas while it is hot and still retains the thermal energy produced during reactions in the gasifier.

76. "Hydrogen" or "$H_2$" as used herein is elemental hydrogen in its naturally-occurring form of two hydrogen atoms, and is the dominant gas in making liquid fuels.

77. "Industrial Oxygen" is the relatively pure oxygen gas (95% pure oxygen) derived from an oxygen plant.

78. "Integrated Gasification Combined Cycle" (IGCC) is coal gasification tied to a combined cycle turbine system (CCTS).

79. "Low Btu gas" or "Lean Gas" is coal gas that has been diluted with nitrogen, thereby reducing its heating value, increasing its mass and the mechanical efficiency of a gas turbine when combusted, and reducing the $NO_x$ emissions resulting from low temperature gas combustion.

80. "Methanolization" is the conversion through catalytic means of a synthesis gas into methanol.

81. "Methanol-to-Gasoline Process" or "MTG Process" is a proprietary, commercially-available catalytic process developed by Mobil Oil in the 1970's and now owned by Exxon-Mobil, in which methanol is converted into a high-octane, ultra low sulfur or zero sulfur synthetic gasoline through Exxon-Mobil's catalytic technology, as a finished product. The MTG Process does not require a refinery to produce a finished product, as does the Fischer-Tropsch Process.

82. "Oxygen-blown entrained flow gasification" is the production of a coal gas in a gasifier which operates under pressure and utilizes as its feed a very finely ground coal whose particles are entrained in either water or a gas, where reaction conditions require pressurized oxygen from an air separation unit ("ASU") to produce a coal gas.

83. "Oxygen Plant" or "Air Separation Unit" is an industrial facility that cryogenically separates the oxygen in air from the nitrogen and other gases in air, in order to produce industrial oxygen of about 95% purity.

84. "Pyrolysis" is the thermal treatment of a hydrocarbon feed material (such as coal) in the absence of oxygen, to result in devolatilization and cracking of the gas contained within the feed material. Within this Complaint, "pyrolysis" is used synonymously with "coking".

85. "Raw syngas" is a syngas that has not undergone cleaning.

86. "Regenerative hot gas cleaning with elemental sulfur recovery" is hot gas cleaning that uses a sorbent that can be regenerated after it has been saturated with sulfur, with the technical objectives that the sorbent can be used over multiple operating cycles without excessive degradation and sulfur can be captured in elemental form.

87. "Sorbent," as used within this Complaint, is a chemical that absorbs sulfur.

88. "Shift reaction" is the chemical reaction by which a syngas containing excess CO is reacted with steam to increase the content of the $H_2$ and decrease the content of CO to obtain the desired ratio of $H_2$ to CO; this reaction yields $CO_2$ as a by-product.

89. "Synthesis Gas" or "Syngas" is a gas containing a mixture of $H_2$ and CO in a ratio that permits the gas to be used to make designated fuels or chemicals.

90. "Syngas of fuel quality" means a syngas suitable for use as a fuel and not a chemical.

91. "Syngas of chemical quality" means a syngas suitable for use as a chemical but which could also be used as a fuel.

*(ii) Technological Setting of Plaintiff's Process*

*(a) Synthetic Gasoline Production (Rich Gas Production)*

92. Reference is made to Exhibit 2, a recent presentation made by representatives of ExxonMobil Research and Engineering and Uhde GmbH at the "First World Coal-to-Liquids

Conference" in Paris, France on April 3-4, 2008, and entitled "An Alternative Route for Coal to Liquid Fuel ExxonMobil Methanol to Gasoline (MTG) Process."

93. As presented within Exhibit 2, the ExxonMobil MTG Process is a technology to produce liquid fuels from coal or natural gas in the form of synthetic gasoline (with smaller amounts of liquefied petroleum and fuel gas also produced by the MTG Process). (See Exhibit 2, pages 1,2, 5, and 6).

94. The MTG Process to produce synthetic gasoline has been commercially operated for over ten years at a 14,500 barrel per day plant in New Plymouth, New Zealand (see Exhibit 2, page 8 and page 18).

95. Under the MTG Process, syngas derived from coal or natural gas is converted first to methanol, and then the methanol is converted to synthetic gasoline (around 89% of hydrocarbon product yield), liquefied petroleum gas (LPG) (around 10% hydrocarbon yield), and fuel gas (around 1% of hydrocarbon yield). (See Exhibit 2, page 6.)

96. As related by Exhibit 2, the MTG Process produces synthetic gasoline as a finished product (see Exhibit 2, page 12) and no refinery is needed to make a marketable liquid fuel product (see Exhibit 2, page 15).

97. As shown by Exhibit 2, page 13, MTG gasoline made from the Exxon-Mobil MTG Process "is completely compatible with conventional gasoline infrastructure" and "contains essentially no sulfur and low benzene contents." Exhibit 2, page 13 shows that sulfur and benzene constituents of the MTG gasoline are less than U.S. conventional gasoline derived from petroleum.

98. As shown by Exhibit 2, page 4, the Exxon-Mobil MTG Process obviates many of the process steps that the Fischer-Tropsch Process necessitates to produce finished products.

99. As stated by Exhibit 2, page 3, "Syngas Generation Dominates Capital Investment" Exxon-Mobil's evaluation indicates that syngas generation is about 60% - 70% of the capital investment of a coal-to-liquids facility.

100. Plaintiff's Process is a much less expensive method of coal gasification and gas treating than the oxygen-blown entrained flow gasification technologies and hot gas cleaning technologies DOE has supported through its Clean Coal Technology Demonstration Program.

101. In 1984, Plaintiff's Process's syngas was identified in a written memorandum to Plaintiff (see Exhibit 3) by Bechtel National as highly suitable for the production of methanol, as the $H_2$ to CO ratio of Plaintiff's syngas was 2 $H_2$ to 1 CO, a ratio that did not require additional hydrogen in order to be chemically suitable for methanolization. In 1984, Bechtel National suggested that the Process was suitable for MTG (see Exhibit 3).

102. In 1988, and as related further by this Statement of Facts at numbered paragraph 224-226, 241, Bechtel National prepared a comprehensive study (inclusive of material and energy balances, equipment lists, and process economics) for the use of the Process to co-produce methanol and power. The 1988 Bechtel study established that the Process could be used to generate syngas for making methanol.

103. In 1991, Bechtel National produced a comprehensive study of the Process (inclusive of material and energy balances, equipment lists, and process economics) for the use of the Process to co-produce synthetic gasoline made from methanol using the MTG Process and electric power. The 1991 Bechtel Study established that the Process could be used to generate syngas for making methanol and the methanol converted to synthetic gasoline.

104. As stated by the Bechtel National 1991 study in its Summary (see Exhibit 4):

"The Calderon Methanol/Gasoline and Power Process represents a unique combination of carbonaceous feed pyrolysis, combined with hot gas treating to produce a syngas for conversion to methanol/gasoline and a byproduct fuel gas for power generation."

105. As indicated by Exhibit 2, page 3, the issue in coal to liquids is "quantity of and quality of liquid products."

106. Plaintiff states that, based on a 1991 study of the Process by Bechtel National, the yield of synthetic gasoline and power from one ton of coal using the Plaintiff's Process together with the MTG Process is 51 gallons of synthetic gasoline and 1340 kWh.

107. Plaintiff states that, in the time period 1991 through the present, the costs of producing synthetic gasoline made from methanol produced from the Process's syngas would have been competitive with conventional U.S. gasoline prices and the costs of producing electric power from lean gas produced by the Process would have been competitive with prices from pulverized coal-fired generating stations.

108. As stated by Exhibit 2, page 5, a coal-to-liquids plant using the MTG Process will have its yields and capital costs dependent on coal quality (including ash content, moisture content, sulfur content, and heating value).

109. Plaintiff's Process can utilize any type of coal.

110. Not all gasification technologies can use any type of coal.

111. An issue that has proven important for the commercial application of coal gasification for liquid fuels and power is the variety of coals that coal gasifiers are capable of utilizing. A gasification technology's limitations as to the types of coals it is able to use can have a significant impact on the economics of its operation, given that coal costs (including coal transportation costs) are one of the more significant operating costs for a coal gasifier.

