bed coal gasifiers normally produce liquid by-products (tars), which are difficult to separate, may require upgrading, and can contain cancer-causing agents.

2.2.3 Air-Blown Moving-Bed Gasification

The use of air for the gasification of the char eliminates the considerable investment cost and energy requirements for the oxygen supply that has been conventionally employed in pressurized gasifiers. It also eliminates the need for steam feed to moderate gasifier temperatures. The dilute gas produced (lean gas) is particularly suitable for, or limited to, onsite uses such as the production of electrical power. The air-blown system also integrates well with the proposed hot-gas cleanup system and eliminates the need for separate high-temperature heat recovery (high-pressure steam generation). The large char inventory of the moving-bed gasification, together with the use of air, facilitates safe control of the gasifier oxidant feed.

By contrast, the oxygen-blown systems normally require cooling of the hot gases from the gasification. The medium-Btu gas produced is entirely usable either for chemical synthesis or for fuel applications, and its higher heating value makes it suitable for medium-distance offsite use. The entrained-flow systems require precision control of the oxygen/coal ratio to maintain safe gasification conditions.

2.2.4 Integrated Hot-Gas Cleanup Sulfur Recovery

The moving-bed hot-gas cleanup system separately desulfurizes the lean and rich gases, cracks the hydrocarbon constituents of the rich gas, recovers elemental sulfur, and produces additional lean gas from the regeneration of the lime absorbent.

By contrast, the conventional cold gas cleanup systems (solvent scrubbing) require separate processing for sulfur recovery. Separate recovery and handling of coal liquids (from moving-bed systems) may also be required, together with extensive wastewater treating to accommodate soluble organics. The hot-gas cleanup systems proposed to date for commercial application do not recover the sulfur in elemental form. The cold recovery processes require a separate sulfur conversion process.

2.2.5 Environmental Impacts

The environmental impacts of the process are minimal and readily controlled. The process is a net consumer of water; thus, treatment is needed only for normal blowdowns associated with steam generation. Because the process does not isolate the normal distillation products of coal (tars, phenols, ammonia, etc.), the environmental control of these materials is also not required.

Solids wastes are limited to lime fines bled from the hot-gas cleanup system and the gasifier slag. The quantity of lime waste is expected to be small and will be combined with the coal feed for ultimate discharge as a component of the slag. The slag is a fused, sand-like material similar to bottom ash from coal-fired power plants and will normally be acceptable for disposal in landfill or road-base aggregate.

Atmospheric emissions are limited to dust from coal handling and the $SO_2$ and $NO_X$ resulting from fuel-gas combustion for power generation. Since run-of-mine coal is used, coal processing and associated dust emissions are minimized. The cleanup of the fuel gas prior to combustion is expected to control the sulfur emissions to levels lower than currently mandated by EPA. The use of low-Btu gas in the combustion turbines is expected to facilitate the control of $NO_X$. The gasification and subsequent gas cracking conditions are such that $CO_2$ is predominately converted to CO.

By contrast, conventional moving-bed systems produce an aqueous waste containing water-soluble organics requiring extensive biological treatment. Entrained-flow and fluidized bed systems normally produce an ash discharge containing some unconverted carbon and some ash fines. Both of these can impair utility of the ash and its ease of disposal.

### 2.2.6 Potential Productivity

The rich and lean gases from the Calderon process can be combined and used for production of power only (no methanol production).

However, selective use of the cracked pyrolysis gas for methanol production and the low-Btu gas from air-blown char gasification for power generation is preferred. This co-production provides (per ton of the as-delivered design coal) some 122 gallons of methanol and 1,340 kWh of electrical power.

**Section 3**

## CAPITAL AND OPERATING COST ESTIMATES

### 3.1 CAPITAL COSTS

The capital costs estimates prepared are of order-of-magnitude, venture guidance precision, reflecting the conceptual nature of the design. They are based on first-quarter 1988 equipment, material, and labor prices. The total capital requirements for the project are divided into the following two cost components:

| | ($MM) |
|---|---|
| Total plant investment | $165 |
| Other capital requirements | 15 |
| Total capital requirement | $180 |

### 3.1.1 Total Plant Investment

The estimate of total plant investment is based on the conceptual design process, engineering and site information. Estimating methods consistent with the conceptual nature of the design were

employed and rely on informal vendor contact as well as extrapolation from current Bechtel information.

The estimate reflects first-quarter 1988 price-and-wage levels. No allowance has been made for future escalation. The costs exclude allowance for funds during construction (AFDC), which are developed separately in the economic assessment.

Included in the estimate is a contingency allowance for the uncertainty that exists within the conceptual design quantity pricing for the technology under construction. The contingency assigned to the gasification portion of design reflects its first-of-a-kind developmental status.

The distribution of the total plant investment between the major process and support facilities is illustrated in Figure 3-1."

*Government Concern for Energy Security and Alternate Fuels;*
*'430 Patent Filed; 1989 Clean Coal Technology Program Proposal (Rejected);*
*'732 Patent Filed*

242. In March, 1987, a year before Plaintiff submitted its 1988 CCT Program (Round 2) Proposal, DOE completed a comprehensive study to assess the energy security implications of declining domestic oil production and rising imports. The study had been prepared by DOE at the request of President Ronald Reagan.

243. This comprehensive energy study was summarized and high-lighted by Mr. Gary E. Voelker, Director, DOE Office of Coal Conversion, in his keynote address to the 1988 Contractor's Review Meeting held May 10, 1988 at DOE's Morgantown, West Virginia Energy Technology Center.

244. As related by Mr. Voelker in his written speech, delivered at the 1988 Contractor's Review Meeting held in May, 1988 (and which Mr. Calderon attended):

"One of the conclusions of the study is that, if current trends continue, the U.S. and its principal allies are likely during the next decade to become more dependent on oil, much of which in ever-increasing percentages will come from the unstable Persian Gulf.

"As stated in the Energy Security Report, 'Growing dependence on Persian Gulf suppliers has important implications for the economic, foreign policy, and national security interests of the United States.'

"Key projections show U.S. oil imports increasing from 5.2 million barrels per day (about 33% of consumption) in 1986 to between and 8 and 10 million barrels per day (about 50%) in the 1990's at prices of $30 to $35 dollars per barrel. That equates to a flow of $100 billion per year from the U.S....

"When oil prices fell during 1986 and 1987, that was good economic news to energy consumers. Unfortunately, this also portended two items of potential bad news for the future.

"First, the world as a whole will once again turn toward a small number of countries to fulfill its vital requirements for oil.

"Second, we have been given a false sense of security by the lower prices and the adequate supplies.

"Another conclusion of the Energy Security Report is that the most promising technological opportunities for further reductions in oil consumption rest in the development of alternative fuel systems.

"You may ask, 'what does this have to do with coal gasification and gas stream cleanup?' I believe it has everything to do with coal gasification and gas stream cleanup."

"We all know about the advantages of environmental superiority, efficiency, modularity, and phased introduction which are causing more and more utilities to consider Integrated Gasification Combined Cycle as the power generation technology of the future...

*"I would also like to suggest that because of its versatility, coal gasification and gas stream cleanup can also play a vital role in the establishment of an alternate fuels industry in the U.S.*

*"The route from coal to coal-liquids can take three paths:*

*"First, coal can be gasified and then the gases can be changed to liquids by "indirect liquefaction". The overall economics of these liquids are critically dependent upon the efficiency and cost of coal gasification and the associated cleanup.*

*"I would like to suggest that we pursue the development of advanced concepts for the production of clean, less expensive synthesis gas that can be effectively integrated with liquid synthesis subsystems....*

*"Third, coal can be converted to a liquid and partially to a solid and a gas by techniques that are being pursued in our gasification "coproducts" program.* I believe this approach has tremendous potential. The trick will be to get some acceptable value for all of the product

streams. We have some excellent approaches being pursued in this area and look forward to positive results....

"As I said earlier, I consider gas stream cleanup a critical part of the gasification system....*A critical role of gas stream cleanup is to remove sulfur compounds from the gasifier output*....By the year 2000, imports [of elemental sulfur for domestic industrial consumption] are projected at a level of 4 million tons per year or about 30%....Sulfur recovered from new coal facilities would not swamp the market but if *all* (emphasis in original) produced elemental sulfur, they would just about meet the projected year 2000 shortfall....

"I make these observations as a way of suggesting that the *researchers in the gas stream cleanup program should be looking hard at the trade-offs between concepts that produce elemental sulfur* and those that produce wastes that must be disposed of...." (emphases added)

245. After hearing Mr. Voelker outline what he, as the Director of DOE's Office of Coal Conversion, perceived to be the appropriate priorities for the coal gasification and gas stream cleanup research and development activities of DOE and its contractors, Mr. Calderon quite shortly, after the May 10, 1988 DOE Contractor's meeting, on May 26, 1988, filed the patent application for the '430 patent, "Method of Producing and Treating Coal Gases."

246. The application (Appl. No. 198,862) for the '430 patent described the pyrolysis of coal to produce a volatile matter and a char and the gasifying of the char to produce a relatively low Btu gas, and the cleaning of gases, with the first, high hydrogen "rich gas" used to support transportation fuels production and the second "lean gas" to support power generation.

247. Mr. Calderon had conceived and actually reduced to practice these critical steps of the invention (i.e. pyrolysis of coal to produce a volatile matter and a char, gasifying the char to produce a low Btu gas, and cleaning of the gases from sulfur), which are described by the '430 patent, through his test work conducted earlier in the 1980's, and these critical steps formed the subject matter of the Plaintiff's 1988 CCT Program Round 2 proposal submitted to DOE.

248. In 1989, enough funding was finally provided to begin procurement and construction of the PDU. Alongside procurement and construction activities at the PDU,

Plaintiff continued in its quest to organize and fund a commercial-scale demonstration project for the Process.

249. Plaintiff applied to the Federal Energy Regulatory Commission (FERC) and in 1989 obtained a small power producer certification, which would enable it to sell electricity from the proposed Bowling Green, Ohio co-production facility (for methanol and power co-production) to the local utility, Toledo Edison (now First Energy). This step Plaintiff took to substitute for the power sales agreement that the City of Bowling Green had cancelled.

250. Concern for dependency upon Persian Gulf oil supplies was not only expressed in the Energy Security Report commissioned by President Reagan; in June, 1988, the House of Representatives' Committee on Appropriations made the following observations in its conference report accompanying the "Department of the Interior and Related Agencies Appropriations Bill, 1989":

"The Committee is concerned with the lack of emphasis on substitute liquid fuel research and development in the face of growing dependence on imported oil for the liquid products needed in the transportation sector. The largest ultimate potential source for such substitutes is coal, and the Committee has provided significant funding to encourage increased research effort on coal liquid products. Large increases are also recommended in other areas such as oil shale, and liquids from coal gasification and natural gas. If liquids equivalent to those in use today can be obtained at reasonable costs, they will provide viable alternatives to other substitutes such as alcohol fuels, without the need to alter completely the transportation infrastructure."