112. The coal use flexibility of the Process has significant commercial value, in that it enables the Process to address a larger portion of the market for coal gasification: the Process's use of different types of coals maximizes fuel supply options and allows for the Process's installation in a wide variety of coal-resource rich geographical areas.

113. A critical technical issue in the gasification area is the type of coal preparation and feeding system required by the coal gasifier.

114. Plaintiff's Process does not require any coal preparation or pre-treatment, other than crushing the coal to minus 3 inch pieces.

115. Oxygen-blown entrained flow gasifiers such as the gasification technologies demonstrated at the DOE-funded IGCC projects at Polk Power Station (Florida) and at Wabash River Station (Indiana) utilize very finely ground coal entrained in water or gas.

116. Oxygen-blown entrained flow coal gasifiers that utilize a coal slurry require a high ratio of water to coal (in the Polk Power Station and Wabash River Station IGCC projects, the ratio was 40% water to 60% coal), which presents a significant energy efficiency penalty in the operation of the entrained flow coal gasifiers as well as necessitating extensive coal preparation and water treatment facilities.

117. The use of oxygen-blown entrained flow systems also affects the ultimate hydrogen-to-CO ratio of the raw gas produced by the coal gasifier. The tables below redact gas quality information from a DOE technical report on the DOE-funded Polk Power Station IGCC Project and a DOE technical report on the DOE-funded Wabash River Power Station IGCC Project, and

shows the hydrogen-to-CO ratio of these coal gasifiers:

| | Polk Power Station IGGC Coal as Fuel | | Wabash River Station IGCC Coal as Fuel |
|---|---|---|---|
| Hydrogen | 37.95% | Hydrogen | 34.40% |
| CO | 44.6% | CO | 45.30% |

118. As the required ratio of hydrogen to CO in a syngas used to make methanol (that can be converted to synthetic gasoline without a refinery) is two H2 to 1 CO, both the Polk Power Project syngas and the Wabash River Project syngas are deficient in hydrogen. The Polk Power Station Project's syngas is deficient in hydrogen by 57%, if this syngas were to be utilized to make methanol, and the Wabash River Station Project's syngas is deficient is in hydrogen by 62%, if this syngas were to be utilized to make methanol.

119. The deficiencies in hydrogen referenced by numbered paragraph 118 can be rectified by further processing to increase the hydrogen content; however, methods utilized to increase hydrogen (such as a shift reaction), cause complexity, inefficiency, increased water consumption, production of CO2 (a greenhouse gas), and increased capital cost.

120. Due to the intensive water usage of the coal slurry-based gasification processes, such processes may be more difficult to permit and install in geographical regions where water resources are constrained.

121. The Plaintiff's Process does not require coal preparation or pre-treatment, other than crushing the coal to pieces three inches and under. The Process does not require industrial oxygen necessitating an air separation unit or water usage. It does not require a water treatment plant. Significant commercial value is present in this Process given that it does not require coal preparation or pre-treatment, water usage, or industrial oxygen usage and yet produces a clean

syngas with a hydrogen-to-CO ratio suitable for methanolization and a clean lean gas for efficient power generation via a combined cycle turbine system.

122. Coals that are utilized in coal-fired electric power plants are generally known as "steam coals" as their usage is as a combustion fuel to produce heat to raise steam in the power plant's boilers. By percentage weight of gas matter, steam coals can contain as much as 40% volatile matter (i.e. raw coal gas), of which a significant portion of such gas is hydrogen.

123. The hydrogen and carbon content of coal is a valuable, but as yet largely unutilized, chemical resource for synthetic fuel production in the United States, since nearly one-eighth of the real estate in the United States has coal deposits.

124. At the present, and during the entire time period described by this Complaint, steam coal is and has been typically used as a combustion fuel in the United States for generating power, rather than as a source of hydrogen and carbon monoxide for making transportation fuels such as methanol/gasoline.

125. With few exceptions, almost all of the electric power generating stations in the United States that use steam coal pulverize it and burn it in boilers that raise steam that is in turn fed into a steam turbine, for electric power generation.

126. It follows from numbered paragraph 125 that the United States is not obtaining any significant synthetic fuel benefit from its native coal resources to produce transportation fuels. Further, the commercial potential of converting coal into synthetic gasoline with electric power as a co-product is not being (and during the period of this Complaint was not) realized in the United States, and at all times during the time period of this Complaint was a viable market for the Process.

127. The potential contribution of coal to the decrease of imported crude oil (and the potential scale of a synthetic fuels industry based in domestic coal) is very significant, considering that the energy value contained in coal reserves located in Ohio River Valley states (i.e. West Virginia, Pennsylvania, Kentucky, Ohio, Indiana, and Illinois) represent a domestic energy resource that contains four (4) times the energy value of crude oil reserves located in Saudi Arabia, Iran, Iraq, Kuwait, and the Arab Emirates. Certain states in the western United States also have very large reserves of coal (e.g. Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming).

*(b) Power Generation (Clean Lean Gas Production)*

128. Coals burned in conventional, pulverized coal fired power stations without pollution control devices for sulfur dioxide and nitrous oxides emit these gases as pollutants; sulfur dioxide and nitrous oxides have been linked to acid rain and nitrous oxides to smog.

129. Nitrous oxides are also extremely potent greenhouse gases, and present more heat-trapping effects than carbon dioxide (although carbon dioxide is much more prevalent in the atmosphere as a greenhouse gas pollutant, given the volumes of carbon dioxide generated through anthropogenic activities, especially the burning of fossil fuels).

130. Efforts to utilize coal gasification for power generation have focused on the merits of coal gasification technology as producing a gas under pressure that can be cleaned of sulfur and other pollutants before the gas is combusted.

131. Generally, it is more difficult and expensive to attempt to clean gases of pollutants after they have been combusted, due to the increased volume of the flue gas emission and the heterogeneity of different gases contained in the flue gas emission stream.

132. Combined cycle turbine system technology offers an opportunity to lower $NO_x$ emissions from coal-fired power generation through the use of the increased efficiency in power generation offered by the combined cycle system.

133. Gas turbines are commercially available that are engineered to be able to combust a lean gas.

134. Lean gas combustion has an emissions reduction advantage over gases with higher energy content, as lean gas generally burns cooler than gases of higher heating value and produce less nitrous oxides. Fuels that produce more heat during combustion, as is the case with higher heating value gases, produce more $NO_x$ combustion emissions; conversely, lean gas produces less $NO_x$ emissions, because less heat is produced during combustion due to the lean gas's lower energy value.

135. A lean gas with nitrogen mass can increase the mechanical efficiency of a gas turbine, given that increase in mass serves to increase mass flow.

136. Within the coal gasification area, considerable attention has been given to the use of a higher-heating value coal syngas diluted with nitrogen from an air separation unit, as a means of attaining lower $NO_x$ emissions and increased gas turbine efficiency.

137. As for example, the Tampa Electric Polk Power Station IGCC project funded by DOE utilized nitrogen from an air separation unit to inject into the gas produced by the gasifier, to increase the mass of said gas before it entered the project's combined cycle turbine system.

138. The injection of nitrogen produced by an air separation unit increased reliance on an air separation unit in the coal gasification process tested at the Tampa Electric Polk Power Station IGCC project, which also required large amounts of oxygen to gasify the coal.

139. An air separation unit is an expensive and energy-consumptive system.

140. Plaintiff's Process gasifies char with air, to produce a lean gas, and does not require an air separation unit as it does not require industrial oxygen (i.e. 95% pure oxygen) to gasify coal.

141. As air is primarily nitrogen, Plaintiff does not require an air separation unit for a nitrogen source to produce a lean gas.

142. Plaintiff's lean gas is cleaned of sulfur in a regenerative hot gas clean-up, with a relatively small loss of the thermal energy in the lean gas produced during air-blown char gasification, but such loss is more than made up in energy efficiency by virtue of the hot, highly reactive porous char.

143. The Plaintiff's Process in producing a hot, clean, lean gas with inherent nitrogen mass has significant commercial advantage, as it allows for increased energy efficiency in power generation and lower capital and operating costs, as compared to the oxygen-blown entrained flow coal gasification processes demonstrated at the Polk Power Station IGCC Project and the Wabash River Station IGCC Project.