251. In 1989, Plaintiff again submitted a proposal to the DOE under the "Clean Coal III Innovative Technology Program" for a project entitled "Calderon Coal Conversion Process for Cogeneration of Electric Power and Methanol Transport Fuel."

252. Plaintiff's Public Abstract for the CCT Program Round 3 shows that, in 1989, DOE had as "technology type" among the types of projects considered: "Conversion (gasification, liquefaction, coprocessing, etc.)" and Plaintiff identified its project as fitting under that category,

as well as "sulfur and nitrogen oxide reduction" and "other" (which Plaintiff identified as "Reduction of Greenhouse Gases").

253. Plaintiff's 1989 CCT Program Proposal was rejected by DOE.

254. DOE selected an oxygen-blown entrained flow gasification project to be installed at a Florida power plant owned by Tampa Electric Company, the Polk Power Station IGCC Project. This selected project did not (despite the concerns expressed in the Energy Security Report initiated by President Reagan and by the House Committee on Appropriations) have any liquid fuels co-production and produced electric power only.

255. In 1990, Mr. Calderon filed a divisional patent application of the '430 patent, that resulted in the '732 patent, which addresses the re-powering of existing coal-fired power plants to co-produce power and methanol or synthetic gasoline, as a readily-available means of accelerating the displacement of oil imports by synthetic fuels production that Congress expressly sought through its enactment of the Nonnuclear Energy Research and Development Act of 1974 (*see, e.g.* 42 U.S.C. 5905(b)(3)(E)).

*PDU Construction Completion;*
*Secretary of Energy Watkins' Visit to the PDU; Outbreak of the Persian Gulf War;*
*Bechtel National of Study of the Process for Co-Production of Synthetic Gasoline/Power*
*Clean Coal Technology Round 4 Proposal (Rejected)*

256. In the summer of 1990, Secretary of Energy James Watkins made a site visit to the Plaintiff's Alliance, Ohio PDU, which at that time was about 95% completed in construction. Secretary Watkins, a retired admiral in the Navy, was quoted by the *Alliance Review*, the local newspaper, as referring to the Calderon Process as "very fascinating technology" (see Exhibit 12).

257. Mr. Calderon wrote to Admiral Watkins one month later, in the wake of the invasion of Kuwait and prior to the start of the Persian Gulf War, to urge:

"I envision building such generic plants like the "Liberty" ships built during World War II by the United States....[i]f we contract to sell the electric power at 5¢/kWh, we can produce methanol from coal in an environmentally acceptable manner for the equivalent of $13/barrel of crude oil. In converting the methanol to gasoline via the known MTG process, the price would increase to the equivalent of $18.60/barrel of crude oil....In view of what is happening in the Middle East, it is evident that we must work towards energy independence, and a process like ours may be one good way to help attain it. I therefore recommend that you form a task force at DOE to work with us to put our development on a fast track. We are prepared to recruit the necessary manpower to work around the clock....I would appreciate your thoughts."

(See Exhibit 12, which also includes photographs of Liberty Ships to illustrate the history and example of commercial-scale mass production to which Mr. Calderon was referring in his letter to Admiral Watkins.)

258. Admiral Watkins wrote Mr. Calderon in October, 1990, congratulating him on the completion of construction of the PDU and advising:

"With regard to your suggestion that we form a task force at the Department of Energy to put the further development on a fast track, it seems more appropriate to consider the next steps after successful operation of the PDU. We wish you good luck in the ensuing 18-month period of operation and evaluation of this unit, and look forward to hearing of the success of the Calderon process."

(See Exhibit 12).

259. Plaintiff returned in 1991 to Bechtel National, Inc. to commission an engineering study for use of the Process for the co-production of power with synthetic gasoline, given events in the Middle East. Bechtel National produced an engineering study (complete with material and energy balances, equipment list, projected construction and operating costs, and sensitivities) that confirmed that Plaintiff's Process could competitively co-produce synthetic gasoline and power from coal.

260. By 1991, DOE had made all the project selections for coal gasification that it was destined to make under the five solicitations it would issue under the Clean Coal Technology Program. Not a single gasification project selected was for the co-production of transportation fuels with power, although the urgent need for substitutes for petroleum had been identified by the Department of Energy Organization Act (in 1977), repeated more recently by the Energy Security Report commissioned by President Reagan (in 1987), by the House Committee on Appropriations (in 1988), and by DOE's own Director of the Office of Coal Conversion (in 1988). In 1991, Plaintiff submitted yet a fourth proposal to DOE in response to Round 4 of the Clean Coal Technology Program—this time, to co-produce transportation fuel in the form of synthetic gasoline with electric power.

261. Raw materials proposed for conversion under the Plaintiff's Clean Coal Technology Round 4 proposal were a combination of high sulfur coal with smaller amounts of chopped scrap tires and out of condition kernel corn, to demonstrate the technology's ability to use coal, biomass, and scrapped tires as a solid waste; the Plaintiff had successfully co-fed and gasified combinations of coal, scrap tires, and out of condition kernel corn at the PDU.

262. DOE again rejected Plaintiff's 1991 CCT proposal.

*Start of Operations at the PDU;*
*Argonne National Laboratory Personnel- Authored 1991 DOE Report to Congress on "Coal Refineries" Independently Confirms Bechtel National Yield Data and Advises that "Demonstration of the Technology at Near-Commercial Scale May Warrant Further Investigation"*

263. In 1991, operation of the PDU was underway—start-up had begun in the Fall of 1990, but the facility was idled over the winter months of 1990-1991. Plaintiff had recruited an operating staff for the PDU, and operations in 1991 focused on sub-systems. Insufficient

funding had been provided to operate the PDU as an integrated unit. Plaintiff encountered another, thirteen month-long delay between the time that it completed sub-system testing and its operation of the PDU in a 48-hour continuous steady-state test, which integrated operations (although the rich and lean gases were conjoined and cleaned through one hot gas clean-up, due to insufficient funds to construct and operate two hot gas clean-up systems). The delay was due to winter shut-down as well as the need for funding to be appropriated specifically for the 48-hour steady state test, on a year-ahead basis.

264. In July 1991, Argonne National Laboratory prepared a report on behalf of DOE, as required by Congress, on "Coal Refineries: A Definition and Example Concepts;" Congress had "directed DOE to '...prepare an analysis of the coal 'refinery' concept in which coal is processed to provide a suite of marketable products such as transportation fuels, electricity, byproducts such as sulfur, and carbon-based fuels'". Argonne included the Calderon Process in DOE's Report to Congress on coal refineries, introducing it as:

> "The Calderon concept is designed to convert the volatile matter of the coal to a clean synthesis gas suitable for production of liquid fuels along with a residual char which is ultimately converted to a fuel gas for power generation. The notable differences between the Calderon Process and conventional devolatilization techniques which aim for co-production of liquid fuels and electricity, are that run-of-mine coal is not pretreated before use (such as by comminution for particle size reduction or moisture removal), air instead of oxygen is used, and the product gases are not cooled before cleanup as required for conventional combined cycle systems. The product gases are treated to recover elemental sulfur by a proprietary hot gas cleanup process devised by the Calderon Energy Company. The energy content of the coal is not partially converted into steam during a cooling stage (as in a conventional cleanup) but is retained in the product gases undergoing hot gas cleanup."

> "This process is being advanced by the Calderon Energy Company of Bowling Green, OH as a potential cost-effective means of producing a clean synthesis gas and fuel gas from run-of-mine high sulfur coal. These clean gases would be suitable in applications such as methanol production and electric power generation."

265. The DOE Report to Congress drafted by Argonne National Laboratory personnel also independently confirmed the yield of the Process at 0.4 pounds (0.06 gallons) of methanol and 0.67 kWh of electricity from a pound of typical high sulfur coal (as delivered), which closely matched the yield developed by the Bechtel National 1988 study of the Process.

266. This DOE Report to Congress notes, under the heading "Likely Applications":

"This coal refinery is an example of a coal refinery in which electric generation is coupled with coproduction of commercial chemicals. Coproduction of electricity and chemical products in such a manner can potentially reduce the cost of electric power generation [9]. It would be expected that the most likely commercial entities interested i2 owning and operating a coal refinery based on the Calderon process would be the electric utility industry or independent power producers. The final application of this coal refinery concept will primarily depend on the successful commercial-scale demonstration of the process, the required capital investment, and the overall process economics."

267. Under "Research Needs," the DOE Report to Congress drafted by Argonne National Laboratory personnel notes:

"Demonstration of the technology at near-commercial scale may warrant further investigation."

*48-hour Continuous Integrated Operation Test at the PDU as a Decision-Point, and Government Acceptance of 48-Hour Test; Review and Recommendations by Dr. David Archer, DOE's Independent Consultant; Clean Coal Technology Round 5 Proposal (Rejected)*

268. In 1991, for the federal fiscal year of 1992, the House Committee on Appropriations (Department of Interior and Related Agencies Subcommittee) included $1.4 million as an earmark to support a continuous integrated operating period for the Process Development Unit, $400,000 was subject to retainage by the Government conditioned upon the successful completion of the continuous test period.

269. The Plaintiff and the Department of Energy (Morgantown Energy Technology Center) entered into a letter agreement that defined "particular terms relating to the 48 hour test....in order that both Calderon Energy and the Department of Energy clearly understand each other with regard to interpretation of the Congressional language requiring 48 hour continuous operation."

270. The letter agreement provided for a definition of integration that focused on the operation of the pyrolysis, char gasifier (including slagging operations), and the "hot gas desulfurizer," with the standard set of cleaning the product gas to EPA-promulgated New Source Performance Standards values for pulverized coal-fired power plants (cited by the letter agreement as set forth at 40 C.F.R. 60, Subpart D, and specified by the letter agreement as removal of 90% of the sulfur in the coal utilized). The required 48-hour duration of the continuous integrated test this letter agreement defined as "integrated operation of 48 hours without mechanical failures causing plant shut-down for not longer than 8 hours total in the 48 hour period and with process conditions not to deviate more than 10% of the average established steady state conditions for more than 40 hours of the 48 hour period."

271. This letter agreement looked toward a future decision by DOE to provide further funding, with this decision conditioned upon the success of the 48-hour continuous operating test, as evidenced by the letter agreement's author, Mr. Daniel Cicero, Project Manager, Coal Conversion, Power Systems Technology Division, statement at the letter's concluding paragraph, "I hope that this agreement will help to ease the decision to proceed when the 48-hour demonstration test has been achieved."