*(c) Cost Barriers*

144. An issue that has proven to be an obstacle to the widespread commercial adoption of coal gasification is the capital cost associated with coal gasification systems that have to date been demonstrated at a commercial scale.

145. As evidence of the degree to which high capital cost has been a barrier, in the Fall/Winter of 2007-2008, several project cancellations occurred of IGCC projects proposed or under consideration by power companies in the United States (see Exhibit 5).

146. Industry literature cites high cost and reliability issues (see Exhibit 6) as reasons for these cancellations.

147. Plaintiff's Process's capital costs are much less expensive than oxygen-blown entrained flow gasification.

*(d) Refractory Life*

148. A particular reliability concern has been the refractory life of coal gasifiers, which according to a recent, February 2008 press release by DOE's Pacific Northwest National Laboratory (PNNL) has averaged only twelve to sixteen months (see Exhibit 7).

149. PNNL has stated that "Refractory lifespan must be increased before we can realize the promise of clean coal," and is working to provide a model for advancing understanding of refractory behavior that could extend the refractory lifespan to three years. (See Exhibit 7, page 1-2).

150. Plaintiff's Process does not gasify coal, but rather first pyrolyzes the coal to yield a hydrogen-rich gas, and gasifies the remaining char. Char is easily gasified with air, as has been shown by the industrial experience of a blast furnace, which gasifies coke with air.

151. Refractory lining life of a blast furnace is typically ten to twelve years (see Exhibit 8), and under operating conditions that are more abusive on refractory linings than char gasification.

152. Plaintiff's Process is thus reasonably expected to have a refractory lining life of between ten and twelve years, similar to a blast furnace's lining life.

153. Within proposals to the DOE Plaintiff submitted in response to DOE Clean Coal Technology Demonstration Program solicitations, Plaintiff referenced the advantage of an air-

blown char gasifier from the standpoint of refractory life based on the established design of a blast furnace.

*(e) Efficiency*

154. Parasitic power consumption of an example oxygen-blown entrained flow gasifier, such as at the Tampa Electric Polk Power Station, is 63 MW from 303 MW of power generation; the "parasitic" consumption is that required to operate the IGCC system.

155. Use of a coal slurry, large oxygen plant, and cooling the raw gas for desulfurization in an oxygen-blow entrained flow gasification system tied to conventional sulfur recovery and removal systems creates efficiency penalties.

156. As Plaintiff's Process avoids coal preparation or pre-treatment steps as well as usage of water and industrial oxygen, and incorporates a regenerable hot gas clean-up that obviates more expensive, conventional sulfur recovery and removal systems, considerable capital and energy consumption is saved by the Process.

*( C ) Government Action Amounting to a Taking*

*Background of the Inventor and the Process*

157. Albert Calderon, founder and president of Energy Security of America Corporation, is an inventor with over forty (40) United States patents awarded to him for inventions in the areas of coal gasification, hot gas cleaning, metallurgical coke-making, direct iron making and direct steel-making, and related areas. In the 1960's and 1970's he became well-recognized in the steel industry for his innovative, patented scrap-charging equipment for basic oxygen furnaces (see photograph, Exhibit 9).

158. Mr. Calderon's method of commercial implementation of said patented scrap-charging equipment was to enter into contractual relationships with heavy equipment fabricators servicing the steel industry (e.g. Alliance Machine Company and Morgan Engineering in the United States, Birwelco (U.K.), and Cockerill-Ougree (Belgium)) to serve his company, Calderon Automation, Inc., with equipment fabrication services. Calderon Automation, Inc., marketed and sold the scrap chargers, setting the final price for each sales transaction. Mr. Calderon and Calderon Automation, Inc. sold twelve such scrap chargers in the steel industry; these machines, each of which would have cost between $10 and $15 million per machine (in 2008 dollars) depending on machine capacity, were installed at U.S. Steel, Ford Motor Company's Rouge Steel Plant, Armco, Inc., Colorado Fuel and Iron, Jones & Laughlin Steel Company, and Inland Steel. A Calderon scrap charging machine sold to Inland Steel, installed in 1966, is still in operation at its East Chicago plant. In 1980, the Office of Science and Technology Assessment (OSTA) of the Congress of the United States noted Mr. Calderon's "considerable experience with the industry as a designer and builder of steelmaking facilities" in its June 1980 publication entitled, *Technology and Steel Industry Competitiveness.*

159. In 1969, Mr. Calderon was asked by Inland Steel to investigate what could be done in a technologically innovative manner to address air pollution from Inland Steel's by-product coke plants. For ten years, he worked to provide technical solutions to the air emissions problems of conventional by-product coke plants. In 1979, he determined to develop a new process of making blast furnace coke and treating coal gas. Mr. Calderon's work in this endeavor formed in him a base of technical and scientific experience that led him to invent the '430 and '732 patented inventions, as well as the '541 patent's invention.

160. Coking and blast furnace operations in the steel industry have proved over a very long period of time to be reliable methods of production of coal gas, both for chemical usage (in the case of coke oven gas) and as a combustion fuel (in the case of both coke oven and blast furnace gas). The by-product coke plant remains the predominant method of coal gasification in industrial usage today, with over 500 million tons of metallurgical coal gasified annually in by-product coke ovens worldwide. Blast furnace technology has been used in making iron since at least 1650.

*Work Relating to the '430 and '732 Inventions and Hot Gas Cleaning*

161. From 1981 through 1986, Mr. Calderon rented space and worked testing pilot scale equipment during the "graveyard shift" within a local foundry in Bowling Green, Ohio. There, he conceived and actually reduced to practice the coal pyrolysis, char gasification, and hot gas cleaning components of the Process that became the subject matter of the '430 patent. He also worked to produce a specification blast furnace coke, which he accomplished by March, 1982, as confirmed by AK Steel (then Armco, Inc.). Work and pilot testing conducted by Mr. Calderon was at his own expense, as was the equipment cost for the pilot scale testing. Mr. Calderon spent approximately $1.2 million of his own resources (cash as well as "sweat equity") to design and test the pyrolysis, char gasification, and hot gas cleaning elements of the Process during the period 1981-1986.

162. In 1982, Mr. Calderon had developed gas quality data from gas generated by the pyrolysis and hot gas cleaning portions of the Process, at a pilot scale, that showed that the finished, cleaned gas's hydrogen and carbon monoxide ratio was 2 hydrogen to 1 CO. Armco, Inc's research department confirmed the gas quality from an analytical standpoint.

Mr. Calderon's gas quality data showed that the gas exiting from the hot gas clean-up had a hydrogen content of around 60%, and non-detectable levels of hydrogen sulfide. These results were repeated later, in 1986, when Calderon was working with Babcock & Wilcock Company, in efforts to support its first proposal to U.S.DOE under Round I of the Clean Coal Technology Program.

163. In 1984, Mr. Calderon asked Bechtel Corporation to study the Process, which at that time was configured to co-produce blast furnace coke and syngas. Mr. Calderon had requested Bechtel to evaluate the quality of the gas from his tests with Armco, Inc. to determine whether the Process could be used to co-produce liquid fuels with blast furnace coke, with the liquid fuels made from the Fischer-Tropsch process (the Fischer-Tropsch process was utilized by Germany in World War II to produce synthetic fuels from coal in commercial-scale operations, and by South Africa, in commercial scale operations, beginning in the 1970's). Bechtel, however, advised Mr. Calderon in writing that his gas quality data, at a 2 hydrogen to 1 CO ratio, was better suited to making methanol, as "methanol synthesis requires a ratio of H2 to CO closer to 2 which fits Albert's test results and can be used in conjunction with the Mobile process to make high octane gasoline." Bechtel's memorandum also states that "*Bechtel R&E has recently completed a comparison study of end uses of syngas and believes that Fischer-Tropsch processing has a definite cost disadvantage over methanolization*" (emphases added) (see Exhibit 3).