272. In October 1992, Plaintiff successfully completed the 48-hour continuous operating test run. Plaintiff offered to Mr. Daniel Cicero, Project Manager, who was present during the test

run, to continue to operate the PDU past the 48th hour of test operations, to provide for additional operating time as the PDU could have continued steady state operation and clocked additional hours, if required by the Government. Mr. Cicero, however, accepted the 48 hours of operating time, and asked that the PDU demonstration test be orderly terminated and the PDU shut down. Plaintiff complied, and within a few days thereafter received a letter dated October 19, 1992 from the Contracting Officer, Mr. G. William Bolyard, stating that "Based on Amendment A018 to Grant NO. DE-FG21-87MC24138, the Contracting Officer provides notification of the government's acceptance of the 48-hour test and authorizes the expenditure of the $400,000 provided therein."

273. The use of the $400,000 released to Plaintiff from the $1.4 million FY 1992 earmark was utilized by Plaintiff with DOE's concurrence to demonstrate the regeneration of the hot gas clean-up's spent sorbent, in a separate non-integrated test run in April, 1993.

274. The 48-hour test operation established the workability of the pyrolysis, char gasification, and hot gas desulfurization portions of the PDU.

275. The success of the 48-hour test as well as Plaintiff's work at the PDU was well-documented, and by an external source. Writing to Mr. Calderon on November 16, 1992 Dr. David Archer, U.S.DOE's independent consultant for the PDU project for an 18-month period and a professor at the Department of Mechanical Engineering, Carnegie Mellon University (Pittsburgh), states that he "thoroughly studied your process," "reviewed the material and energy balances both for the PDU and the proposed demonstration plant," "considered and commented on your proposed PDU modifications; inspected the PDU both before and after the modifications were made," "reviewed operating procedures for the PDU and assisted in the preparation of test plans," "analyzed your overall gas cleaning process and prepared a report

with an accompanying spreadsheet calculation of material and energy balances, thermodynamic calculations, and heat transfer calculations," "prepared a spreadsheet calculation for analyzing the data from your PDU operations," "visited the PDU on numerous occasions and witnessed your 48-hour continuous run," and "received and analyzed operating data from this run; prepared a report on my findings."

276. Dr. Archer's November 16, 1992 letter to Mr. Calderon further states:

"With the concurrence of Mr. Cicero, the results of my work have been made available to you—in particular, the report on your gas cleaning process, the two spreadsheet calculation procedures, and the report on the analysis of the 48 hour continuous run. I want to thank you and your hard working staff for your complete cooperation. And I congratulate you all on your achievements to date."

"Best wishes to you in your pursuit of a Clean Coal project award."

277. Referring to Dr. David Archer's report on his analysis of the 48-hour continuous test, Dr. Archer writes in the "Conclusions" portion of the report:

"The Calderon fuel gas cleaning process has significant potential for the removal of higher hydrocarbons, H2S, and particulates from high temperature (1400-1800 F) coal gasification products. The regeneration of the limestone based sorbent with recovery of the sulfur removed from the fuel gases as liquid S is a particularly attractive feature of the process. The information available for process evaluation indicates that Calderon gas cleaning is environmentally and economically effective. Further work at the PDU (and perhaps also in the laboratory) is required to provide data on the continuous operation of the process."

278. Under "Recommendations," Dr. David Archer's report reads:

"….Consideration should also be given how the Calderon gas cleaning process might be integrated with other coal gasification processes in plants currently scheduled for design and construction. A number of IGCC power plants are now part of the U.S. DOE Clean Coal program. It is possible that the Calderon technology might be beneficially adapted to some of these plants—particularly those now contemplating hot gas cleaning."

279. In the "Summary" portion of Dr. David Archer's report:

"The Calderon gas cleaning process for high temperature, gaseous fuels derived from coal, both rich and lean—high and low Btu, has been studied. Material and energy balances, thermodynamic analyses, and heat transfer calculations have been carried out for the limestone

based sorbent calcination, hydrocarbon cracking, H2S absorption, and sorbent regeneration processes. (The liquid S recovery and the particulate removal processes have yet to be studied.) The overall fuel gas cleaning processes have been demonstrated in bench scale, batch apparatus. Continuous operation of the cracking and absorption processes has been achieved at the Calderon PDU; the operation of the regeneration and S recovery processes at the PDU is now planned. Additional data are required for process optimization and equipment scale up."

280. These passages from Dr. David Archer's November 16, 1992 letter to Mr. Albert Calderon and from Dr. Archer's report, read together with the letter agreement between DOE and Plaintiff dated August, 1992, and letter of acceptance for the 48 hour demonstration test from the Contracting Officer dated October 19, 1992, show that essential components of the Process had been proven at the PDU to be workable. These components included pyrolysis, char gasification (including slagging), and the hot gas desulfurization portion of the Plaintiff's hot gas cleaning process.

281. Thus, as of the 48-hour continuous test's completion, the workability of these portions of the Plaintiff's technology had been established and any government position that these portions were not workable or were technologically infeasible would not have been technologically or scientifically supportable.

282. Plaintiff provided a copy of Dr. David Archer's report to DOE in its 1992 Clean Coal Round 5 proposal, as a part of its application.

283. In the Spring of 1993, Plaintiff separately operated the sorbent regeneration step of the hot gas clean-up, at the PDU, and successfully regenerated the limestone sorbent. This regeneration trial lasted only a few days and was not sufficiently long to allow for collection of the sulfur in a liquid form; however, in bench scale test work that Plaintiff performed for Sun Refining and Marketing (now Sunoco) in 1991, ten regenerations of sorbent were achieved and elemental sulfur was collected. This written reconfirmation by Sunoco of the hot gas clean-up's

workability (including its sorbent regeneration step) had been included as part of the materials Plaintiff submitted with its 1992 Clean Coal Technology Round 5 proposal.

284. Plaintiff's earlier hot gas clean-up test work with Babcock & Wilcox, conducted in 1985, also had shown the sorbent regeneration and elemental sulfur release of Plaintiff's hot gas clean-up (see Exhibit 11). Babcock & Wilcox reported that the purity of the sulfur sample collected from sorbent regeneration and sulfur release was 97.8% elemental sulfur (see Exhibit Exhibit 11). Babcock & Wilcox's confirmation of the hot gas clean-up's workability, including regeneration of the limestone sorbent and release of elemental sulfur, was included within Clean Coal Technology proposals submitted by Plaintiff to DOE.

285. Despite Plaintiff's progress at the PDU and its achievements in showing the workability of critical components of the Process at a PDU-scaled operation, Plaintiff was advised by Mr. Daniel Cicero, DOE's Project Manager, that his management within the DOE had advised him "not to encourage Albert."

286. At about the same time as the PDU project, the Department of Energy through its Morgantown Energy Technology Center (a DOE national laboratory), had been working to develop a hot gas clean-up system utilizing zinc-based sorbents. The laboratory utilized zinc ferrite initially, but subsequently used a zinc titanate sorbent when the zinc ferrite failed to withstand repeated regenerations; the zinc-based sorbents cost several thousand dollars per ton as compared to the dolomitic limestone that Plaintiff utilized as a raw material (which it calcined to lime).

287. Deposition of carbon onto the lime during the cracking of hydrocarbons and impregnation of carbon into the lime at high operating temperatures hardened the lime, so that it could be conveyed and handled without excessive degradation.

288. Dr. David Archer, DOE's independent consultant, recommended in writing to DOE that the Calderon hot gas clean-up be considered for IGCC projects in the Clean Coal Program contemplating hot gas cleaning.

289. On December 7, 1992, Plaintiff submitted a final proposal to DOE under Round 5 of the Clean Coal Technology Program, again for co-production of transportation fuel in the form of synthetic gasoline and electric power. The '430 patent and the '732 patents formed the subject matter of this application, together with Plaintiff's hot gas cleaning process (the '541 patent). Plaintiff submitted as a part of its 1992 CCT Program Round 5 proposal the complete engineering study, including material and energy balances, cost estimates, and equipment lists, that it had paid Bechtel National to prepare in 1991, for a co-production project for synthetic gasoline and electric power from Ohio high sulfur coal.

290. DOE rejected Plaintiff's CTTD Program Round 5 proposal.

*Long-Term Impact of the Clean Coal Round 5 Rejection: Inability to Commercially Apply '430 and '732 Patented Inventions*

291. When DOE rejected Plaintiff's Clean Coal Technology Round 5 project, it closed the window on commercialization of Plaintiff's Process and the '430 and '732 patented inventions.

292. After this rejection, Mr. Calderon met with the Morgantown Energy Technology Center's Director, to determine if there were other sources of funding within DOE to advance the technology. Mr. Tom Bechtel advised Mr. Calderon that DOE was not interested in other coal gasification processes, other than those it had already selected under the Clean Coal Technology Program. None of these gasification technologies, as previously stated by this Complaint, were specifically designed to co-produce methanol/synthetic gasoline and power from coal.

293. DOE did not issue any other solicitations under the Clean Coal Technology Demonstration Program, after Round 5. DOE did not issue a solicitation providing for grant funding for near-commercial scale or commercial scale demonstration projects utilizing coal gasification technology for co-production of fuels and power until 1999, when it issued the Early Entry Co-Production Plant solicitation. This solicitation was issued seven years after CCTD Round 5, and 12 years after President Reagan's 1987 Energy Security Report.

294. Plaintiff submitted a proposal to DOE under the Early Entry Co-Production Plant solicitation and was again rejected. DOE selected three projects, two of which utilized oxygen-blown entrained flow gasification technology.

295. Over the next sixteen years, Plaintiff attempted to interest power companies and industrial companies to directly invest in the Process or form a project, such as South Carolina Electric & Gas, Northeast Utilities, Ohio Edison, First Energy, NRG, Detroit Edison, and others. However, the lack of a commercial-scale demonstration project—particularly in light of the construction and operation of the IGCC technologies DOE had selected under the CCTD Program—proved to be a stumbling block. Private sector companies simply were not prepared to take on the risk of a first-of-a-kind commercial scale plant, without government assistance to ameliorate the perceived technical risk.

296. Plaintiff has attempted other means of continuing to fund work to advance the Process, as related in the balance of this Statement of Facts--however, these attempts also ultimately proved unavailing, due to other DOE actions that effectively suppressed the commercial-scale demonstration of the Process, as related further in this Complaint.