164. The "Mobile" process referenced by the Bechtel 1984 memorandum was the MTG Process. In the early 1980's, the United States Department of Energy, the government of Germany, and a three-member industrial group (including Mobil Research and Development Corporation, Uhde GmbH, and Union Rheinische Braunkohlen Kraftstoff, AG (URBK)) had

together invested in a pilot plant project located at a URBK facility at Wesseling, near Cologne, Germany; this pilot facility had converted methanol to gasoline at a daily production rate of 135 barrels per day, which exceeded the original design target of 100 barrels per day, according to a 1983 DOE press release (see Exhibit 10). Thus, DOE was aware of the availability of the MTG Process and knew of its commercial utility and benefits—as well as the importance to coal-based liquid fuels production using the MTG process of a low-cost, high-hydrogen syngas from coal that did not need additional hydrogen and could be used as the gas feedstock for methanolization--during the time period in which the events of this Complaint occurred.

165. Calderon's combination of pyrolysis with its hot gas cleaning technology resulted in a 2 hydrogen to 1 CO syngas that was in a suitable chemical ratio for making methanol, without "chemically recombining" (or the addition of hydrogen) (see Exhibit 10, DOE's press release discussing the need for "chemical recombination" of coal-derived gas from gasification). The avoided need to "chemically recombine" (or add hydrogen) presents a critically important advantage in liquids fuel production (and specifically synthetic gasoline) of the Plaintiff's process, as it avoids a shift reaction and the lowered efficiency, increased capital cost, increased water usage, and $CO_2$ emissions of a shift reaction.

166. Encouraged by the availability of a process to convert methanol to synthetic gasoline, as well as the possibility of utilizing methanol as a neat combustion fuel for transportation (as was at that time under consideration by the California Air Resources Board), Mr. Calderon pursued further development of an integrated gasification and hot gas cleaning technology that would efficiently co-produce power from coal with reduced $SO_2$ and $NO_x$ emissions and make available large supplies of methanol or synthetic gasoline from domestic coal.

167. In 1985, with the encouragement of Congresswoman Marcy Kaptur (D-Ohio), Mr. Calderon supplied test data to Dr. Stephen L. Rosen, head of the Chemical Engineering Department of the University of Toledo for theoretical confirmation of a critical step in Calderon's hot gas clean-up that Mr. Calderon had observed empirically in operation—the reduction of $SO_2$ to elemental sulfur in the presence of carbon, at a certain requisite temperature. Dr. Rosen confirmed that this reaction would go to completion. Mr. Calderon then filed the patent application in 1985 that resulted in the United States Patent Number 4,609,541, the "hot gas clean-up patent."

168. Also in the 1985-1986 time frame, Mr. Calderon determined to join the step of pyrolyzing coal to gasifying the resulting char with air, to result in two separate gas streams: (1) a high hydrogen "rich gas," which after cleaning and cracking in the hot gas clean-up would have the 2 hydrogen-to-1 CO ratio of Mr. Calderon's earlier test results reviewed by Bechtel (and identified by Bechtel as a hydrogen-to-CO ratio highly suitable for making methanol and, via the Mobil MTG Process, synthetic gasoline); and (2) a "lean" gas resulting from gasifying the hot char that resulted from coal pyrolysis, which after sulfur removal (by way of the hot gas clean-up) and particulate removal could be utilized as a turbine fuel in a combined cycle gas turbine, to generate electric power.

169. Mr. Calderon foresaw that combining pyrolysis with air-blown char gasification and Calderon's hot gas cleaning technology presented several energy efficiency, emissions control, and process advantages over coal gasification processes at that time considered "advanced" and that were being actively funded and supported by the United States Department of Energy.

170. As for example, DOE funded in the early to mid-1980's the "Coolwater Project" in Barstow, California—an oxygen-blown entrained flow gasification project utilizing the same

technology as would later be funded by DOE in the 1990's at the Polk Power Station IGCC Project. The Coolwater Project also utilized very finely ground coal suspended in water, as a coal slurry, and gasified the coal particles suspended in the slurry with large amounts of oxygen in a gasifier. However, the intensive use of water and oxygen created large energy efficiency penalties, and resulted in a synthesis gas that had more CO than hydrogen.

171. For making methanol, the low hydrogen content of the syngas in the coal slurry-based oxygen-blown entrained flow process necessitated increasing the hydrogen content, for example by way of a "shift reaction"—a chemical process that again used water, in which the water's oxygen content is reacted with the CO in the syngas to make $CO_2$, and the resulting hydrogen is added to the syngas. The shift reaction would result, however, in additional $CO_2$ emissions, and increase process complexity, enlarge capital investment outlay, and decrease overall efficiency.

172. Rather than rely on water-based coal slurries and extensive coal preparation, Calderon saw that combining coal pyrolysis with char gasification would allow the use of unprepared, crushed coal and yet yield a high hydrogen syngas for making liquid fuels and a lean gas for power generation. The lean gas, having large thermal mass by way of its nitrogen content, would increase efficiency at the combined cycle turbine; lean gas also burns cooler and creates much lower $NO_x$ emissions than higher-heating value fuels, including natural gas.

173. In addition, the consistency, reliability, and favorable maintenance history of char gasifiers—as known by Calderon through his work in the steel industry and his familiarity with blast furnaces—convinced Calderon that char gasification would provide a reliable means of producing a lean gas for power generation. Blast furnace refractory linings have a life of between 10 and 12 years.

*Initial Attempt at Demonstration Project Funding; Verification by Babcock & Wilcox; City of Bowling Green IGCC Project*

174. In early 1985, Mr. Calderon approached the Babcock & Wilcox Company in Barberton, Ohio, as a potential industry partner for Plaintiff's gasification and hot gas cleaning process. Babcock & Wilcox ("B&W") is a well-known engineering services company and equipment vendor in the field of coal-fired power generation, including for boilers and pollution control equipment. Mr. Calderon and B&W determined to work together to submit a proposal to U.S.DOE in response to its first solicitation under the then brand-new Clean Coal Technology Program ("CCT Program"), authorized through the 1986 Appropriations Act for the Department of Interior and Related Agencies and with program authority codified at 42 U.S.C.S §5903d of the Federal Non-nuclear Energy Research and Development Act of 1974.

175. Exhibit 11, relating to the work between Plaintiff and B&W to verify the Plaintiff's gasification integrated with its hot gas cleaning process, shows that the Process's pyrolysis, char gasification, and hot gas clean-up elements were tested.

176. This pilot testing was done entirely through expenditures of Mr. Calderon, and shows that, by 1985, Plaintiff had conceived and actually reduced to practice the pyrolysis, char gasification, and gas desulfurization steps of the '430 patent, as well as regeneration of the sorbent, and the '541 patented invention for hot gas cleaning.

177. An April 14, 1986 letter from Mr. C.J. Baroch, Vice President, Advanced Energy Systems, to the United States Department of Energy Office of Procurement Operations, and submitted with the Plaintiff's proposal in response to DOE's Clean Coal Technology Program (Round I) solicitation states:

"The Babcock & Wilcox Company has been working with Calderon Automation, Inc. for nearly a year to develop the unique coal gasification process described in the attached Proposal. B&W has been involved in the economic analysis of the overall process and the Bowling Green Integrated Coal Gasification Combined Cycle Project, the conceptual design of the Bowling Green plant, and the R&D to provide both quantitative and qualitative data on the process, and in evaluating and developing various scenarios for financing the project.

B&W considers the gasification process unique, and when integrated with a combined cycle plant, potentially financially competitive with other means of using coal in an environmentally acceptable manner. We are prepared to work closely with Calderon Energy Co. on this project and the eventual commercialization of the technology. B&W is evaluating several alternatives for our involvement in the project, and our exact involvement will be better defined later this year. At a minimum, we will be involved in the R&D program to define the process better, the engineering design of the Bowling Green project, and the design and fabrication of much of the gasification and gas cleaning equipment.

B&W believes the Calderon process and project has potential in meeting our country's long-term energy needs. We support Calderon Energy co. in its efforts to obtain funding from the Clean Coal Technology Program."

178. As a prerequisite to filing a CCT Program (Round I) proposal, Mr. Calderon convinced the City of Bowling Green, Ohio in 1985 to enter into a formal and binding electric power sales contract for a period of twenty-five years from a new Integrated Gasification Combined Cycle power plant which the Plaintiff would build within the City of Bowling Green

179. The Council of the City of Bowling Green, Ohio authorized the Director of Utilities to enter into the electric power sales contract with the Plaintiff (then known as Calderon Energy Company of Bowling Green, Inc.) by way of Ordinance No. 4598, passed October 4, 1985.