270. DOE's attempts to preclude other gasification technologies from achieving commercialization, in favor of those gasification technologies it has historically supported by

way of the Clean Coal Technology Program it conducted in the 1980's and 1990's, is further evidenced by recent loan guarantee regulations that prohibit use of the loan guarantee program for "demonstration projects." These loan guarantee regulations will have a practical sequencing effect, in that qualification for a loan guarantee is only available if the process has been demonstrated, but first-of-a-kind demonstration projects are expressly prohibited from loan guarantee support (and DOE controls the timing and availability of the pre-requisite demonstration project funding).

271. By controlling both the availability of demonstration project funding as well as the availability of loan guarantee support, DOE is in the position of regulating both the timing and pace of technological demonstration and commercial market entry in the coal gasification area, such that it can, if it selects to, preference only technologies that have received prior DOE funding. Under DOE financial assistance regulations, financial award decisions, which are discretionary, are not able to be appealed within the agency.

272. Nor would the availability of a case-by-case review of financial assistance awards, even if clearly available, capture an agency pattern or policy, on a broader and more categorically preclusive level, of selectively administering direct financial assistance programs in coordination with a loan guarantee or tax credit program, to carry out an implicit, preclusionary technology policy that favors already-funded processes.

273. As to the Plaintiff's Process, DOE's administration of its financial assistance activities in the coal gasification area have had just this intentional type of preclusive and preferentially technology-entrenching effect, such that by way of this practical form of regulation, DOE has foreclosed utilization of Plaintiff's process for a sufficiently long period as to have effected a taking of Plaintiff's patent rights.

*Application for Funding Under the Coke Oven Emission Control Program Authorized by the Clean Air Act Amendments of 1990 (42 U.S.C.S 7412(n)(2)); Steel Industry Support; Selection for COEC Award Under Competitive Solicitation; DOE Effort to Deny Funding After Selection*

274. In the spring of 1993, Plaintiff learned of an up-coming competitive solicitation to be issued by DOE in coordination with U.S.EPA (Office of Air Quality, Planning, and Standards") under the "Coke Oven Emission Control" (COEC) program, authorized by the Clean Air Act at 42 U.S.C.S § 7412(n)(2).

275. The COEC Program was mandated by Congress, as a result of negotiations with the steel industry in connection with promulgation of the Clean Air Act Amendments of 1990. As a mandatory program, 42 U.S.C.S § 7412(n)(2)(A) states that:

> "….the Secretary of the Department of Energy and the Administrator [of the Environmental Protection Agency] ***shall** jointly undertake a 6-year study to assess coke oven production emissions control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities.* In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens *as well as alternatives to existing coke oven production design.*" (bolding and emphases added)

276. The COEC Program authorized appropriations of "$5 million for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph" 42 U.S.C.S 7412 (n)(2)(D).

277. A single COEC solicitation was eventually issued by DOE, having an issuance date of November 11, 1993 and a close date of November 11, 1994.

278. The COEC solicitation stated that it had $3.04 million in available program funds.

279. In order to obtain funds to continue to operate the PDU and further develop the Process's pyrolysis step (as applied to blast furnace coke-making) and Plaintiff's hot gas

cleaning (as applied to cleaning and cracking coal gas from coking), Plaintiff approached the American Iron and Steel Institute (AISI) Technical Committee on Coke Oven Practice, to request whether AISI would be willing to co-sponsor with Plaintiff a proposal to DOE under the COEC Program. Plaintiff made a presentation at the May, 1993 meeting of the AISI Technical Committee on Coke Oven Practice, at which representatives of many of the major United States and Canadian integrated steel producers in operation at that time were present.

280. Plaintiff distributed at this AISI meeting of the Technical Committee on Coke-making Practice a letter dated May 3, 1993 from Dr. David Archer, DOE's independent consultant to Mr. Daniel Cicero, DOE's Project Manager for the PDU project. Dr. Archer's May 3, 1993 letter stated that "It seems to me that the Calderon process can be effectively adapted to coke production and volatiles processing—yielding a maximum quantity of valuable products while minimizing environmental impact."

281. Dr. Archer's May 3, 1993 letter further states:

"Continued operation of the PDU would be important in determining the optimal process parameters for coke production—the information required to carry out a preliminary design and evaluation of a coke plant and its equipment based on the Calderon coal process. PDU operation will also provide data on

the operating temperature, pressure, and coke production rate of the pyrolyzer

the temperature and flow rates in the lime pebble beds for processing the coal volatiles to enable their use as a clean synthesis gas or medium Btu fuel gas—cracking, desulfurizing, removing particulates.

the temperature and flows in the lime pebble regeneration process—integrating the production of elemental sulfur and hot lime pebbles for further processing of the coal volatiles.

282. Dr. Archer's May 3, 1993 letter states in conclusion:

"My experience with you and your associates, outlined in my past letter to you, Albert, gives me confidence in your capability to devise an innovative cokemaking process, to adapt the Calderon PDU to the process, and to operate it successfully. ***I believe also that such an operation would also be of considerable value in developing the range of applications originally envisioned for the Calderon coal process....***" (emphasis and bolding added)

283. Funding to support a coke-making project at the Alliance, PDU would advance the pyrolysis and hot gas cleaning portions of the Plaintiff's technology, through a commercial-scale demonstration of these Process elements. Further, it would be valuable in "*developing the range of applications originally envisioned for the Calderon coal process*…"; as indicated by the '430 patent, these applications included synthesis gas production to support making methanol and synthetic gasoline from the volatile matter of coal.

284. At the conclusion of the May, 1993 meeting of AISI's Technical Committee on Coke Oven Practice, this AISI Committee determined to create a technical working group to follow the Calderon Process and Calderon's hot gas cleaning, as applied to making blast furnace coke and a high hydrogen desulfurized syngas for steel mill use—and as an alternative coke-making technology to the byproduct coke oven.

285. In January, 1994, LTV Steel's Vice President of Purchasing, Engineering, and Strategic Planning issued a letter of intent to Plaintiff that outlined the provisions of a long-term coke purchase contract from a commercial-scale facility that would employ the coal pyrolysis and gas cleaning portions of the Process (which eventually became known within the steel industry as the "Calderon Cokemaking Process"), under which LTV would purchase 500,000 tons per year of specification blast furnace coke and desulfurized fuel gas for use in reheat furnaces.

286. With technical assistance from LTV Steel, Plaintiff prepared a proposal to submit to the still-open COEC program solicitation. The COEC proposal provided for funds to be provided to the Alliance, Ohio PDU for additional operation of the existing pyrolysis tube and hot gas clean-up, and modification of the PDU facility to install and demonstrate one full-size

commercial-scale reactor to produce metallurgical coke, with hot gas cleaning of the coal gas produced during coal devolatilization to make coke.

287. Plaintiff's COEC proposal also described that the work in Alliance, Ohio would support the engineering and construction of a commercial-scale facility producing 500,000 tons of blast furnace coke per year and desulfurized syngas, to be installed in Cleveland at LTV Steel's Number 1 Cokeplant, consistent with LTV Steel's January, 2004 letter of intent providing for long-term coke purchase by this steelmaker.

288. LTV provided a letter of support (dated April 20, 1994) for inclusion in the Plaintiff's COEC proposal; this letter and a subsequent letter dated July 29, 1994, confirmed that LTV Steel was prepared to provide $750,000 of in-kind support with respect to the Alliance PDU project that Plaintiff proposed under the COEC program, which had a $3.04 million federal cost share, as proposed.

289. As a part of its proposal, Plaintiff also submitted a letter from the AISI Technical Committee on Coke Oven Practice, indicating that this AISI Committee was prepared to serve as an advisory committee for the proposed coke-making demonstration project at the Alliance PDU to be funded by the DOE award.

290. Plaintiff timely submitted its proposal to DOE on May 10, 1994, under the COEC program solicitation. Under the solicitation's rules, DOE was required to exercise its best efforts to render a decision with respect to a submitted proposal within 90 days of the agency's receipt of the proposal.

291. In late August, 1994, Calderon became concerned that the federal fiscal year end was approaching and DOE had still not made a decision regarding the proposal Calderon had submitted. On September 2, 1994, LTV Steel sent a letter to Congressman Louis Stokes to

"request your assistance in clarifying with U.S.DOE the extent of federal funds available under the referenced U.S.DOE solicitation for Fiscal Year 1994. Our inquiry is occasioned by certain delays in the U.S. DOE proposal selection process and in view of the approaching termination date of the federal fiscal year, September 30, 1994."

292. On September 20, 1994, Mr. Dale Siciliano of the Pittsburgh Energy Technology Center issued a written notice to the Plaintiff that its application entitled "Calderon Cokemaking Process/Demonstration" "has been selected for negotiation, and discussions with your organization are anticipated in the near future."

293. On October 24, 1994, DOE issued a "Techline" faxed public announcement that announced that "DOE is preparing to team with the Calderon Energy Company of Bowling Green, Ohio, to assist it in developing a novel cokemaking technology that could give the U.S. Steel industry an innovative approach to reducing coke oven emissions."

294. The Techline also stated:

"Through its Pittsburgh Energy Technology Center, DOE is working with industry to develop processes that will enable coke producers to meet strict new emission standards set by the 1990 Clean Air Act Amendments. Coke, a product of coal, is used as a fuel to produce the heat and chemical reactions needed to reduce iron to molten iron in the blast furnace method of iron production, the primary method of iron-making used by integrated steel mills around the world.

During conventional cokemaking, toxic gases are generated which must be controlled to meet federally mandated emissions levels.

Calderon's technology is intended to eliminate those emissions because its novel coking process is conducted in a completely closed system. The system is engineered so that no open transfer points exist between processing steps, such as coal charging, coke pushing, and quenching. A conventional coke facility has several open spaces where toxic gases can escape.

The process as a whole produces no air emissions, water discharges, or solid wastes, as a result of basic process innovations over conventional technology. These innovations are also anticipated to reduce capital and operating costs.

Calderon will use an existing half-size coking tube while it designs and constructs a full-size, commercial scale tube. Modifications will be made to a development unit at Alliance to accommodate the commercial-scale tube. The development unit was built for tests in an earlier project funded by the Department of Energy, the State of Ohio's Coal Development Office (Ohio Department of Development), and Calderon.

When operational, the unit will produce coke using blended coal shipped from LTV Steel Company. Coke produced during the facility tests will be delivered to LTV for product quality testing.

A commercial scale coking facility would employ an assembly of tubes each tube of the same size as that to be tested at the Alliance facility. The number of tubes in the assembly would vary according to the coke facility's production capacity.

*Gases produced from the coking process will be thermally cracked (broken down) and sulfur in the gas will be removed using a hot gas clean-up system developed by Calderon. The system produces a clean-burning fuel gas or synthesis gas.*

*The hot gas cleanup uses an inexpensive sorbent material which can be used repeatedly to avoid solid waste creation. The sorbent release elemental sulfur, a marketable product, when regenerated.*

Conventional coke-making facilities employ a chemical plant—known as a by-product recovery plant—and complex air emissions control facilities to process coke oven gas. By-product recovery plants often emit hazardous air pollutants.