180. The electric power sales contract with the City of Bowling Green provided for the sale to the City of 48MWe of electricity from an IGCC project to be constructed by the Plaintiff.

181. In December, 1985, the Council of the City of Bowling Green also authorized an ordinance to issue industrial development bonds for the costs of the facilities, by way of Ordinance 4626, which Plaintiff utilized to provide a portion of the 50% non-federal cost share required by the CCT Program solicitation rules.

182. As submitted to U.S.DOE in response to the 1986 (Round I) Clean Coal Technology Program Solicitation (DE-PS01-86FE60966), Calderon's proposal showed that the Bowling Green Integrated Gasification Combined Cycle (IGCC) project would demonstrate both rich gas production (to confirm at commercial scale the production of a syngas suitable for making liquid fuels, and specifically methanol) and lean gas generation; however, both gases were to be combined and cleaned, for use as a combined cycle turbine fuel to make electric power at the proposed facility. This project configuration was proposed to save capital expense in that neither a methanol plant nor an MTG plant would require construction, and yet the essential quality of the syngas for liquid fuels production would be demonstrated at a commercial scale.

183. In 1986, U.S.DOE rejected Calderon's Clean Coal Technology Program Round I proposal.

184. Plaintiff sought to redress the agency's rejection of its proposal through contacting a member of the Ohio Congressional delegation, who was advised by DOE that the agency did not think the Plaintiff's gasification and hot gas cleaning technology were technically feasible.

*Funding, Construction, and Initial Operation of Process Development Unit;*
*Explicit Evidence of Agency's De Facto Exclusionary Policy in Cooperative Agreement;*
*Bechtel 1988 Engineering and Economic Study;*
*Stearns-Rodgers (United Engineers);*
*1988 Clean Coal Technology Program Proposal (Rejected)*

185. Through the efforts of members of Ohio's Congressional delegation in both the House of Representatives and the United States Senate, federal funding in the eventual amount of $13,315,800 was awarded to the Plaintiff to construct and operate a proof-of-concept Process Development Unit (PDU) in Alliance, Ohio, principally to test the Plaintiff's hot gas clean-up technology, although pyrolysis and char gasification were also ultimately funded to allow for

actual gases from pyrolysis and char gasification to be tested in Plaintiff's hot gas cleaning system.

186. Funding for this $13.31 million federal award was made available through a series of earmarks in Conference Reports, under the DOE Fossil Energy Research and Development account and Department of Interior and Related Agencies Appropriations Acts for the federal fiscal years 1987, 1988, 1990, and 1992.

187. In March, 1987, Plaintiff executed with DOE a Notice of Financial Assistance Award for the Process Development Unit project, bearing the project title "Process Development Unit for Coal Gasification Tied to Regenerative Got Gas Cleanup" (Grant Agreement No. DE-FG21-87MC24138).

188. The first earmark for the PDU project appeared within the Conference Report for the Department of Interior and Related Agencies Appropriations Act for Fiscal Year 1987, House Report 105-09 (October 15, 1996) and named an initial $4,931,000 amount as designated for the "Calderon hot gas regenerative system". The Report's agreement of the managers stated, with respect to this project, the following conditions:

> "1. Funding for the Calderon hot gas regenerative system ($4,931,000) is conditioned on (a) access to an existing test site; (b) non-federal cost sharing of at least percent; (c) a maximum Federal share of at least $8 million; and (d) *a commitment to commercialize the project with no further Federal funding after completion of this feasibility demonstration.*" (emphasis added).

189. At the time this earmark was written, and as indicated by the earmark's project title ("Calderon hot gas regenerative system") the project's focus was the Plaintiff's hot gas cleaning system, as within the technical field of coal gasification, hot gas cleaning was (and still is) considered an important technology for development to facilitate the commercial usage of coal gasification in an IGCC application. Hot, clean gas delivered to the combustion turbine portion of the CCTS affords increased efficiency in the generation of power, and avoids the need to cool

gas for gas cleaning and then reheat it before its entry into the turbine; thus, hot gas cleaning allows for the delivery of a hot, clean gas whose retained thermal energy increases the combustion turbine's efficiency.

190. Plaintiff's sorbent was dolomitic limestone, costing $16/ton—which is relatively inexpensive as a sorbent. Plaintiff calcined the limestone with heat from its Process operations to make lime; lime readily absorbs sulfur in sulfur-bearing gases. Plaintiff's regenerable hot gas cleaning relied on gas cracking operations to lay carbon on the sorbent; upon the regeneration of the carbon-impregnated sorbent at a certain operating temperature, a series of chemical reactions results in releasing sulfur from the lime sorbent as elemental sulfur. The carbon-impregnation of the lime also hardens it and increases its resistance to attrition in material handling operations.

191. Plaintiff's hot gas clean-up had commercial application as a method of cleaning coal-derived gas, in both IGCC and industrial applications (e.g. coal gas from coking operations), separate from its use as the regenerable hot gas cleaning technology that Plaintiff used in its overall Process (as described by the '430 and '732 patents) for co-production of methanol/synthetic gasoline and power.

192. As formulated, the PDU project initially encompassed only the construction and operation of the "Calderon regenerative hot gas cleaning" portion of the Plaintiff's Process; however, after the Conference Report language had been written and the Department of Interior and Related Agencies Appropriation Act for 1987 had been enacted, Plaintiff discussed with Gary Voelker, DOE's Director of Coal Conversion, making actual coal gases in the project, rather than utilizing simulated gases. Mr. Voelker agreed that the project should include both the making and the cleaning of the rich gas from coal pyrolysis and the lean gas from char gasification for the project to be meaningful. Plaintiff and Mr.Voelker agreed that the making of

the rich gas and lean gas would increase the cost of the project, and at that time, it was difficult to quantify the cost increase. Mr. Voelker and Mr. Calderon agreed that initially, only engineering would take place under the Cooperative Agreement in order to quantify the project's cost increase. This information was provided to Mr. Donald Heslop, Contracting Officer, and the Cooperative Agreement, as executed in 1987, provided for both gasification and hot gas cleaning and released funding for engineering.

193. Accordingly, when Plaintiff negotiated its Cooperative Agreement with DOE, the Statement of Work included not only hot gas cleaning but coal pyrolysis and char gasification.

194. As indicated by the Conference Report language quoted in numbered paragraph 194, the earmark condition that "(d) *a commitment to commercialize the project with no further Federal funding after completion of this feasibility demonstration*" applied specifically to the "Calderon hot gas regenerative system."

195. Although the Conference Report language quoted in numbered paragraph 194 *supra* applied only to Plaintiff's hot gas cleaning technology, the DOE, as a condition of entering into the Cooperative Agreement with the Plaintiff for the PDU Project, exacted a considerably larger condition bearing on the Plaintiff's competition for future federal demonstration project funding for the entire Process described by the '430 and '732 patents, when it included the following provision in the Cooperative Agreement at its Part III, Special Terms and Conditions for Research Grants, at its last paragraph, numbered 10:

> "10. In accordance with Congressional language providing funds for this award, this award is subject to the following requirements:...
>
> (4) The Grantee commits to commercialization of the project with no further Federal funding after completion of the feasibility demonstration."

196. As the Statement of Work for the Cooperative Agreement included pyrolysis, char

gasification, and hot gas cleaning, the inclusion of paragraph 10, clause 4 within the Cooperative Agreement's Part III (Special Terms and Conditions) applied to "the project" as defined by the Cooperative Agreement.

197. Plaintiff alleges that DOE's insistence on including said paragraph 10, clause 4 within the Cooperative Agreement's Part III Special Terms and Conditions (without any carve-out for those portions of the Process that did not include hot gas cleaning) evidences an intent on the part of DOE to exclude not only the Plaintiff's hot gas cleaning technology from further federal funding (as for example, in a commercial scale demonstration), but also the Process as a whole (inclusive of pyrolysis and char gasification as tied to Plaintiff's hot gas cleaning).