*The system's product gas will meet all applicable emissions standards for sulfur dioxide and nitrogen oxides when combusted as a fuel.* In addition to eliminating the gases emitted between processing steps in a conventional coke oven, Calderon's process would also eliminate leaks from oven doors found in most conventional facilities.

Data collected during the 16-month testing period will be used for the design of a 500,000 ton-per-year commercial coke facility. Calderon anticipates that the modular construction of its technology—and its capital cost savings—will aid in the domestic manufacture and export of process equipment, and the construction of facilities in the United States and abroad.

Preliminary estimates are that a commercial Calderon facility could save as much as $95 million in capital costs, by reducing the capital cost of a 500,000 ton per year facility from $225 million for a conventional coke facility to approximately $130 million for a Calderon coke facility. (Emphases added.)

295. Plaintiff was advised in writing by DOE that the Techline public announcement "…is sent out to a listing of approximately 3,000 via fax".

296. Less than one month after DOE's laudatory Techline announcement, on November 14, 1994, Plaintiff received a written notice from the Department of Energy, Pittsburgh Energy Technology Center, rescinding "the recent pre-award cost authorization letter dated November 9, 1994." DOE's November 14, 1994 letter stated: "We have been advised that DOE funding for your project has not been certified as of November 14, 1994."

297. DOE advised Plaintiff verbally that the COEC Program funding was not available, and that the COEC Program funds had been allocated by the Office of Fossil Energy to other programs funded under the U.S.DOE's FY 1995 budget, effective September 29, 1994, in response to an annual OMB "offset directive" received by DOE in May or June of 1994. U.S.DOE did not seek an appropriation for the COEC Program for FY 1995.

298. Plaintiff was advised by DOE that Plaintiff's COEC project was the only project selected for award that had been affected by the OMB "offset directive."

299. Plaintiff and LTV Steel sought the assistance of Congressman Ralph Regula (Ohio-16th District) to return the COEC program funding. Plaintiff's letter to Congressman Regula relating the information it had received from the Pittsburgh Energy Technology Center regarding the COEC program funds and their usage by the agency, while a competitive solicitation was open and Plaintiff had been selected for award negotiations.

300. On December 22, 1994, LTV Steel provided a letter of support to Congressman Regula stating the importance of an alternative cokemaking technology for the United States steel industry.

301. Reference within LTV Steel's December 22, 1994 letter is made to the evaluation of the Calderon technology by Thyssen, one of the two world leading cokemaking technology companies, which "reviewed the technology and believes in its potential." Plaintiff had visited Thyssen's cokemaking and by-product plant engineering group in Bochum, Germany in December, 1994, and Thyssen had agreed to support Plaintiff's new coke making process.

302. U.S.EPA Region 5, Air and Radiation Division's Mr. Edward Wojciechowski (Iron and Steel Expert) also provided to Plaintiff a positive memorandum of the Process as applied to cokemaking and gas cleaning.

303. By late February, DOE had "re-granted" funding for the Calderon Cokemaking Process, as indicated by letter of February 27, 1995 from LTV Steel to Congressman Regula. DOE and Plaintiff executed a Cooperative Agreement regarding the cokemaking and gas cleaning project in May, 1995.

304. In August 1996, DOE's Contract Technical Representative for the Calderon Cokemaking Project wrote the following in an internal memorandum to Mr. William Mundorf, of the Pittsburgh Energy Technology Center:

> "Bill: I appreciate your concern about Calderon and your worry why they have only spent $200,000 of the $3,000,000. To answer your question about are they another government contract candidate for termination, the answer is NO. In my 18 years of dealing with the government, Mr. Calderon is one of the best contractors that I have worked with. He has been trying very hard to get backers, and Bechtel in San Francisco is about to join in. He has two strong supporters (LTV Steel and Alliance Machine). He is trying to get each to contribute $3 million to his program. Bechtel wants the demo reactor to be 1/10 the size of a commercial facility; a huge jump from what we awarded. If more of our contractors had the commercial insight as Calderon, DOE would be a whole lot better off. He works his butt off and spends our money wisely. *He was sharp enough to realize that DOE was pulling one on him when we tried to deny him the award. Remember our management/headquarters spent the money for something else. We are lucky that he did not really expose PETC for some questionable dealings.* I feel that this is one program that DOE will get their money's worth. His main goal is commercialization, not just a government study that fades away. Working with Calderon is a very positive experience." (emphasis added)

305. Plaintiff alleges and shows that the DOE memorandum language quoted in numbered paragraph 304 and the chain of events in numbered paragraphs 291 through 298 evidence that the agency's headquarters intentionally tried to deny the award after the solicitation had been competitively bid and the Plaintiff had been selected for award negotiations.

306. Further, Plaintiff would have been unable to demonstrate at commercial scale the pyrolysis and hot gas cleaning elements of the Process, without the federal funding indicated as needed by the steel industry representatives and LTV Steel.

307. The events related by numbered paragraph 305 and 291-298 show that DOE actively attempted to preclude and block the development and demonstration of critical sub-systems of Plaintiff's gasification process (i.e. Plaintiff's pyrolysis and hot gas cleaning) as applied to cokemaking.

308. Plaintiff alleges that the attempt to deny the cokemaking project award is further evidence of DOE's *de facto* technology policy categorically denying Plaintiff the ability to obtain federal funding for commercial-scale demonstration of its Process (including critical sub-systems thereof) from DOE.

309. The evaluation by Bechtel of the Calderon coke-making process referenced by Mr. Michael Baird's August, 1996 memorandum turned out to be the first step in a series of steps required to assemble industry investment in the Calderon Cokemaking Process, especially given the increase in size of the Project. These steps included a successful coking trial at the Alliance PDU with Bethlehem Steel and U.S.Steel in 1997, followed by an industry evaluation of the Process with participation by Bethlehem, US Steel, and LTV.

310. The Plaintiff successfully re-started the Alliance, Ohio PDU after more than four years of being mothballed, and operated the coal charging and pyrolysis portions of the PDU to produce specification metallurgical coke.

311. The cokes made at the PDU met specifications set by U.S. Steel and Bethlehem Steel for acceptable blast furnace coke; specification coke was made with metallurgical coals used in by product slot ovens and as well as a metallurgical coal that could not be safely used in a by-product slot oven because of its excessive wall pressure.

312. The work accomplished at the PDU was significant enough in the steel industry that a technical paper prepared by Bethlehem Steel and U.S.Steel research groups on the Calderon

Process as applied to coke-making garnered a Second Place Kelly Award for engineering excellence in 1999.

313. Plaintiff's cokemaking technology and hot gas cleaning were included within the 1999 edition of the industry's treatise on steel-making, *The Making, Shaping, and Treating of Steel*, published by the American Iron and Steel Engineers (AISE) (see Exhibit 13).

314. The technological success at the PDU demonstrates that the pyrolysis portion of the Process was reliable, as it was operated for three months on a continuous basis, after having been mothballed for more than four years.

315. The PDU coke-making trials also demonstrated the versatility in coal usage of the Process and the capabilities of the coal charging system, as coking coals have swelling properties.

316. On April 15, 1999 Mr. Malcolm Roberts, Vice President and Chief Technology Officer for Bethlehem Steel Corporation, submitted testimony to the U.S. House of Representatives Appropriations Subcommittee on Interior and Related Agencies for the Fiscal Year 2000 Appropriations to "Demonstrate the Commercial Feasibility of the Calderon Cokemaking Process," requesting $20 million in federal funding to match a 50% $20 million commitment to construct and operate one full-scale Calderon coking reactor and associated hot gas clean-up (see Exhibit 14).

317. Appropriations by way of earmarks to the project were obtained in FY 2000 and FY 2001, at $7 million for each of these two years, with a third appropriation earmark (it was understood by Plaintiff and the industry group) of an equal amount forthcoming for fiscal year 2002.

318. Earmarks provided to Plaintiff's coke making project were to the "steelmaking feedstock account," a new account created under the Conference Report for fiscal year 2000, under the Fossil Energy R&D account, given that DOE had allowed the lapse without any appropriations request of all but $3.14 million of an original $30 million authorized for appropriation by 42 U.S.C.§ 7412(n)(2)(D).

319. During the period 1994 through 1996, DOE did not request any appropriations for the Calderon Cokemaking Project (or for the COEC Program), although authorizations for $5 million for each year were still effective under 42 U.S.C.§ 7412(n)(2), for fiscal years 1995, 1996, and 1997, and other general authority for coal conversion exists within the Nonnuclear Energy Act.

320. Starting in late 1999, the steel industry entered into a period of economic turmoil, in part due to the exportation of large amounts of steel into the United States at excessively low costs by foreign steel producers. Conditions became sufficiently difficult financially that the United States Congress enacted an emergency loan guarantee program for the steel industry.

321. Throughout 1999 and continuing into 2000, Plaintiff, Bethlehem Steel, and Bechtel Corporation had entered into negotiations towards a joint venture for the demonstration and commercialization of Plaintiff's Process as applied to making blast furnace coke and its hot gas cleaning process as applied to cracking and desulfurizing the gas from devolatilizing coal.

322. The joint venture centered around a commercial-scale demonstration of one coking reactor and associated hot gas cleaning (as described by Bethlehem Steel's Vice President and Chief Technology Officer in his written testimony to Congress), to be installed at the Cleveland Works of LTV Steel, and a 50% cost share by the Department of Energy, obtained through ear-marks.

323. The DOE had made it clear to the industry group that it would not itself seek funding for the commercial-scale coking reactor and hot gas clean-up demonstration, thus the only way in which the industry group could obtain funding for the Process was through earmarks.

324. Plaintiff alleges that DOE's refusal to actively budget and obtain appropriations for the coking demonstration project was due to its *de facto* technology policy applied to the Plaintif and Plaintiff's Process that precluded Plaintiff and its Process from obtaining from the agency federal funding for commercial demonstration.

325. Once the private sector participants in the demonstration project had indicated their willingness to enter into commitments (contingent upon the Government's provision of the 50% federal cost share), U.S.DOE entered into an amendment with Plaintiff to obligate the first federal appropriation, of $7 million in FY 2000 funds, to the demonstration project.

326. DOE applied a 7% administrative "tax" on this earmark, to result in a $6.45 million federal amount for obligation, although typically its administrative practice under all three of its other Clean Coal demonstration programs (i.e. the Clean Coal Technology Program, Power plant Improvement Initiative, and Clean Power Initiative) has been to apply a 1% administrative tax.