198. At the time DOE and Plaintiff entered into the Cooperative Agreement, DOE had already issued one Clean Coal Technology solicitation, and additional Clean Coal Technology Demonstration solicitations were planned by the agency.

199. These Clean Coal Technology Demonstration Program solicitations were geared toward the commercial-scale or near commercial scale demonstrations of clean coal technologies, including coal gasification technology.

200. Plaintiff states that its Process was and is a highly competitive coal gasification technology to those that DOE considered and selected under its Clean Coal Technology Demonstration Program.

201. Plaintiff alleges that the purpose and intent of DOE's inclusion of paragraph 10, clause (4) within the Cooperative Agreement's was to extract from Plaintiff an agreement not to compete for Clean Coal Technology Demonstration Program funding—or indeed any future federal funding—for the commercial demonstration of Plaintiff's Process.

202. The Cooperative Agreement's Statement of Work evidences that one of the

purposes of the PDU Project was to provide specifications and cost data that would allow for the development of information to compare the Plaintiff's Process (inclusive of pyrolysis, char gasification, and hot gas cleaning) to "conventional" IGCC configurations utilizing cold gas cleaning" and to "conventional IGCC configurations utilizing zinc ferrite as a hot gas clean-up process." Specifically, section 2.4 "Task 4: Design Scale-Up and Economic Analysis" states:

> "The Grantee shall use the data accumulated in Task 3 to produce a complete set of specifications for the construction of a 48-MW integrated gasification/combined cycle facility using the Calderon process. A comparison shall be made of the Calderon integrated combined cycle (IGCC) concept versus 48-MW IGCC conventional configurations using zinc ferrite as a hot gas cleanup process. The specific IGCC configurations (i.e. gasifier type, etc.) relating to conventional IGCC with cold gas cleanup the COTR; information regarding the location of data pertaining to these designed systems shall be provided by the COTR. A determination shall be made as to the economic competitiveness of the Calderon process at a commercial scale."

203. The fact that the Cooperative Agreement included the section 2.4, "Task 4: Design Scale-Up and Economic Analysis" language requiring development of specifications at a 48MW plant size and economic competitiveness at a commercial scale evidences that the Plaintiff was utilizing the work and data to be generated under the Cooperative Agreement to support its then-planned 48MW project utilizing the Process with the City of Bowling Green.

204. Plaintiff alleges, with more specificity, that DOE's intent and purpose in exacting a commitment from Plaintiff "to commercialization of the project with no further federal funding after completion of the feasibility demonstration" (as provided by paragraph 10, clause 4 of the Cooperative Agreement's Part III) was to attempt to exclude Plaintiff for competing for a Clean Coal Technology Demonstration Program award for the Bowling Green, Ohio 48MW IGCC demonstration project.

205. Said IGCC demonstration project or variants thereof (later projects being increased in scale and including methanol or methanol/gasoline and power co-production), each of which was to be sited in the City of Bowling Green, Ohio, were subsequently proposed by Plaintiff to

DOE for funding under Clean Coal Technology Demonstration Program Solicitations Round 2 (1988), Round 3 (1989), Round 4 (1991) and Round 5 (1992).

206. Each such Clean Coal Technology Demonstration proposal Plaintiff submitted for commercial-scale demonstration project funding for the Process was rejected by the United States Department of Energy, as is also further related by this Statement of Facts.

207. A cokemaking demonstration project that was to have utilized a commercial-scale pyrolysis reactor of Plaintiff's and Plaintiff's hot gas cleanup was at first selected by DOE under a competitively bid solicitation issued under authority of the Clean Air Act, and then denied funding, under questionable circumstances, as is further related by this Complaint's Statement of Facts.

208. Plaintiff alleges that the pattern of repeated funding denials by the DOE was the result of the agency's *de facto* technology policy that categorically excluded the Plaintiff from competing for federal commercial-scale demonstration project funding, and that numbered paragraph 10, clause 4 directly evidences this policy.

209. Plaintiff alleges that this *de facto policy* was applied to the Plaintiff and its Process from the inception of the relationship between DOE and Plaintiff, and has continued over a two decade period, as indicated by the events related further by this Statement of Facts.

210. Plaintiff alleges that the effect of DOE's inclusion of the above-referenced Paragraph 10, clause 4 in the Cooperative Agreement was to extract an agreement from Plaintiff that it would remove the Process from competition for federal funding with other coal gasification processes then known to DOE.

211. Plaintiff alleges that the DOE's inclusion of said paragraph 10, clause 4, is in direct contravention of 42 U.S.C. § 5801d (requiring that DOE provide a reasonable opportunity to small businesses to participate "fairly and equitably" in grants and contracts).

212. Plaintiff alleges that the agency's inclusion of paragraph 10, clause 4 within the Cooperative Agreement is direct evidence of the agency's treatment of the Process in a categorically disqualifying manner for commercial-scale demonstration project funding.

213. Plaintiff alleges that the DOE's inclusion of this paragraph 10, clause 4 within the Cooperative Agreement is also direct evidence of DOE's efforts to delimit competition within its clean coal gasification program, at least as to Plaintiff's Process.

214. A required blanket condition in a funding agreement with a small business that permanently bars the small business technology owner from forever competing or being considered for federal funds for a viable gasification process, where such condition has not been authorized by Congress, is an impermissible, unenforceable contract term because it contravenes public policies of fair and merit-based competition in government financial assistance award processes.

215. Thus, public policies supporting open competition and small business participation in energy technology demonstration projects and the Nonnuclear Energy Act's emphasis on technology innovation provided Plaintiff with reasonable, investment-backed expectations that it would not be unfairly excluded from competitions or awards of commercial-scale demonstration project funding.

216. DOE also included within the Cooperative Agreement a draconian, penalizing

contract termination provision that was unsupported by any language within the Conference Report providing earmark funding to the PDU project. This language, also at paragraph 10, clause (4), read:

> "In accepting this Grant, the Grantee affirms that its agreement dated October 4, 1985 with the City of Bowling Green, Ohio relating to that city's purchase of power is in full force and effect. Grantee shall notify the Contracting Officer in writing immediately in the event that such agreement is in any way altered or terminated and agrees that this Grant shall terminate at that date and that all costs incurred after that date shall be considered unallowable."

217. Such provision placed the Plaintiff in economic peril in the event the City's cancellation of the power purchase agreement occurred during the construction period of the Cooperative Agreement, as Plaintiff would then be completely financially responsible for long delivery items whose progress payments occurred after the City's cancellation date.

218. Other projects selected by DOE under its Clean Coal Technology Demonstration Program were allowed to change sites and restructure.

219. Plaintiff objected to the DOE's inclusion of the last paragraph of Part III's Special Terms and Conditions (i.e. numbered paragraph 10) in a letter dated March 9, 1987 to the contracting officer, Mr. Donald Heslop. Mr. Calderon wrote:

> "We are in agreement with the subject matter of the documents attached to the Award but we do take exception to the last paragraph of Part III, as the language in the bill passed by Congress does not limit the commercialization of the Calderon technology to the City of Bowling Green. It is a fact that we have a power agreement with the City of Bowling Green which is in full force and effect at the present time; however, in the event that such agreement becomes null and void, we still do intend to commercialize the technology at some other location, and in so doing DOE must resume its financial assistance even though the commercial plant may be in a location other than Bowling Green, Ohio."

220. DOE eventually provided a Cooperative Agreement amendment that modified the terms of the Cooperative Agreement's Part III termination clause II to termination in the event that the City of Bowling Green cancelled its power purchase agreement and the Plaintiff failed to

notify the Contract Officer. However, within the amended termination clause, DOE required an alternate "commercialization plan" for approval by the Contract Officer.