327. Plaintiff alleges that the scale of the administrative tax that DOE applied to the funds earmarked for the Project was disproportionate and discriminatory, and further evidences a DOE *de facto* policy to utilize funds earmarked to the Process for other purposes within the agency.

328. The DOE amendment indicates that DOE funds authorized for the Project were in excess of $12 million, reflecting that the agency and Plaintiff anticipated that an earmark of an additional $7 million (or, after the DOE-applied administrative tax, $6.45 million) would be

provided by way of an earmark under the 2001 appropriations bill for the Department of Interior and Related Agencies.

329. In the course of discussing with Plaintiff the amendment to the Cooperative Agreement, DOE officials at the level of the National Energy Technology Laboratory advised Plaintiff, for the first time, that it would apply statutory cost-sharing requirements for the Clean Coal Technology Program, to require that during the construction phase of the Project, the federal funding would require matching on a dollar-for-dollar basis by non-federal dollars (see 43 USC 5903d ("cost sharing by project sponsors is required in each of the design, construction, and operating phases" *id.*). No such language appeared within the Coke Oven Emission Control Program's authorizing statute (see 42 U.S.C. § 7412(n)(2)).

330. As a portion of the non-federal cost share constituted by the Project was in the form of in-kind assistance as well as income from coke purchases by LTV Steel, which occurred during the project's operating phase, the result of DOE's application of cost sharing rules it had developed under the Clean Coal Technology Program to the COEC program project was that more hard cash would be required in the beginning stages of the Project from the cash-contributing participants--the principal such participant being Bethlehem Steel.

331. Plaintiff alleges that DOE knew or should have known of the probable effect of asking financially strained partners—such as LTV and Bethlehem—to commit to a larger cash contribution earlier in the project, considering that the financial health of the steel industry was a newsworthy and well-known subject nationally as well as regionally.

332. Plaintiff advised Bethlehem Steel and Bechtel Corporation of DOE's newly-advised requirement at a meeting in July, 2000.

333. Within a few days after this July meeting, Bethlehem Steel withdrew from the project, followed by Bechtel Corporation.

334. Bethlehem Steel's Director of Research, John Chilton, wrote a letter to the House appropriations committee for the Department of Interior and Related Agencies, urging that Congress continue support for the Calderon coke-making process, despite Bethlehem Steel's withdrawal.

335. In the fall of 2000, Bethlehem Steel Corporation filed for bankruptcy.

336. In 2001, LTV Steel filed for bankruptcy.

337. Plaintiff, with a major domestic steel-maker (see Exhibit 15), then worked with DOE to redirect the $6.45 million in funds obligated to the Cooperative Agreement to an iron-making application of the Process; however, Plaintiff agreed to allow the FY 2001 earmark of $6.45 million only on the condition that it would be made available later in the iron-making project, when needed.

338. DOE has repeatedly reneged on its commitment to make this $6.45 million earmark available, such that Plaintiff is now in a position in its iron-making project that it has been forced to lay off a number of its technical staff.

339. Plaintiff alleges that DOE's refusal to release the FY 2001 $6.45 million earmark shows further a policy to suppress the commercial demonstration of the Process, in that the iron-making project would also show a commercially-scaled pyrolysis reactor of Plaintiff's design in an application demonstrating high-ash feeds (iron ore).

340. In 2004, Plaintiff executed a long-term synthetic natural gas contract with the City of Bowling Green, and submitted a funding proposal to DOE in August, 2005, in response to a

DOE solicitation for research and development on the co-production of synthetic natural gas and electric power. Plaintiff was again rejected.

341. For the first time in DOE's multiple rejections of proposals, DOE provided Plaintiff with a statement of reasons for proposal rejection.

342. Plaintiff's review of DOE reasons revealed that the agency's evaluation was based on a faulty understanding of the Process and that the written statement had errors.

343. Plaintiff attended a debriefing meeting with the agency and learned that its proposal was the only one submitted in a particular category. After announcements of award were made, it also learned that DOE had selected a pyrolysis and char gasification technology for funding which had not yet had a process development unit constructed and operated, and was at an earlier stage of development than Plaintiff's Process.

344. Plaintiff alleges that the aforementioned 2005 proposal rejection, as a part of the chain of proposal rejections described hereunder, further evidences the agency's institutional bias against the Plaintiff's Process and its determination to prevent its commercial demonstration.

345. Hot gas cleaning has again emerged as a critical issue within the DOE clean coal program, as evidenced by a recent DOE news release regarding a "warm gas" cleaning process advanced by RTI. However, the RTI process only operates at temperatures of between 700 to 900 degrees F, whereas the Plaintiff's hot gas cleaning process operated at much high temperatures, made possible by gas cracking against the sorbent--thus able to deliver hotter gas to a gas turbine, for higher efficiencies.

346. The selection by DOE of the RTI Process—when its independent consultant, David Archer, suggested consideration of Plaintiff's hot gas clean-up for IGCC projects DOE funded--evidences that technologies surrounding gasification--such as hot gas cleaning or coal feeding--

are being advanced by the agency as part of a "suite" of processes which have at their core the oxygen-blown entrained flow gasification system: while Plaintiff's hot gas cleaning is adaptable to oxygen-blown entrained flow gasifiers, the RTI technology is not adaptable to gas cleaning of higher hydro-carbon gases that result from pyrolysis, without a separate cracking unit.

347. Plaintiff alleges that numbered paragraphs 337 through 347 show a continuing pattern of agency preclusion and suppression of technologies developed by the Plaintiff, despite technological merit.

*Importance of a Commercial Scale Demonstration Project to Regulatory Agencies*

348. In the fall of 1997, while the PDU was in operation to produce blast furnace coke, the Director of the United States Environmental Protection Agency's Office of Air Quality, Planning, and Standards, John Seitz, and his assistant director, Bruce Jordan, made a special visit to the Alliance, Ohio PDU. Messrs. Seitz and Jordan had been made aware of the Calderon Process as applied to both coke-making and power generation through a presentation that Plaintiff made in July or August of 1997, at OAQPS offices in Research Triangle Park, North Carolina. Members of OAQPS's steel group had invited a presentation on the cokemaking application of the Process, and Plaintiff had presented on that application as well as power generation. It was application of the Process to power generation, however, that caught the attention of Mr. Seitz and Mr. Jordan.

349. While at the Alliance, Ohio PDU, Director Seitz suggested that if Plaintiff were able to identify an existing brown field power plant at which the Plaintiff's Process would be installed, Director Seitz would be willing to co-sponsor with the Department of Energy, Department of Commerce, and Environmental Protection Agency a project to demonstrate the

Plaintiff's Process, as applied to power generation, at commercial scale. Director Seitz emphasized that while his agency had an interest in the environmental benefits of the Process as applied to coke-making, the greater interest of his agency would be in the Process's application to power generation, due to the greater overall emissions presented by the widespread use of coal as a combustion fuel for power generation and the greater potential environmental benefits of the Process as applied to power generation.

350. To the best of Plaintiff's knowledge and belief, Director Seitz indeed approached DOE to determine its interest in such a project, and DOE declined to participate in such a project.

351. In 1998, Plaintiff received a letter dated April 21, 1998 from OAQPS's Associate Director for its Emissions Standards Division, Mr. Jack Edwardson, requesting Plaintiff to submit funding requirements for a commercial-scale demonstration of the Process at a brownfield power plant site. This 1998 letter reads:

"Dear Mr. Calderon:

I am writing this letter as a follow up to our phone conversation today. As I mentioned during our conversation, we (the Office of Air Quality, Planning, and Standards) believe that the Calderon Process shows great promise for reducing emissions of greenhouse gases and other pollutants. As a result, we are considering a budget initiative for our fiscal year 2000 that would request funding to demonstrate your technology on a commercial scale. While the Calderon Process has potentially great benefits for both cokemaking and power generation, our proposed budget initiative would focus on the latter due to the potentially enormous benefits of reducing emissions of greenhouse gases and other pollutants.

To prepare a budget initiative, we must have a short description of he proposed project along with an estimated amount of resources required. We have prepared the attached short description of a proposed initiative using the information we have received previously from your company, as well as, the information we discussed earlier. However, we are less familiar with the resources that would be required for this initiative. Therefore, we would appreciate any information your could provide along those lines. In addition, if you have any comments on the attached description, please feel free to provide them to me...."

352. The project description referenced by the OAQPS April 21, 1998 letter reads:

"Abundant amounts of fossil fuel are available in the U.S. to satisfy national energy needs for many years into the future. Unfortunately, large amounts of this fuel are in the form of coal which when burned can contribute to a number of environmental problems, including global warming (carbon dioxide emission), tropospheric ozone (nitrogen oxides), particulate matter (sulfates), sulfur dioxide (SO2), and air toxics (mercury). To a large extent, these environmental problems have caused a shift away from coal usage to foreign oil as a source of energy. In the past, much attention has been focused on addressing each of the above environmental concerns. To date, however, no technology has been demonstrated that can satisfactorily address all of the problems while ensuring that the country can use its most abundant fossil fuel to satisfy energy needs.

Fortunately, a new technology is available which offers a solution to the above problems. It is referred to as the Calderon Process--named after its inventor Albert Calderon. Basically the process removes sulfur through a gasification process, alters the carbon and nitrogen content of the fuel in this process which results in a low Btu gas with extremely efficient combustion properties. The net result is that more energy can be generated through the same volume of fuel--thus significantly reducing the amount of carbon and nitrogen emissions.

Funding for this initiative will support demonstration of the repowering capabilities of the Calderon Process at an existing utility plant, which is located on a Brownfields site. The demonstration will show that the Calderon Process will allow an existing utility plant to become more efficient while at the same time reducing emissions of greenhouse gases and nitrogen oxides."

353. Due to the limitations on OAQPS' budget, OAQPS was not able to fund a commercial-scale demonstration project. When Plaintiff advised OAQPS of the scale of funding required for a commercial-scale demonstration brown-field project at an electric utility (around $250 million to $300 million), OAQPS indicated that it could not request this scale of budget request.

354. In late 2006, Plaintiff wrote to the Administrator of the United States Environmental Protection Agency to advise of the Process. Plaintiff received a response from U.S.EPA's current director of the Office of Air Quality, Planning, and Standards, Mr. Stephen Page, in January, 2007.

355. OAQPS Director Paige's January, 2007 letter emphasizes the need for a commercial scale project operating at an existing utility before the agency can include

consideration of Plaintiff's Process in a working group, formed within U.S.EPA, regarding regulatory incentives to encourage gasification, as he writes:

Dear Mr. Calderon:

Thank you for your letter of December 19, 2006 to Stephen L. Johnson, Administrator of the U.S. Environmental Protection Agency, to bring to his attention your company's innovative technology for sulfur dioxide, nitrogen oxide, and mercury control at coal-fired electric utility units. As you are aware, the Agency is very interested in multi-pollutant emissions control strategies and technologies, and we appreciate your interest in reducing such emissions.