221. Albert Calderon again wrote Mr. William Bolyard, DOE's contracting officer, on January 27, 1987 regarding the condition of "commercialization of the project with no further federal funding after completion of feasibility demonstration," when the agency carried this term over into a Cooperative Agreement amendment obligating $3,968,867 in federal funding to the Plaintiff's PDU project. Mr. Calderon wrote:

> 'Item (4) – Commercialization of the project with no further Federal funding after completion of feasibility demonstration.
>
> (a) No further Federal funding—
>
> The language in the Congressional Record, dated October 15, 1986 (H10590) states the following:
>
> "The managers agree that:
>
> 1. Funding for the Calderon hot gas regenerative system ($4,931,000) is conditioned on (a) access to an existing test site; (b) non-Federal cost-sharing of at least 20 percent; (c) a maximum Federal share of $8 million; and (d) a commitment to commercialize the project with no further Federal funding after completion of this feasibility demonstration."
>
> 'Please be informed that Calderon Energy Company, the grantee, reconfirms that it will commercialize the Calderon hot gas regenerative system with no further Federal funding after the receipt of an aggregate award of eight million ($8,000,000.00) as provided for in the language of the Congressional Record. Calderon Energy Company, however, informs the Department of Energy that it intends to make a proposal to DOE under the Clean Coal Program in response to a solicitation due to be issued by DOE on February 23, 1988, to be funded on a 50-50 basis. This forthcoming proposal will be based on a cooperative agreement for innovative clean coal technology which would also incorporate the Calderon hot gas regenerative systems as one of Calderon's several innovative technologies; but, no Federal funds will be requested for the Calderon hot gas regenerative system with which the subject Grant #DE-FG21-87MC24138 is concerned.'

222. Shortly after executing the Cooperative Agreement with DOE in 1987, Plaintiff entered into a subcontract with Bechtel National, Inc. for certain process engineering and

economic assessments for the "proprietary technology of Calderon" in connection with its application to an integrated gasification/conventional combined cycle power generator plant to be constructed in the City of Bowling Green, Ohio; the work Bechtel performed was as a subcontract under Grant Agreement No. DE-FG21-87MC24138.

223. When Plaintiff executed Grant Agreement No. DE-FG21-87MC24138 with DOE, the Process Development Unit project was seen by Plaintiff as supportive of efforts to advance the electric power project in Bowling Green; however, many months after U.S.DOE had rejected the Plaintiff's 1986 Round I Clean Coal Technology Demonstration Program proposal, the City of Bowling Green determined to cancel the long-term electric power sales agreement. Its cancellation was due to two issues: (a) the uncertain time frame as to the availability of the balance of the government funding that would be required to construct and operate the commercial-scale power project; and (b) the unavailability of back-up power supply, as of the time of contract cancellation.

224. Plaintiff determined, however, to persist in its efforts to build a commercial-scale or near commercial-scale demonstration plant and to obtain Clean Coal Technology Program funding, and in 1988, requested Bechtel National to produce a comprehensive engineering and economic study and preliminary engineering estimate (including material and energy balances and equipment lists) for a co-production facility to generate methanol and electricity.

225. Bechtel confirmed that utilizing the Plaintiff's Process, 122 gallons of methanol and 1340 kWh of electricity could be obtained from 1 ton of coal.

226. The Bechtel 1988 Study also provided a comparison of the advantages and disadvantages of the Plaintiff's Process with fixed bed and oxygen-blown entrained flow gasification. Numbered paragraph 241 infra provides sections from the Executive Summary of

the Bechtel National 1988 study, which include said comparison of advantages and disadvantages of the Plaintiff's Process with fixed bed and oxygen-blown entrained flow gasification.

227. The Plaintiff pursued permitting and construction of the Process Development Unit in Alliance, Ohio, on a parallel track, during the 1987-1989 time frame, as development of an IGCC project in Bowling Green. DOE did not obligate funding to start construction of the PDU until January 22, 1988, and at that time obligated only $3,968,000 for the PDU's construction phase. This amount, however, was insufficient to construct the PDU, whose scope had been enlarged to include coal gasification as well as hot gas cleaning. Congress then provided a second earmark of $3,069,000 to the PDU project under the June 16, 1988 conference report accompanying the Department of Interior and Related Agencies Appropriations Bill for 1989, "to complete the Calderon project subject to the cost-sharing requirements of the conference report accompanying the fiscal year 1987 continuing resolution." Due to the piecemeal nature of obtaining funding by way of earmark over a period of years, procurement and construction of the PDU was not able to be started until 1989.

228. Plaintiff also experienced two 10-month delays in the DOE's release of funds earmarked to the Project, one of which occurred during the construction period.

229. Both 10-month delays occurred because the agency withheld funds appropriated for use beginning at the start of the federal fiscal year until the very end of the federal fiscal year for which they were appropriated. In each case of 10-month delay, federal funding appropriated was not released by the agency until August of the federal fiscal year (the federal fiscal year ending on September 30), causing undue hardships to Plaintiff as a small business with limited resources.

230. Plaintiff alleges that the DOE's dilatoriness in releasing funding caused delays for Plaintiff in constructing the PDU and generating data that would help it compete for a Clean Coal Technology Demonstration Program award.

231. The agency's requirement of a "commercialization plan" that was not dependent on further federal funding also resurfaced: a letter from May 22, 1989, written several months prior to DOE's obligation of funding for the PDU in August, 1989, states as follows:

"In our initial letter dated Feburary 16, 1989, we requested that you reconfirm your position regarding commercialization since the agreement with the City of Bowling Green was terminated. In addition, we requested that you provide us with a commercialization plan which details the status of your firm's effort to obtain the necessary commitment for commercialization and provide a schedule of key milestones defining when you plan to achieve some form of commitment towards commercialization. As an example, this commitment should include a power purchase agreement, a joint venture agreement to build a commercial-scale plant, or a cooperative agreement with an industrial firm to retrofit a commercial plant. *This commercialization plan should be prepared with the understanding that no additional financial support will be provided by the Federal Government.*" (emphasis added.)

232. This May 22, 1989 letter further confirms that the DOE's official position was one of a categorical disqualification of the Process from consideration or competition for federal commercial-scale demonstration project funding—no matter the merit of the Process.

233. Plaintiff alleges that the agency policy evidenced by the Part III Special Terms and Conditions at its numbered paragraph 10 and this May 22, 1989 letter is a *de facto* technology policy applied specifically to Plaintiff's Process in a discriminatory and categorically disqualifying manner, whose impact was to protect other coal gasification processes eventually selected for award by DOE from competition for federal funding and to deny Plaintiff's Process federal funding.

234. Plaintiff alleges that this *de facto* technology policy, applied to the Plaintiff's Process, contravenes both federal financial assistance policies requiring competitive, merit-base selection of federally funded energy technology demonstration projects and the Congressional

directive at 42 U.S.C. § 5908 that small businesses be provided a reasonable opportunity to participate in energy technology demonstration projects. Plaintiff alleges that this *de facto* technology policy regulated its ability to commercially demonstrate and commercially apply the Process, since no other source of funding besides DOE funding was available to construct and demonstrate a first-of-a-kind commercial scale demonstration of a coal gasification process.

235. Plaintiff alleges that, in regulating and preventing commercial scale demonstration and commercial application of the Process, said *de facto* technology policy also violates Plaintiff's reasonable, investment-backed expectations under the Bayh-Dole Act, 35 U.S.C. § 200 et seq., which allocates patent rights to subject inventions to the small businesses that made them.

236. Plaintiff alleges that, in regulating and preventing commercial scale demonstration and commercial application of the Process, said *de facto* technology policy also violated Plaintiff's reasonable, investment-backed expectations under 35 U.S.C. § 203, which provides a right of first practical application to the small business retaining patent rights to a subject invention.

*Clean Coal Technology Round II Proposal (1988);*
*Bechtel 1988 Study*

237. Plaintiff submitted a second proposal under the Clean Coal Technology Program (Round II) in 1988, for the co-production of electric power and methanol, again to be sited in Bowling Green, Ohio; and was again rejected by DOE.

238. Plaintiff was joined in its 1988 CCT Program proposal by United Engineers and Constructors, Inc. (Stearns Rogers Division), owned by Raytheon Company. Stearns Roger's

supporting letter, dated April 22, 1988 by its James P. Sheehan, and addressed to Mr. J. Allen Wampler, Assistant Secretary, Office of Fossil Energy, states:

> "We have been reviewing the Calderon technology with its several innovative features which provide for reducing or eliminating SOx and NOx emissions, using most any type of coal. The technology should be acceptable for repowering existing coal fired boiler systems with minimal changes to existing facilities."
>
> "A successful demonstration plant would open the door to commercialization, primarily with utilities that burn coal. The technology should prove of value in the generation of electric power, as well as provide a clean transportable fuel (methanol) which could reduce oil import needs.
>
> "We ask that you strongly consider the Calderon technology as one of the best opportunities for the clean coal program."