In your letter, you indicate that the technology has been successfully demonstrated for the Glass Manufacturing Industry Council in a site visit earlier in 2006. Further, you indicate that the technology is viable for any coal type found in the United States, which is of great interest to the Agency. However, the testimonial information you provided in your letter does not contain detailed, quantifiable engineering data on the process or the costs of the technology, which is necessary for EPA to evaluate the merits of the process.

*Absent long-term, full-scale data from the technology installed on an identifiable coal-fired unit and its associated costs, we are unable to fully evaluate the process. We encourage you to provide such data. We would then be able to review the data, discuss the results internally and with other stakeholders (e.g., Department of Energy), and then meet with you.*

The Agency has initiated a working group under the auspices of the Subcommittee on Economic Incentives and Regulatory Innovation of the Clean Air Act Advisory Committee. The Subcommittee has been charged with discussing and identifying potential barriers and potential opportunities to create incentives under the Clean Air Act for the development and deployment of advanced coal technologies. With the receipt of the information discussed above, I believe that the Calderon process could be considered by this working group during their deliberations.

Again thank you for your letter. I appreciate the opportunity to be of service and trust the information provided is helpful." (emphasis added)

356. As indicated, a commercial scale demonstration project showing the Process is essential for consideration of the Process by OAQPS for inclusion in regulatory incentive discussions, and further illustrates the importance to commercial application of a commercial-scale demonstration project. It also illustrates the intertwined relationships between DOE and client federal agencies, such as EPA, for the technical results from DOE demonstrations—and the degree to which a lack of a DOE imprimatur on a coal gasification process can block its

recognition by other agencies. Thus, funding denials also have regulatory impact affecting commercial application of a process.

COUNT I: THE GOVERNMENT HAS EFFECTED A *PER SE* TAKING OF PLAINTIFF'S PATENT RIGHTS IN THE PROCESS

357. Numbered paragraphs 1 through 356 are referenced and incorporated herein as if fully set forth within this Count I.

358. The Federal Circuit in *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177 (Fed. Cir. 2004) has recognized that a *per se* takings approach is not precluded in cases involving property of other types besides real property (*id.* at 1197 and the opinion's note 17), and specifically, that the Supreme Court in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 1555 L.Ed.2d 376, 123 S.Ct. 1406 (2003) has analogized the transfer of interest earned in IOLTA accounts as "…akin to the occupation of a small amount of rooftop space in *Loretto*." (*Rose Acre Farms*, 373 F.3d at 1197 and opinion note 17, citing and quoting *Brown v. Legal Found. of Wash.*, 583 U.S. 216, 235 (2003)). From the Federal Circuit's *Rose Acre* opinion, it is apparent that personal property may be the subject of a *per se* takings analysis and that the *per se* classification of takings law is not limited in its application to real property. Further, as recognized by the Supreme Court in *Brown v. Legal Found. of Wash.*, a required transfer of personal property is analogous to the invasion of real property by physical occupation, and can qualify as a *per se* taking.

359. Patent rights and trade secrets are personal property. The nature of the patent right is that of a temporary monopoly that the Government grants in exchange for disclosure of the invention. A prospective patentee has a choice: either to disclose trade secret information in exchange for the temporary monopoly of the patent or maintain the invention as a trade secret;

once the trade secret has been disclosed, however, its status as legally protected trade secret information is lost. Where the Government unjustifiably precludes any commercial application of a patented invention, so as to render the temporary monopoly worthless to the patent owner or any transferee of the owner, a *per se* taking has occurred, in that the transfer of personal property in the form of the invention disclosure was made by the patentee but the patentee's reward of a temporary monopoly has been destroyed by the Government.

360. Plaintiff alleges that the Government's actions in this case have effected a *per se* taking of the '430 patent, the '732 patent, and the Plaintiff's natural right to exploit said patents.

**COUNT II: THE GOVERNMENT HAS EFFECTED A CATEGORICAL TAKING OF PLAINTIFF'S PATENT RIGHTS AND TRADE SECRETS UNDER *LUCAS v. SOUTH CAROLINA COASTAL COMMISSION***

361. Numbered paragraphs 1 through 357 of this Complaint are referenced and incorporated herein as if fully set forth within this Count II.

362. A regulatory takings claim "arises from some public program adjusting the benefits and burdens of economic life to promote the common good," as opposed to a government appropriation of private property for its own use. *Rose Acre Farms v. United States*, 373 F.3d 1177, 1184, citing and quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324-35, 152 L.Ed. 2d. 517, 122 S.Ct. 1465 (2002) (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, at 124).

363. A categorical taking occurs when regulation effects a complete economic devaluation of property, such that no beneficial use is left. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). "[I]f a regulation prohibits all economically viable use of land—destroying its economic value for private ownership—the regulation has the same effect as a

physical taking." *Palm Beach Associates v. United States*, 208 F.3d 1374, 1379 (Fed. Cir. 1994) (quoting *Florida Rock Industries v. United States*, 18 F.3d 1560 (Fed. Cir. 1994).

364. The Government's actions in applying a preclusive technology standard in the coal gasification area that has regulated technology introductions, and that excluded Plaintiff's Process from federal demonstration project funding, where such funding is necessary to the commercial and "practical application" of the Process (within the meaning of Section 201(f) of the Bayh-Dole Act) has so devalued the Plaintiff's patent rights in its Process that no value remained in these patent rights, there is no beneficial use, and a categorical taking occurred.

365. Plaintiff has been unable to obtain any value from the positive commercial right, created by the Bayh-Dole Act in small businesses that retain title to subject inventions, to have the first opportunity to achieve "practical application" of the subject invention (as compared to the Government or a third party compulsory licensee), due to the preclusive impact of the Government's actions. The Government's actions in precluding and blocking Plaintiff's commercial use and practical application of its Process have resulted in a situation that is equivalent to the effective and complete ouster of the Plaintiff from its rights as a property owner in its patents, such that a categorical taking has occurred. Plaintiff has been unable to utilize its exclusive right to exploit the '430 or '732 patents or license others to do so, as a result of the Government's actions in precluding and blocking the commercial utilization of the Process, since without any opportunity to construct and operate a commercial-scale or near commercial-scale demonstration Project, the patents underlying the Process have no beneficial use and no value.

366. Without demonstration project funding, it is not possible to show to the satisfaction of industry the economics and emissions of the Process, and commercial installation or licensing is not feasible. Therefore, as to both Plaintiff and any potential third party transferee the '430

and '732 are and were made valueless. Further, the economic devaluation of the patents underlying the Process were complete as of the time that the Government denied demonstration project funding in May 1, 1993, since as of that time DOE conclusively closed the door on demonstration project funding for the Process post-dating Plaintiff's completed testing at the PDU. Plaintiff has been unable to commercially apply, exploit, or license the '430 and '732 patents and these patents as well as Plaintiff's natural right of exploitation have been made valueless as well as useless by the Government's action.

## COUNT III: THE GOVERNMENT HAS EFFECTED A REGULATORY TAKING OF PLAINTIFF'S PATENT RIGHTS UNDER THE THREE FACTOR TEST ENNUNICATED IN *PENN CENTRAL TRANSPORTATION CO. v. NEW YORK CITY*

367. Numbered paragraphs 1 through 357 of this Complaint are referenced and incorporated herein as if fully set forth within this Count III.

368. The Supreme Court in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 547 L.Ed. 2d 631, 98 S. Ct. 2646 (1978) acknowledged that it had "hitherto been 'unable to develop any "set formula"' for evaluating regulatory takings claims, but identified 'several factors that have particular significance.'" *Penn Central Transp. Co. v. New York City*, 438 U.S. at 124. According to the Court in *Lingle v. Chevron*, 544 U.S. __ (2005) (slip opinion) "Primary among these factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'" *Lingle*, *supra* at 8-9, quoting *Penn Central*, *supra*, at 124. As the Court in *Lingle* further summarized, "In addition, the 'character of the governmental action'—for instance, whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the

common good'—may be relevant in discerning whether a taking has occurred." *Lingle, supra,* at 9, quoting *Penn Central*, *supra* at 124. "The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules." *Lingle, supra,* at 9, also citing by way of example to *Palazzolo v. Rhode Island,* 533 U.S. 606, 617-618 (2001); *id.*, at 632-634 (O'Connor, J. concurring).

369. Plaintiff alleges that the Government's actions in: (a) repeatedly denying Clean Coal Technology Program funding to construct and operate a commercial-scale or near commercial-scale demonstration project for the Process, under the specialized circumstances of this case in which the denial of commercial scale demonstration funding is also tantamount to denial of a governmental approval to construct and operate a commercial-scale demonstration project; together with (b) DOE's application of a *de facto* technology policy to Plaintiff's Process that categorically disqualified it in a discriminatory manner from demonstration funding for an over a two-decade period, have resulted in a regulatory taking under the *Penn Central* factors.

370. *Character of Government Action* Plaintiff presents that of special importance to this case is the character of the governmental action. The agency's attempts to block demonstration and commercial application of the Process due to the agency's adherence to a *de facto* technology policy that categorically disqualified Plaintiff's meritorious gasification and hot gas cleaning technologies from federal funding limited competition within the federally-funded gasification area. DOE defined the technical field of "coal gasification" as exclusionary of Plaintiff's innovative process technology in its demonstration programs, selection under which

has proven to provide not only necessary financial assistance for process demonstration but as a necessary government approval for commercial demonstration and commercial application.

371. *Character of Government Action* Further, as related in the Preliminary Statement, DOE has carried out its clean coal technology programs in the coal gasification area inconsistently with statutory directives by Congress that require "criteria of priority" concerning the use of federal funds in demonstration projects carried out under the Federal Nonnuclear Energy Research, Development, and Demonstration Act (42 U.S.C. 5100, et seq.). DOE's actions in carrying out the Clean Coal Technology Program in the coal gasification area are substantially in contravention of these policies, such that it has transformed DOE's actions from financial assistance to the direct regulation of intellectual property introductions into the market and commercialization.

372. *Character of Government Action* The failure of DOE to abide by mandatory directives of Congress applicable to the clean coal technology demonstration project area, and specifically coal gasification, has special relevance under two *Penn Central* factors in this case: (1) the character of the government action; and (2) the reasonable, investment-backed expectations of the plaintiff property owner. Plaintiff does not maintain that DOE's actions were necessarily unlawful and is not seeking the equivalent of administrative review of DOE's denial of funding applications or other agency actions by way of this takings case (*See Rith Energy v. United States*, 247 F.3d 1355, 1356-1366 (Fed. Cir. 2001), citing to *Del-Rio Drilling Programs v. United States*, 146 F.3d 1358 (Fed. Cir. 1998)) Plaintiff's primary concern in this case is the impact which Government action has had upon its property rights.