239. Plaintiff's Clean Coal Round III (1988) proposal contained a comprehensive study of the Process prepared by Bechtel National, which included material and energy balances, equipment lists, and an economic study of the Process.

240. This 1988 Bechtel Study contains a comparison of advantages of the Process in relation to conventional gasification technology.

241. Reproduced below are salient sections of the Executive Summary of the 1988 Bechtel Study:

**"Section 1**

**INTRODUCTION AND BACKGROUND**

This report presents a brief summary of a conceptual design development, cost estimate, and economic assessment for a minimum-capacity commercial-scale facility integrating the Calderon Coal Gasification technology with convention methanol and combined cycle power generation processes.

The conceptual process-design assumptions have been derived from test data developed by Calderon during a series of atmospheric pressure batch pyrolysis and gas-treating tests. These data have been supplemented by literature data for pyrolysis gas yields and compositions. Mechanical design assumptions related to commercial scale and elevated pressure and temperature conditions reflect a number of preliminary concepts adequate for cost estimating but requiring verification for any final design.

This study has identified a number of process and mechanical design concepts requiring further development/demonstration during the forthcoming Process Development Unit (PDU) design and test program. The economic evaluation has shown that, assuming the major design assumptions are supported by a successful PDU development program, the Calderon process has potential as a cost-effective and environmentally acceptable technology to co-produce electrical energy and liquid transportation fuel from high-sulfur domestic coal.

The commercial-scale conceptual design that is the subject of this report integrates the Calderon process for coal gasification with methanol and power production. In the Calderon gasification process, the coal is first pyrolyzed to yield a readily gasifiable char. The resulting pyrolysis gases are cracked and simultaneously desulfurized to yield a clean syngas. The residual char is then gasified with air to yield a low-Btu gas which is subsequently desulfurized for use as fuel.

The Calderon process concept developed from early attempts by Mr. Calderon to develop a continuous retort for the production of metallurgical coke. In this process, coal was fed upwards through a vertical, heated wall tubular retort. The retort was also capable of producing a partially coked coal or char that could be fed hot by simple overflow directly to a down-flow gasifier.

By segregating the gases produced during the coal pyrolysis from that produced during char gasification, it was possible to produce a medium-Btu gas rich in tars and hydrocarbons. By using either oxygen or air for the char gasification, it was possible to produce either a medium- or low-Btu gas without condensable hydrocarbons.

Pyrolysis tests were conducted using runs-of-mine high-sulfur coals, blends of coal with as much as a 33-percent corn, and blends of coal with shredded tires. The blend of corn with coal appeared to accelerate the pyrolysis and thus had potential to increase the retort pyrolysis capacity.

During the atmospheric pressure testing of the coal pyrolysis and char gasification, Mr. Calderon employed beds of dolomitic lime to remove the sulfur from the gases produced. As an outgrowth of this testing, he discovered that the exposure of these gases to the lime at elevated temperature would result in complete cracking of their tar and hydrocarbon constituents, depositing carbon on the lime. Burning the carbon off the lime with air was accompanied by evolution of the absorbed sulfur in elemental form.

In August of 1987, Bechtel National, Inc. (BNI) completed a preliminary design and cost estimate, and outlined a test program for a PDU needed to verify the process concepts for commercial application of the Calderon technology.

The PDU design was intended to simulate the commercial-scale equipment components needed for coal pyrolysis, char gasification, and cleanup of the product gases. It was sized to process 1 ton of coal per hour, which was estimated to be the capacity of a single commercial-sale pyrolysis module (tube).

## Section 2

## DESIGN BASIS AND DESCRIPTION

The commercial-scale conceptual design described here integrates medium-Bu content syngas preparation and its conversion to methanol with low-Btu content fuel gas preparation and its conversion to electrical power. The scale selected by Calderon (1,600 tons/day coal feed) is that consistent with a medium-scale demonstration of a single gas preparation and cleanup module.

The design is based on a greenfield siting of this integrated facility which includes coal pyrolysis/gasification, hot-gas cleanup and sulfur recovery, methanol production and combined-cycle power generation, together with the necessary support facilities. The quantities of feeds and products and the overall configuration of the facilities are illustrated in Figure 2-1.

The site selected by Calderon for the design basis is in an industrial area of Bowling Green, Ohio, adjacent to an interstate highway interchange. By the end of 1988, the municipality shall have installed a supply of potable water and domestic sewage to the plot boundary. An access point for delivery of electricity to the local utility is situated at the corner of the selected site. Provision is made in the conceptual design to receive feed coal and distribute product methanol and by-product sulfur and slag by truck transport over the interstate highway system.

The proprietary Calderon process, illustrated in Figure 2-2 (for which a patent has been issued and others are pending), combines novel approaches for the production of energy products from coal: pyrolysis, gasification, and integrated regenerative hot-gas cleanup. The hot-gas cleanup is unique in that it directly yields elemental sulfur.

The feed coal is first pyrolyzed (heated) to yield a crude hydrocarbon-containing rich gas. This gas is then cracked and treated for sulfur removal to yield a syngas (hydrogen and carbon monoxide). The syngas provides feedstock, which is converted to methanol for use as a liquid transportation fuel.

The low-volatile-content char remaining from the pyrolysis is gasified by partial combustion with air to yield a dilute (low-Btu) gas. This gas is cleaned for sulfur removal and then used to fuel a gas turbine with steam cycle to produce electric power.

### 2.1 PROCESS COMPONENTS

The major components of the Calderon process are illustrated in the configuration shown in Figure 2-2. This process provides a unique and efficient integration of the following:

- <u>Coal Pyrolysis</u>. The coal is heated to drive off its volatiles content (rich gas)
- <u>Char gasification</u>. The hot char from the pyrolysis is gasified by partial combustion with air to yield a hot, low-Btu-content gas (lean gas). The ash

content of the coal is converted to a molten, glassy slag. The lean gas produced has minimal $CO_2$ content as a result of its discharge through hot char, which converts $CO_2$ to CO.

- Rich Gas Cracking and Desulfurization. The gas is passed through a moving bed of lime, where the hydrocarbons are cracked and sulfur is absorbed by the lime and moisture and $CO_2$ are converted to CO.

- Lean Gas Desulfurization. The lean gas is passed through a moving bed of lime, which captures the sulfur content of the gas.

- Sulfur Recovery. The lime is regenerated by partial combustion with air, releasing sulfur vapor. The sulfur is condensed and recovered in molten form.

- Slag Removal. Molten slag from the gasifier is quenched in water and settled from the resulting coarse, sand-like slurry.

The significant features and potential advantages of the Calderon process for co-production of methanol and electrical power are summarized below.

## 2.2 PROCESS FEATURES

The Calderon coal gasification/gas cleanup process has a number of unique features that make it highly suitable for the co-production of electrical power and liquid transport fuel (methanol). These features are discussed below and contrasted to alternative oxygen-blown gasification processes.

### 2.2.1 Positive Displacement of Coal Feed

The positive displacement (ram) feed can accommodate unprepared (run-of-mine) caking or non-caking coal which is mechanically forced through the horizontal pyrolyzer.

By contrast, entrained and fluidized-bed systems require finely ground coal; moving-bed systems require sized coal and limit acceptable quantities of coal fines; and neither system employs positive force to move the coal through the processing zone.

### 2.2.2 Horizontal Pyrolysis (Pre-treatment of Gasifier Feed)

The positive displacement feed of coal into the horizontal pyrolyzer consolidates the coal and coal fines into a porous, fractured, non-caking, non-swelling char suitable for gasification. The horizontal configuration retains the pyrolysis liquids formed in contact with the heated char, favoring their cracking to lighter components, which are then removed as vapor (rich gas).

By contrast, fluidized systems may require non-caking coal or pre-treatment of the coal to prevent agglomeration within the bed. Moving-bed gasification of coal may require non-caking coal and/or mechanical stirring devices within the bed to prevent coal agglomeration. Moving-