373. *Character of Government Action* The Government's action has the same economic impact as a permit denial that forces the property owner to maintain his or her property in a

"natural state"—similar to the situation recognized by the Federal Circuit in *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560; it has had the same effect as a "quarantine" on the `commercial use of personal property, see *Yancey v. United States*, 915 F.2d 1534. Without federal demonstration project funding, it is impossible to construct and operate a commercial-scale first-of-a-kind demonstration project, which is the pre-requisite step before commercial application of the Process.

374. *Character of Government Action* Further, the *de facto* exclusionary policy applied by the Government to the Plaintiff's Process has had preclusive effect on any utilization of the Process, in that other regulatory agencies, such as environmental and public utility regulatory agencies, require a demonstration project before they will consider the Process.

375. *Reasonable Investment Backed Expectations* Plaintiff's reasonable investment-backed expectations are based on statutory criteria incumbent upon DOE in administering its funding programs at 42 U.S.C. § 5904 and the Bayh-Dole Act, which creates a positive right in a small business retaining title to a subject invention to have the first opportunity (as compared to the Government or a compulsory third party licensee selected by the Government) to achieve "practical application" of a subject invention through its own efforts or those of a voluntary licensee. Plaintiff's expectation that it would not be precluded from commercially applying its Process through the DOE's application of an arbitrary technology standard are consistent with the public purposes of the Non-nuclear Energy Research and Development Act and the Patent Act, both of which seek to incentivize innovation. In addition, the Plaintiff's reasonable investment-backed expectations as a small business inventing and retaining title to a subject invention is that Government should not be able to compel an effective compulsory license to the public by its

actions precluding commercial application of the subject invention, without paying reasonable compensation (see 35 U.S.C.§203).

376. *Reasonable Investment Backed Expectations* Plaintiff disclosed trade secrets in its patent application in exchange for a temporary monopoly. Plaintiff' Albert Calderon invested considerable cash resources in excess of $1.2 million in the development of the Process, including through the Founder's sale of over $1 million dollars of other assets (real estate and timber). Plaintiff also has devoted over 28 years to the development of the Process, as a full-time pursuit, organized a company with employees to further the Process, paid for patent application and maintenance fees, retained consultants to do process engineering work and major engineering companies, and generally "by the sweat of his brow" (and many long nights) tested and piloted the Process. Plaintiff and its founders efforts to advance this Process have been unusually long, persevering, and determined, as well as constituting a level of expense not ordinarily undertaken by a small business or individual entrepreneur--and in a field in which the return on investment is notoriously slow in arriving, given the long cycles associated with capital replacement in both the utility and petroleum industries and the fitful availability of financial resources for construction and operation of new process technologies in heavy industry. Plaintiff and its founder have "investment-backed" expectations in the literal sense that they have invested considerable hard cash and unwaveringly determined efforts to develop and commercialize the Process.

377. *Severity of the Economic Impact.* Without demonstration project funding, it is not possible to show to the satisfaction of industry the economics and emissions of the Process, and commercial installation or licensing is not feasible. The actual economic devaluation of the patents underlying the Process were complete, as of the time that the Government denied

demonstration project funding in 1993, although proof of the market for the Process awaited the mass cancellations of oxygen-blown entrained flow gasification that occurred in 2007.

**COUNT IV: DUE TO THE TIME-LIMITED NATURE OF PATENT RIGHTS AND THE PATENT *QUID PRO QUO*, FUNDAMENTAL FAIRNESS REQUIRES THAT A TAKING BE RECOGNIZED WHERE THE GOVERNMENT HAS SO ALTERED THE PATENT *QUID PRO QUO* THAT IT HAS PROVIDED A WORTHLESS RIGHT IN EXCHANGE FOR TRADE SECRET DISCLOSURE**

378. Numbered paragraphs 1 through 357 of this Complaint are referenced and incorporated herein as if fully set forth within this Count IV.

379. This Count IV describes and alleges a taking of Plaintiff's intellectual property underlying the '430 and '732 patents that is conceptually similar to the takings situation identified by Justice Stevens in his dissenting opinion in *Eldred v. Ashcroft*, 537 U.S. 186, 226 (2003), in which he observed that the issuance of a patent is "considered as a *quid pro quo*--the grant of a limited right for the invention's disclosure and subsequent contribution to the public domain" (citing to *Pfaff v. Wells Electronic Inc.*, 525 U.S. 55, 63 [1998])" and stated that "[i]t would be manifestly unfair if, after issuing a patent, a representative of the public sough to modify the bargain by shortening the term of the patent in order to accelerate public access to the invention. The fairness considerations that underlie the constitutional protections against *ex post facto* laws and laws impairing the obligation of contracts would presumably disable Congress from making such a retroactive change in the public's bargain with an inventor *without providing compensation for the taking*." (emphasis added).

380. In this case, Government action in the form of the preclusion and obstruction of the commercial application of Plaintiff's '430 and '732 patents has the same impact on Plaintiff's property rights as would a shortening of the patent term, in that for the period in which the

Government precluded and obstructed Plaintiff's commercial application of the '430 and '732 patents (May, 1993, the date of the alleged taking, through the end of the patent term), Plaintiff was unable to exploit the '430 and '732 patented inventions nor would a licensee or assignee have been able to exploit the '430 and '732 patented inventions.

381. Given the Government's dominance in the coal gasification technology area and its intransigence in funding the Process (with such intransigence evidenced by its repeated funding denials, negative statements concerning the technology, and its positive efforts to obstruct the Plaintiff's competitively selected coke-making demonstration project (which would have demonstrated the "rich" gas and hot gas cleaning aspects of Plaintiff's technology, thus providing commercial-scale demonstration project data that would also have advanced the liquid fuels and power co-production described by the Process), neither Plaintiff nor any assignee of Plaintiff could obtain economic value from the Process patents. DOE's regulation of technology introductions in the coal gasification area precluded the Process from having any beneficial use for any party--thus, having the same effect as a shortening of the patent term (in this case, to the point of its elimination).

382. In so far as Plaintiff's patent rights have been effectively shortened to the point of elimination by DOE's actions, a takings case lies. The Government has retroactively so altered its bargain that Plaintiff's patent rights have been rendered worthless. Fundamental fairness requires, therefore, that a taking lies, therefore, for the vitiated patent rights

**DAMAGES**

383. Plaintiff has suffered damages due to the action of the Government as a direct result of the taking of its property, namely the '430 and '732 patents and the inventions disclosed therein, without just compensation for the taking.

384. Plaintiff's damages set forth by Exhibit 16 have been calculated utilizing the discounted cash flow analysis method of valuation of property, in which the value of the property at the time of the taking is compared to the value of the property after the taking, and a discounted cash flow analysis is utilized as a measurement of the difference in value.

385. For discounted cash flow analysis purposes, Plaintiff has utilized that revenue stream projected from licensing its process on a running royalty basis at a rate of $5.472 per barrel of synthetic gasoline (as a refined product, including crude cost and refining) over an eleven year period at an estimated eventual market penetration (as of the eleventh year) of 25% of the coal-fired power generation capacity in the United States. The eleven year period over which revenues have been projected commences in 1996, and assumes that Plaintiff had in 1993 started the permitting and construction process for a first commercially scaled demonstration Project. At a 25% capacity of repowered coal-fired generation, the gross royalty (prior to discounting) is $34,737,692,000 for this eleven year period. A discount factor has been applied to the revenue stream as required by the principles of a discounted cash flow analysis. After discounting, the cash flow is $11,455,630,971. (See Exhibit 16.)

386. Based on the valuation method employed, just compensation due to the Plaintiff, excluding interest, is $11,455,630,971.

387. Plaintiff claims compound interest amounting to $3,692,420,148.

388. The total monetary relief sought as just compensation is $15,148,051,119 (see Exhibit 16, page 4 of 17).

389. In the effort to achieve an equitable arrangement, and in view of the deficits currently facing the United States Government, the Plaintiff is prepared to work with the Court

and defendant to arrive at an appropriate pay-out schedule, under which interest otherwise accruing between payment dates would be suspended.

390. Plaintiff's intention is to utilize the damages awarded as a result of this case to further technological demonstration and commercialization work in the energy and environmental area for its processes (inclusive of greenhouse gas conversion to fertilizer, as an alternate to geological carbon capture and sequestration), as well as the construction of heavy equipment manufacturing capacity which this country lacks. Plaintiff intends to utilize heavy equipment manufacturing in excess capacity in United States shipyards to manufacture equipment for the repowering of existing coal-burning power plants to co-produce synthetic gasoline and power. There is need for additional capacity beyond the existing United States excess shipyard capacity, due to the scale of the market—therefore, additional manufacturing capacity will be needed and Plaintiff is committed to domestic manufacturing of its Process equipment.

391. Accordingly, Plaintiff is prepared to work with the Court and the Defendant to set a pay-out schedule consistently with its projected cash requirements, in an effort to avoid undue financial impact and/or continuing post-award interest obligations for the Defendant.

392. Exhibit 16 can be referenced as to the details of the computation of the damages, that capacity does exist in the shipyards, and that Plaintiff was cited as a prospective customer in the 1995 privatization of the Charleston Shipyard, which was the only former United States shipyard successfully privatized in the entire Base Realignment and Closure process (see Exhibit 16, pages 14 and 17).

397. Plaintiff was also not in a position to ascertain or prove its damages until the oxygen-blown entrained flow gasification technologies selected by DOE were rejected by the power industry through plant cancellations in 2007 and until the refractory reliability issues associated with this type of technology were admitted by the agency. However, since the fall of 2007, project cancellations have shown the weaknesses of the technologies DOE selected, and in areas that the Process specifically and adequately addressed. Plaintiff is not required to bring a takings case before it is able to prove its damages or to engage in piece meal litigation to establish a taking.

**WHEREFORE:**

Plaintiff prays for relief in the amount of $15,148,051,119 as just compensation.

Respectfully submitted,

Reina A. Calderon

Date: May 22, 2008

Reina A. Calderon, Esq.
Vice President and General Counsel
Energy Security of America Corp.
500 Lehman Ave., P.O. Box 126
Bowling Green, Ohio 43402

Admitted to Practice Before the Ohio Supreme Court
Juris Number: 0058724

Admitted to Practice Before the United States Court of Federal Claims:
Admission Date: March 13, 2008