# ATTACHMENT 1

# TABLE OF CONTENTS

# TABLE OF CONTENTS


| Section | Title | Paragraph # | Page # |
|---|---|---|---|
| I. | Preliminary Statement | 1 | 1 |
| II. | Jurisdiction | 24 | 14 |
| III. | Standing | 26 | 15 |
| IV. | Parties | 27 | 15 |
| V. | Property Interests for Fifth Amendment Takings Purposes | 32 | 16 |
| VI. | Statement of Facts | 35 | 17 |
| | *(A) Property Interests Taken – Ownership of Property and Status of the Property As Protected Under the Fifth Amendment's Takings Clause* | 35 | 17 |
| | *(B) Technological Context of this Complaint* | 57 | 23 |
| | *(C) Government Action Amounting to a Taking* | 157 | 39 |
| | Count I: The Government Has Effected a Per Se Taking of Plaintiff's Trade Secret and Patent Rights in the Process | 357 | 104 |
| | Count II: The Government Has Effected a Categorical Taking of Plaintiff's Patent Rights and Trade Secrets Under *Lucas v. South Carolina Coastal Commission* | 361 | 105 |
| | Count III: The Government Has Effected a Regulatory Taking of Plaintiff's Patent Rights Under the Three Factor Test Annunciated in *Penn Central Transportation Co. v. New York City* | 367 | 107 |
| | Count IV: Due to the Time-Limited Nature of Patent Rights and the Patent Quid Pro Quo, Fundamental Fairness Requires That a Taking Be Recognized Where the Government Has So the Patent Quid Pro Quo That It Has Provided a Worthless Right in Exchange for Trade Secret Disclosure | 378 | 112 |
| | Damages | 383 | 113 |
| | Statute of Limitations | 393 | 116 |

Attachment 1: Table of Contents
Attachment 2: Comptroller General
Attachment 3: Exhibits

# ATTACHMENT 2

# COMPTROLLER GENERAL

LEXSEE 61 COMP. GEN. 482

Matter of: Department of Energy -- Termination of Fossil Energy Programs

B-206940.2

Comptroller General of the United States

61 Comp. Gen. 482; 1982 U.S. Comp. Gen. LEXIS 849

June 16, 1982

**HEADNOTES:**
[*1]

Appropriations -- Availability -- Objects Other Than as Specified -- Termination Costs -- Discretionary Projects -- Nonnuclear Energy Research

Funds appropriated for fossil energy research and development activities of the Department of Energy (DOE) may be used for expenses pertaining to the termination of various fossil energy research and development programs and projects, where those programs and projects are not specifically mandated in either the appropriation act or authorizing legislation, where the Secretary of Energy is given considerable discretion in formulating and executing a comprehensive nonnuclear energy research and development program, and where the proposed terminations and reductions would not leave the remaining overall program inconsistent with the statutory scheme.
Appropriations -- Impounding -- Impoundment Control Act -- Reporting to Congress -- Rescission *v.* Deferral -- Program Termination Costs

A proposal by DOE to defer use of no-year funds to fiscal year 1983 was not a proposed rescission under section 1012(a) of the Impoundment Control Act of 1974, 31 U.S.C. 1402(a), merely because it would have been used to cover expenses incurred in connection [*2] with the termination of authorized projects and activities. Where all available budget authority will in fact be expended for termination costs, a rescission proposed is not required.
Appropriations -- Impounding -- Program Termination -- Prior to Congressional Action on Proposed Deferral -- Propriety

There is no legal requirement that would have prevented DOE from initiating termination activities within the Fossill Energy Research and Development Program in advance of congressional action on a proposed deferred of funds from that program.

**OPINION:**

The Chairman and several members of the House Committee on Science and Technology have requested our opinion as to whether the Department of Energy may use funds appropriated for fossil energy research and development to pay for the termination of a number of fossil energy research and development programs, projects, and activities. We have received similar congressional requests concerning the Magnetohydrodynamics program and the Hydropyolysis Coal Gasification project. In connection with these various requests, we have also been asked several questions concerning a proposal by DOE to defer certain fossil energy funds to pay for subsequent [*3] program termination costs: whether the proposed deferral should not have instead been designated a proposed rescission, and whether Energy could initiate program terminations in advance of congressional action on the impoundment proposal.

After the committee members submitted their questions, the Congress rejected the proposed deferral. *See* H.R. Res. 411, 97th Cong., 2d Sess., 128 Cong. Rec. H1660 (daily ed. April 28, 1982). Nonetheless, we shall address the impoundment questions because they raise significant issues that may again arise in the future.

We have examined the Department's proposals in light of the authorization and appropriation statutes governing the Fossil Energy Research and Development Program, and conclude that the funds in question may be used to pay for fossil fuel program termination expenses. We also conclude that the proposed impoundment by Energy was in fact a

deferral and that the Department need not have waited until the Congress had acted on the impoundment proposal before commencing termination activities. A detailed discussion of the reasons for our conclusions follows.

BACKGROUND

*Program Authorization*

The Fossil Energy Research and [*4] Development Program consists of a number of research and development efforts carried out under authority of the Federal Nonnuclear Energy Research and Development Act of 1974 (the Nonnuclear Energy Act), 42 U.S.C. § 5901 *et seq.* (1976), and the Department of Energy Organization Act, 42 U.S.C. § 7101 *et seq.* (Supp. III 1979). The Nonnuclear Energy Act required the Administrator of the Energy Research and Development Administration (ERDA) to formulate and carry out a comprehensive Federal nonnuclear energy research and development program to advance certain policies and comply with certain requirements of that statute. 42 U.S.C. § 5903(b) (1976). It further required the Administrator to develop and transmit to the Congress a comprehensive nonnuclear energy research, development, and demonstration program, desired "to achieve solutions to the energy supply and associated environmental problems in the immediate and short-term (to the early 1980's), middle-term (the early 1980's to 2000), and long-term (beyond 2000) time intervals." 42 U.S.C. § 5905(b)(2) (1976).

The Nonnuclear Energy Act required that the program transmitted to the Congress include elements and activities [*5] designed to advance the development and demonstration of specific categories of energy technology, including conservation, low sulfur boiler fuels, electrical generation, coal gasification and liquefaction, oil shale, petroleum, geothermal and solar energy, tidal power and synthetic fuels. 42 U.S.C. § 5905(b)(3) (1976). Program elements and activities were to be assigned to the three time intervals. The program was required to include justifications for these assignments and for the degree of emphasis given to each. *Id.* In addition, the Administrator was required to revise the program annually. 42 U.S.C. § 5914(a) (1976).

The responsibility and authority provided to the Administrator by the Nonnuclear Energy Act were transferred to the Secretary of Energy by section 301(a) of the Department of Energy Organization Act. 42 U.S.C. § 7151(a) (Supp. III 1979).

*Funding Authorization and Appropriations*

Appropriations to carry out the requirements of the Nonnuclear Energy Act are made subject to annual authorization. 42 U.S.C. §§ 5821, 5915, 7270 (1976 and Supp. III 1979). The fiscal year 1982 authorization for fossil energy research and development was included in [*6] section 1001 of the Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, 606. That provision authorized the appropriation of $460.8 million for fiscal year 1982 for "[f]ossil energy research and development, including capital equipment not related to construction."

The fiscal year 1982 appropriation statute provided a lump-sum of $431.1 million, to remain available until expended, for "necessary expenses in carrying out fossil energy research and development activities under the authority of the Department of Energy Organization Act * * *." Act of December 23, 1981, Pub. L. No. 97-100, 95 Stat. 1391, 1407. The report of the committee of conference on this act contained detailed recommendations as to specific amounts that were intended to be used for various programs, projects, and activities within the overall fossil energy research and development program. This specific language, however, was not carried over into the appropriation act itself.

*Administration's Proposals*

The Reagan Administration is proposing a major modification of the Fossil Energy Research and Development Program, based upon a perception that "it is the role of the private sector, [*7] responding to free market forces, to support and accelerate advanced technology development." *Federal Energy Programs, FY 1983 Budget Highlights*, at 15 (February 1982). According to Energy, the Fossil Energy program was realigned in fiscal year 1982 to concentrate on long-term, high-risk research and development while relying on the private sector to demonstrate and commercialize promising individual technologies. *Id.* Continuing this realignment, Energy now intends to halt long-term research and development designed to accelerate the development of "advanced" technologies, and intends to leave "proof of concept" work to industry for completion. *Id.*

During the remainder of fiscal year 1982 and continuing into fiscal year 1983, Energy plans to phase out those specific activities no longer considered to be consistent with the Reagan Administration's fossil energy research and development objectives. Some of the specific programs and projects slated for termination include the Magnetohydrodynamics program, the Heat Engines development program, the In Situ Coal Gasification program, the Eastern Oil Shale project, the Tar Sand Oil Recovery projects, the Pressurize Fluidized [*8] Bed Combined Cycle project, the Bi-Gas Combined Cycle pilot plant projects, and a number of Surface Coal Gasification projects, including the Hydropyrolysis Coal Gasification project.

As a consequence of Energy's proposed "realignment" of the fossil energy program, a portion of the funds that were appropriated to carry out activities within the Fossil Energy Research and Development Program are now proposed to be used to cover contract termination costs, personnel reduction-in-force expenses, "mothballing" costs, and other expenses related to program reductions and terminations. In addition, the Reagan Administration had proposed to defer some $45 million in fossil energy funds to cover these same types of expenses in 1983. *See* Deferral Message D82-236, H.R. Doc. No. 155, 97th Cong., 2d Sess. 3 (1982).

DISCUSSION

*1. Program Terminations*

The committee members first ask whether it is lawful for the Department of Energy to use fossil energy funds to terminate various fossil energy research and development programs, projects, and activities. The committee members have expressed concern that proposed terminations are contrary to the intention of the Congress as evidenced [*9] by appropriation and authorizing legislation, that such programs and projects be continued. According to the committee members, Energy's proposal appears to violate the requirements of section 3678 of the Revised Statutes, which provides that sums appropriated be applied solely to the objects for which they are appropriated. *See* 31 U.S.C. § 628 (1976).

As a preliminary matter, we note that, although the committee reports on Energy's lump-sum appropriation for fossil energy research and development contain specific recommendations as to the use of that appropriation, those recommendations are not legally binding on Energy. See *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 315-26 (1975). Agencies are not required to follow restrictions expressed in committee reports when those expressions, as here, are not explicitly carried over into the statutory language. Nonetheless, Energy's use of the funds in question must be consistent with the purposes specified by the appropriation act itself, as well as the applicable authorizing statutes. *See* 31 U.S.C. § 628 (1976); 53 Comp. Gen. 328 (1973).

In a 1977 opinion, this Office concluded that funds appropriated for a particular [*10] project, specifically the Clinch River Breeder Reactor Project, could not be used to further actions intended to implement a proposed curtailment of that project. *See* B-115398.33, June 23, 1977. In that case our decision was based upon the restrictive language of the authorizing legislation. We stated that the proposed curtailment actions would result in the implementation of a project that would no longer be consistent with the major elements of the undertaking explicitly dictated by the controlling statute. Although Clinch River funds were included in a broad lump-sum appropriation for ERDA operating expenses, we found that the authorizing legislation placed specific constraints on the purposes for which those appropriated funds could be used. The applicable statute authorized ERDA to enter into agreements for the research and development, design, construction, and operation of a demonstration reactor that would comply with criteria approved by the Joint Committee on Atomic Energy. *See* section 106, Pub. L. No. 91-273, *as amended by* Act of December 31, 1975, Pub. L. No. 94-187, § 103(d), 89 Stat. 1069. As the proposed curtailment actions would have been inconsistent [*11] with the approved criteria and thus with the statutory scheme, we considered use of funds to further such actions to be unauthorized.

In contrast to the Clinch River opinion, we have on occasion been asked for our views on the legality of project termination or curtailment expenditures where the project on program that was to be terminated had not been specifically provided for in either the applicable appropriation or authorization statute, but instead had been part of an agency effort to implement a broader statutory directive. In a recent case, we stated that expenses pertaining to the termination of activities carried out in furtherance of a statutory program could be paid from funds appropriated for that program, so long as the proposed termination action would not result in such a curtailment of the overall program that it would no longer be consistent with the statutory requirements. *See* B-203074, August 6, 1981, in which we approved the use of funds appropriated for implementation of the Railroad Reorganization and Regulatory Reform Act of 1976 to terminate contracts intended to meet certain goals of that statute. *Accord* B-115398, August 1, 1977, concerning termination [*12] of B-1 bomber production.

The present situation is comparable to these latter cases. First, none of the fossil energy research and development projects and activities that are the subject of DOE's proposed terminations and reductions is specifically provided for in either the fiscal year 1982 appropriation statute or the fiscal year 1982 funding authorization, both of which refer broadly to fossil energy research and development activities of Energy. *See* Pub. L. No. 97-100, 95 Stat. 1391, 1407 (1981); Pub. L. No. 97-37 § 1001, 95 Stat. 357, 606 (1981). Instead, each project and activity was initiated as part of Energy's effort to implement the research and development requirements of the nonnuclear Energy Act. Second, while the original program authorization, contained in the Nonnuclear Energy Act, requires that Energy's program be designed to advance certain specific categories of energy technology, it does not explicitly require the program to include any of the individual projects and activities now considered for termination.

In connection with this latter point, we recognize that section 6(b)(3) of the nonnuclear Energy Act requires Energy to design its Nonnuclear [*13] Energy Research and Development Program to advance the development and demonstration of specific categories of energy technology, 42 U.S.C. § 5905(b)(3). Among the technologies specifically mentioned are Magnetohydrodynamics (although only "if practicable") and In Situ Coal Gasification, both of which have been targeted for termination by Energy. We do not, however, consider section 6(b)(3) to be a mandatory list of technologies that must be pursued at all times with the overall program. Certainly, if any of the listed technologies proved to be technologically infeasible, commercially impractical, or simply too expensive to pursue at a particular time, the Congress did not intend that the Secretary continue implementation of such projects. This view is confirmed by section 15 of the act, in which the Congress anticipates annual revisions to the program. *See* 42 U.S.C. § 5914. It is also confirmed by section 5 of the statute, which sets out broad criteria that are to govern the Secretary's actual selection of projects to constitute the program at any given time. *See* 42 U.S.C. § 5904. Consequently, so long as the program that is transmitted to the Congress contains [*14] a full justification for the degree of emphasis for each of the technologies listed in the statute, the Secretary may decide to discontinue present research and development activities in any particular technology, so long as that decision is made in conformance with the criteria of section 5.

Consistent with our previous opinions regarding terminations of nonmandatory program activities, we consider that expenses pertaining to the termination of activities carried out in furtherance of the Fossil Energy Research and Development Program may be paid from funds appropriated for that program, so long as the proposed termination activities do not result in such a curtailment of the overall program that it would no longer be consistent with the Nonnuclear Energy Act. Consequently, the underlying question in this matter is whether Energy's proposed "realignment" of the program, of which these termination activities would be a part, is in violation of the requirements of the Nonnuclear Energy Act. We conclude that it is not.

As described above, the Nonnuclear Energy Act affords the Secretary of Energy considerable discretion in the selection of individual programs, projects and activities, [*15] so long as those selections are made in accordance with certain principles and criteria set out in section 5, 42 U.S.C. § 5904. Of particular relevance to an examination of the Secretary of Energy's proposal to restructure the fossil energy program are the criteria contained in 42 U.S.C. § 5904(b)(2). That provision requires that, in the execution of an energy research and development program, the selection of individual research efforts should be determined by reference to the following:

(A) The urgency of public need for the potential results of the research, development, or demonstration effort is high, and it is unlikely that similar results would be achieved in a timely manner in the absence of Federal assistance.

(B) The potential opportunities for non-Federal interests to recapture the investment in the undertaking through the normal commercial utilization of proprietary knowledge appear inadequate to encourage timely results.

(C) The extent of the problems treated and the objectives sought by the undertaking are national or widespread in their significance.

(D) There are limited opportunities to induce non-Federal support of the undertaking through regulatory actions, [*16] end use controls, tax and price incentives, public education, or other alternatives to direct Federal financial assistance.

(E) The degree of risk of loss of investment inherent in the research is high, and the availability [of] risk capital to the non-Federal entities which might otherwise engage in the field of the research is inadequate for the timely development of the technology.

(F) The magnitude of the investment appears to exceed the financial capabilities of potential non-Federal participants in the research to support effective efforts. 42 U.S.C. § 5904(b)(2).
The Congress expected these criteria to be in conflict with one another upon occasion, and the Administrator of ERDA (now the Secretary of Energy) was encouraged to balance these factors in determining which efforts should be federally supported. *See* H.R. Rep. No. 93-1563, 93d Cong., 2d Sess. 23 (1974).

In restructuring the Fossil Energy Research and Development Program, Energy appears to be reexamining existing programs with strong emphasis given to the criteria of 42 U.S.C. §§ 5904(b)(2)(E) and (F), which indicate the appropriateness of Federal efforts when the private sector is unable or unwilling [*17] to pursue such efforts. Consequently, many of Energy's termination decisions reflect the Reagan Administration's conclusion that industry should be expected to support the development, from the pilot plant stage onwards, of advanced technologies the engineering feasibility of which has been established. Consistent with this conclusion is the decision to concentrate Federal involvement in more generic research efforts and long-term technology base development.

In some cases, Energy has proposed the termination of programs and activities that in fact satisfy the criteria of 42 U.S.C. §§ 5904(b)(2)(E) and (F) in that high development risks and costs have discouraged private sector involvement. Nonetheless, these criteria must be balanced by that of 42 U.S.C. § 5904(b)(2)(A): a high urgency of public need for the potential results of the research. One example of Energy's reevaluation of programs in light of these multiple factors is the Magnetohydrodynamics (MHD) research and development program. Energy has concluded that MHD technology has higher risks and costs than other Energy-funded electricity generating technologies, a factor that would satisfy the Federal-support criteria [*18] of 42 U.S.C. §§ 5904(b)(2)(E) and (F). *See* Department of Commerce, Energy Research and Technology Administration, *Congressional Budget Request FY 1983,* Vol. 5 at 66 (1982). Energy, however, considers this factor outweighed by the fact that other alternative electricity technologies should be ready for commercial introduction far sooner than MHD. *Id.* The "urgency of public need" of 42 U.S.C. § 5904(b)(2)(A), it appears, has been determined to lie elsewhere.

While favoring Energy's general view that it is preferable to have the private sector carry out activities to promote new energy technology, this Office has stated in the past our opinion that private industry's willingness and ability to advance energy supply technologies may have been overestimated. *See Analysis of Federal Energy Roles and Structures,* EMD-82-21, B-205424, January 20, 1982, at 18. We have also been critical of Energy's categorization of certain technologies as "near-term" simply because Federal efforts have been carried out for some time, and its resulting decision to discontinue efforts in these areas because commercial feasibility has not yet been show. *Id.* Despite our criticisms [*19] of Energy's Fossil Energy Research and Development Program, however, and despite our questioning many of the assumptions upon which the proposal to realign that program is based, we cannot conclude, as a legal matter, that Energy's proposals violate the requirements of the Nonnuclear Energy Act. As we have stated above, the statute gives the Secretary of Energy considerable discretion in formulating and executing a research and development program, so long as certain broad principles and criteria are followed. As Energy's proposals appear to be consistent with those factors, we cannot conclude that the proposed program revisions are an abuse of discretion.

We conclude, therefore, that it is lawful for the Department of Energy to use fossil energy research and development funds for expenses incurred in the termination of fossil energy programs and activities no longer considered to be consistent with the Reagan Administration's fossil energy research and development objectives.

*II. Proposed Deferral of Funds*

As described above, Energy proposed to defer to fiscal year 1983 some $45 million in fossil energy research and development funds to cover various expenses related [*20] to reductions and terminations within the Fossil Energy Research and Development Program. n1 The committee members have first asked whether the proposed deferral should have instead been classified as a rescission. We conclude that it was correctly classified as a deferral.

n1 As we indicated above, the Congress has already disapproved the proposed deferral. *See* H.R. Res. 411, 97th Cong., 2d Sess., 128 Cong. Rec. H1660 (daily ed. April 29, 1982).

The Impoundment Control Act of 1974, 31 U.S.C. § 1400 *et seq.*, covers two types of impoundment actions: "rescissions" and "deferrals." A deferral of budget authority is defined as a withholding or delaying (whether by establishing reserves or otherwise) of the obligation or expenditure of budget authority provided for projects or activities. 31 U.S.C. § 1401(1). While the term "rescission" is not specifically defined in the statute, section 1012(a) provides guidance as to when a rescission exists. That provision requires the President to report a proposed rescission:

Whenever the President determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for [*21] which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons (including the termination of authorized projects or activities for which budget authority has been provided) * * *. 31 U.S.C. § 1402(a).

In those cases where we have been asked to examine an impoundment of funds in connection with the termination of a particular program or activity, the typical situation has involved a proposed rescission. In those instances, once the activity has been successfully shut down, funds remaining for obligation are no longer needed and are proposed to be rescinded. *See, e.g.*, our Clinch River opinion, B-115398.33, *supra.* This type of situation was clearly contemplated by the Congress is drafting section 1012(a) of the Impoundment Control Act, as project termination is expressly given as an example of the reasons that might occasion a rescission proposal. 31 U.S.C. § 1402(a). We do not consider, however, the language "other reasons (including the termination of authorized projects or activities) * * *" to mean that every impoundment in connection with a program termination must be classified as a rescission.

In the present case, [*22] Energy has stated its intention to expend the entire amount of budget authority provided in the fiscal year 1982 appropriation for costs pertaining to the reorganization of the Fossil Energy Research and Development Program, including termination expenses. In actuality, Energy merely proposed to delay the obligation or expenditure of budget authority. This is defined by section 1011(1) as a deferral. 31 U.S.C. § 1401(1)(A).

The committee members' second question is whether Energy could initiate program termination actions in the Fossil Energy Research and Development Program in advance of congressional action on the proposed deferral of funds from that program. The question, however, presupposes the existence of a legal connection between the proposed deferral and the initiation of present fossil energy project termination activities. We find no basis for such a connection. We recognize that the intended use of the deferred funds was to finance future termination expenses incurred to the proposed realignment of the program. Nonetheless, the termination activities that are the subject of the committee members' attention are those that are proposed to be financed from present [*23] sources. Because, as discussed previously, present termination expenses would be properly chargeable to the fiscal year 1982 fossil energy appropriation, termination activities could be continued without regard to congressional action on the proposed deferral.

Finally, we note that continuation of fossil energy termination activities would not interfere with the power of the Congress, contained in the Impoundment Control Act, to prevent the withholding or delaying of obligation or expenditure of budget authority by the Executive branch. Section 1013(b) of the statute provides that budget authority proposed to be deferred must be made available for obligation if either House of the Congress passes an impoundment resolution disapproving the deferral. 31 U.S.C. § 1403(b). In the present case, funds released by congressional action would be available, either directly or through reprogramming actions, for any valid activity of the Fossil Energy Research and Development Program, including the very termination activities the continuation of which has been questioned by the committee members. We conclude, therefore, that there was no legal requirement that would have prevented the [*24] Department of Energy from initiating termination activities within the Fossil Energy Research and Development Program in advance of congressional action on the deferral proposal.

CONCLUSION

For the reasons discussed above, we conclude that Energy may use fossil energy research and development funds for expenses pertaining to the termination of various research and development programs and projects no longer considered to be consistent with the Reagan Administration's fossil energy research and development objectives. In addition, we consider that the impoundment proposed by Energy of certain fossil energy funds to be used for later termination expenses was correctly classified as a deferral, and that there is no legal requirement that would have prevented Energy from commencing termination activities before the Congress had acted on the impoundment proposal.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Energy & Utilities LawConservationGeneral OverviewEnergy & Utilities LawElectric Power IndustryGeneral Overview

# ATTACHMENT 3

# EXHIBITS

**Calderon Process Development Unit**

**Alliance, Ohio**



Exhibit 1

# An Alternative Route for Coal To Liquid Fuel

## ExxonMobil Methanol to Gasoline (MTG) Process




Sam Tabak
Xinjin Zhao
ExxonMobil Research and Engineering

Adrian Brandl
Max Heinritz-Adrian
Uhde GmbH


World CTL 2008

First World Coal-to-Liquids Conference
April 3-4, 2008, Paris, France

ExxonMobil

Exhibit 2

# Options for Coal To Liquids




- All are 3 Step Process
- Thermal Efficiencies are Essentially Governed by Coal or Natural Gas C/H Ratios...Fuels are ~C/H2
  - Coal is ~CH to Fuels plus CO2
  - Natural gas is CH4 to Fuels plus H2O

ExxonMobil

# Syngas Generation Dominates Capital Investment




- Our evaluation indicates that syngas generation is about 60-70% of the capital investment
- Issue is quantity of and quality of liquid products.

ExxonMobil


Product and Process Simplicity for MTG
COAL TO LIQUID
Fischer Tropsch Co Catalyst @220C
Fischer Tropsch Fe Catalyst@340C
MTG
H-Coal™ Direct Liquefaction
Fuel Gas 6 15 1.1
LPG 6 23 10.0
Naphtha 19 36 88.8 36.7
Distillate 22 16 43.3
Fuel Oil/Wax 46 5 20
Oxygenates 1 5 0.1 0.34
REFINERY
Naphtha Reforming
HDT/HDC
DEWAX
Polygas Process
Naphtha Reforming
HDT/HDC
Recovery
Naphtha Reforming
HDT
HDT/HDC
ExxonMobil


CTL Plant: Example Overall Mass Balance
Gasification
MeOH
MTG
~13,900 mtpd Coal
(4.6 million t/a)
Coal
Yields and Capital Costs Dependent on Coal Quality
• Ash Content
• Moisture Content
• Sulfur
• Heating Value
1.4 million t/a Gasoline
(36,000 bbl/d)
0.16 million t/a LPG
(6,622 bbl/d
Sulfur, Fuel gas, CO2
Liquid Fuels
ExxonMobil

# *MTG is Relatively Un-coupled Technology*




| Products | HC Yields |
|---|---|
| Gasoline | ~89% |
| Fuel Gas | ~1% |
| LPG | ~10% |

ExxonMobil

# *Unique Shape Selective Chemistry*

- Unique "*Shape Selective*" chemistry discovered in the early 1970's
- Development done through the 70's/80's on a variety of process options
- Plant started up 1985 and operated successfully for ~10 years until conversion to chemical grade Methanol production
- Second generation Coal based plant scheduled for YE 2008 start-up in China
- Additional plant in Engineering for Medicine Bow, Wyoming




ExxonMobil

# MTG Was Commercially Operated




Commercial 14500 BPD plant in New Plymouth New Zealand. Plant ownership 75% NZ Government and 25% ExxonMobil

ExxonMobil

## Plant Start-up: Total Gasoline Yield




ExxonMobil


New Zealand MTG Unit Gasoline Yield
GASOLINE YIELD, WT% OF HC
95
90
85
80
75
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
12 RVP


New Zealand MTG Unit Gasoline Octane
GASOLINE OCTANE, RON
98
96
94
92
90
88
86
12 RVP
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
ExxonMobil

# New Zealand Finished Gasoline Quality

| | Average | Range |
|---|---|---|
| Octane Number, RON | 92.2 | 92.0 – 92.5 |
| Octane Number, MON | 82.6 | 82.2 – 83.0 |
| Reid Vapor Pressure, kPa | 85 | 82 – 90 |
| Density, kg/m$^3$ | 730 | 728 – 733 |
| Induction Period, min. | 325 | 260 – 370 |
| Durene Content, wt% | 2.0 | 1.74 – 2.29 |
| Distillation | | |
| % Evaporation at 70° C | 31.5 | 29.5 – 34.5 |
| % Evaporation at 100° C | 53.2 | 51.5 – 55.5 |
| % Evaporation at 180° C | 94.9 | 94 – 96.5 |
| End Point, °C | 204.5 | 196 - 209 |

ExxonMobil

# MTG Gasoline vs. US Conventional Gasoline

- MTG Gasoline is completely compatible with conventional gasoline infrastructure.
- MTG Gasoline contains essentially no sulfur and low benzene contents.

| | 2005 Summer | 2005 Winter | MTG Gasoline | US Regulation |
|---|---|---|---|---|
| Oxygen(Wt%) | 0.95 | 1.08 | | |
| API Gravity | 58.4 | 61.9 | 61.8 | |
| Aromatics(%Vol) | 27.7 | 24.7 | 26.5 | |
| Olefins(%Vol) | 12 | 11.6 | 12.6 | |
| RVP(psi) | 8.3 | 12.12 | 9 | |
| T50(F) | 211.1 | 199.9 | 201 | |
| T90(F) | 330.7 | 324.1 | 320 | |
| Sulfur(ppm) | 106 | 97 | 0 | 30 |
| Benzene(%Vol) | 1.21 | 1.15 | 0.3 | 1 (0.62) |

Data Sources: US Average gasoline data from US EIA website

ExxonMobil

# 2nd Generation MTG Technology

- Second Generation Design based on learning's from 10 years of NZ operation
  - Reduced capital cost
  - Reduced utilities cost
- First coal based 2nd. Generation plant scheduled for start-up in late 2008 in China. Second plant in Engineering for 2011 start-up in the US
- Both plants have MTG Technology from ExxonMobil and Basic Engineering by Uhde

DKRW has selected MTG Technology for its CTL project in Medicine Bow, Wyoming. Producing ~15,000 BPD of gasoline. Basic design of the plant is under way with start-up expected in 2011.




MTG plant currently under construction at Jincheng, Shanxi is second generation MTG process. The plant is scheduled to start in late 2008.



*ExxonMobil is the world leader in catalyst development and we manufacture our own catalysts.*



ExxonMobil

# *Key Project Considerations*

**Technical Risk**

- Methanol to Gasoline (MTG) and Coal based Methanol manufacture are both commercially proven technologies

**Simplicity**

- MTG does not require a "refinery" to make a marketable fuel product.

**Operability**

- Methanol is storable which enhances operability between stages

**Constructability**

- MTG uses gas phase conventional type fixed bed reactors

**Flexibility**

- MTG can be used for methanol from other sources such as coal bed methane.
- MTG allows staged investment between methanol and gasoline.

ExxonMobil


EMRE/Uhde Partnership Provides Full Range of CTL Services
Coal
Gasification
Methanol
Uhde
ThyssenKrupp
• Uhde provides feasibility studies for the entire process of clean gasoline production from coal. The study includes gasification, gas treatment, methanol synthesis and MTG.
• Uhde provides licenses of different gasification technologies to meet customer's specific need.
• Uhde also provides methanol synthesis technology.
• Uhde is a full range EPC contractor.
ExxonMobil
Research & Engineering
• EMRE provides technology license for Methanol to Gasoline Technology
• EMRE provides basic engineering design package for licensees to perform detailed engineering design and construction.
• EMRE provides catalysts for the MTG process.
• EMRE provides assistance for start-up and troubleshooting
MTG
Gasoline
ExxonMobil

# NZ Synfuel Plant



Commercial 14500 BPD plant in New Plymouth New Zealand. Plant ownership 75% NZ Government and 25% ExxonMobil.

ExxonMobil




# So Advanced, Yet So Simple.

**Commercially Proven Route for The Production of Clean Gasoline from Coal through Coal Gasification, Methanol Synthesis, and Methanol Conversion**

ExxonMobil's Methanol-to-Gasoline (MTG) Technology, the key step for coal to gasoline conversion, was commercially operated in New Zealand for over ten years. Now we offer the second generation MTG technology which provides:

- Ultra clean, high octane gasoline
- A product fully compatible with refinery gasoline
- Simple, reliable fixed bed reactor design
- A more economically competitive offering

For more information please contact your ExxonMobil representative.

**www.exxonmobil.com/refiningtechnologies**

3225 Gallows Road, Fairfax, Virginia 22037, USA
703-846-2568 • fax 703-846-2725

ExxonMobil
*Research and Engineering*

ExxonMobil

BECHTEL

# Telephone call

COPY: R. K. Bates, A. C. Calderon, R. C. Clemons, T. Morris-White, H. C. Lynch, R. G. Duthie

BY Conference Call J. A. Carragher, R. K. Bates OF Bechtel Scottsdale

TO Albert Calderon, R. G. Duthie OF Calderon Automation Bechtel R&E

DATE January 12 19 84 TIME 9:10 AM

SUBJECT Calderon Process JOB NO. 90165

Albert explained his current rationale for favoring total gassification in the Calderon retort by means of water gas production using oxygen and superheat steam in the quench unit. The current material balance shows a ratio of $H_2$ to CO of 2.36 to 1. Albert believes it would be desirable to reduce this ratio closer to 1:1 as required by the Fischer-Tropsch Process. He wants to do this by converting more of the carbon in the coke to CO. Total gassification would also allow operation of the retort at lower temperature (1900°F) since there would be no coke product and therefore no need to desulfurize at 2800°F. This would reduce electrical power to the induction heating coil by about 25 percent (or to about 700KW/Ton Coal).

Bechtel R&E has recently completed a comparison study of end uses of syngas and believes that Fischer-Tropsch processing has a definite cost disadvantage over methanolization. Methanol synthesis requires a ratio of $H_2$ to CO closer to 2.0 which fits Albert's test results and can be used in conjunction with the Mobile process to make high octane gasoline. Total gassification in the Calderon Process would put it in competition with other gassifiers and at a disadvantage in thermal efficiency due to the electrical power input requirement. The addition of oxygen is also seen as a cost disadvantage.

It was agreed that the present direction should remain coke and gas production with gas cracking and desulfurization and with methanolization and gasoline production from the syngas.

The current M&M flowsheet and material balance will be maintained and R&E will work on the gas processing.

Albert is demonstrating the process at Castmasters for personnel from the State of Ohio Department of Development on January 18. Bechtel may have some recommendations for data gathering, such as cracker regeneration gas analysis and will transmit our thoughts to Albert next week.

Albert has mailed samples of regenerated limestone to Scottsdale.

# Calderon Methanol/Gasoline Power Process

# Demonstration Plant Conceptual Design and Cost Estimates

Prepared for
Calderon Energy Company

April 1991

Bechtel National, Inc.

1899G/1/Calderon/277

Section 1

# Summary

The Calderon Methanol/Gasoline and Power Process represents a unique combination of carbonaceous feed pyrolysis, combined with hot gas treating to produce a syngas for conversion to methanol/gasoline and a byproduct fuel gas for power generation.

## 1.1 PROCESS FEATURES

These process components are integrated as illustrated in Figure 1.1-1. As illustrated in this figure, the feed for the demonstration plant can be a flexible mix of high sulfur run-of-mine coal, scrap tires, biomass (as illustrated by corn). These are pyrolyzed and the char produced is then gasified with air. Ash and metallic components of the feed are removed as a vitreous inert slag.

The hot gases from the char gasification are desulfurized over lime. Hot lime from this process is then used to crack and desulfurize the pyrolysis vapors to yield a syngas for conversion to methanol. The methanol may be segregated as a marketable product or converted to a sulfur-free gasoline blending stock. The fuel gas from the char gasification fires a combined cycle system for power generation. The lime, with its contained sulfur and carbon, is regenerated to yield marketable sulfur and additional fuel gas.

The proposed demonstration plant is scaled to produce 80 MWe export power as a co-product to the production of 50 MM gal per year of methanol,or conversion of this methanol to 19.2 MM gal per year of gasoline and 4 MM gal/yr of LPG (21 MM gal/yr gasoline equivalent). The mixed feed requirement is 984 t/d coal, 188 t/d of corn, and 84 t/d of waste tires (or some equivalent blend)

The plant scale was selected to meet the classification requirements of a small power producer and, at the same time, be of appropriate scale to demonstrate the commercial feasibility of the process. The scale is also compatible with the proposed use of the process for waste disposal (waste tires, etc.) while drawing this waste from a limited geographic area.

ModernPowerSystems
COMMUNICATING POWER TECHNOLOGY WORLDWIDE

Home
New Build Conference 2008
Events diary
Search
News
Planned projects and tenders
Recent features
Turbine Directory
Marketplace
About MPS
Subscribe now
Forthcoming features
Contact us
Submit an article
International Water Power & Dam Construction magazine
Nuclear Engineering International magazine
Central European Power Show

Company profiles
Click the company logos to view their profile
SULZER
DEKOMTE

Email Newsletter
Sign up here for the latest industry news delivered straight to your in-box.

News

# IGCC stumbles and falls in the US. The spate of cancellations is becoming a flood

26 November 2007

Citing uncertainty about potential state regulation on greenhouse gas emissions, Atlanta-based Southern Co and the Orlando Utilities Commission have scrapped plans for a 285 MW integrated gasification combined cycle (IGCC) facility at the Stanton Energy Centre, two months after breaking ground on the project in September. Instead, the partners will build a conventional natural gas fired plant.

The $850 million plant is the fourth coal project in Florida to be dropped this year, but the first that was already under construction. A Southern Co spokesman said the possibility of an executive order from Florida governor Charlie Crist (under legislation signed by the Republican governor earlier this year setting statewide greenhouse gas caps for the power sector) that would require power plants to capture and store carbon dioxide emissions 'raised the level of risk' for the Stanton project. Ironically, such regulations are usually put in place to create financial incentives for cleaner forms of power generation, such as IGCC

The project was one of four selected by the US Department of Energy under the second round of president Bush's Clean Coal Power Initiative, a $2 billion, 10-year effort to advance technology to meet growing demand for low-cost power and reduced carbon emissions.

The total cost of Stanton, which would have been a demonstration project for a kind of gasification known as transport gasification, was estimated at $855 million, with the US Department of Energy contributing $293 million of that sum. Southern Co said it expects to record a $50 million pretax impairment loss in the fourth quarter due to the termination of the project.

Stanton is just the latest in a series of high profile coal firing cancellations. In Minnesota, a series of hearings involving the Mesaba IGCC?project developer Excelsior and the purchaser of its output Xcel Energy has resulted in the Public Utilities Commission effectively scuppering the project. In August the Commission came close to terminating the negotiations and putting an end to Excelsior's quest for a forced PPA with Xcel. In the course of the discussion the Commissioners indicated that no utilities need or want Mesaba's energy because it uses coal and is too expensive. They noted that plans for coal-gasification plants have recently been delayed or cancelled in three other states. Technically, Mesaba is still alive, but its health depends on Excelsior's finding a customer, which is considered highly unlikely, or, just as unlikely, the MPUC changing its mind at the next hearing, which takes place soon.

Buyer's Guide
Search 100's of products or companies
Product GO
Company GO

Browse by category A to Z
A B C D E F G H I J
K L M N O P Q R S
T U V W X Y Z

Site Search
Site and archive search
Search GO

**Exhibit 5 (page 1 of 2)**

been investigating the feasibility of developing in Colorado a $1 billion-plus IGCC power plant with carbon capture and sequestration. After collecting data and doing some

preliminary engineering studies the company has pulled out of the project, at least for a while. 'Xcel's technology won't include a cutting-edge power plant [IGCC] until at least 2016' according to CEO Dick Kelly at a PUC conference earlier in the year. The reasons given are that the plant will be too costly, and the company can't find a partner to help build it.

Other firms that have dropped coal projects include Tampa Electric Co (TECO) which recently cancelled a planned $2 billion IGCC plant in Florida, also due to uncertainty created by governor Crist's new executive orders, Southwestern Power Group which has cancelled plans to build an IGCC plant in Bowie, Arizona, because of the project's high cost and uncertainty surrounding federal greenhouse gas regulations, and Texas-based Tondu, which has abandoned its Nueces IGCC project and now plans, as do Southwestern Power, to build a gas plant instead.

In 2004 American Electric Power signed an agreement with GE Energy and Bechtel to begin the front-end engineering design process for a commercial-scale IGCC plant in the 600 MW range, known as the 'Appalachian'. It is understood that American Electric Power has delayed its planned start up date until 2015, although speaking at the recent World Energy Congress CEO Michael Morris said he was comfortable with the costs of the project, which 'are in line with what we expected'.

Modern Power Systems ©2008
Published by Wilmington Media Ltd.

Terms & Conditions

emerging energy research

On Point

**Clean Power Generation Advisory**

ID#CPG 715-071005

5 October 2007

# TECO, Nuon Cancellations Underscore IGCC's Woes

*Much of the momentum building behind IGCC has waned in 2007 as rising capital costs, stabilizing natural gas prices, and an uncertain carbon policy outlook have undermined IGCC's competitiveness for power generation. Highlighting this trend, two substantial regional utilities—Nuon in the Netherlands, and Tampa Electric in the US—have recently scuttled plans to build second generation IGCC projects. The fact that these companies—which have prior significant IGCC operating experience—have been unable to justify their projects' financial and planning risks highlights IGCC's deteriorating near-term commercial outlook.*

**Alex Klein**
**Tel +1 617 551 8482**
**aklein@emerging-energy.com**

## BACKGROUND

After two years of deliberation and project evaluation, on 18 September 2007 major Dutch utility Nuon tabled its proposed 1,200 MW IGCC project in Eemshaven, Netherlands. The project would have been a scaled-up version of Nuon's 253 MW IGCC plant—the world's first commercial coal IGCC demonstration project—which Nuon built and has owned and operated since 1994.

On the heels of this announcement, regional Florida utility Tampa Electric (TECO) announced on 4 October 2007 that it is shelving plans to proceed with a 630 MW IGCC project. TECO owns and operates the 250 MW Polk IGCC project in Tampa, one of two coal- and petcoke-fired IGCC plants operating in the US. TECO had been awarded over $130 million in tax credits in 2006 from the US government to build the project, which it now must forfeit.

Both companies remain supportive of IGCC as an attractive, relatively clean option to meet future baseload requirements; but, unless market conditions change, these cancellations are a very clear indication of the widespread challenges facing IGCC over the next two to five years.

**Exhibit 1: TECO & Nuon Overview and Involvement with IGCC**

| | | NUON | TECO |
|---|---|---|---|
| Company Overview | Business | Generation, transmission, distribution of power and gas | Generation, transmission, distribution of power and gas |
| | Turnover | €5.6 billion | $3.5 billion |
| | Core Markets | Netherlands | Florida, US |
| Existing IGCC Experience | Project | Buggenum | Polk – Unit 1 |
| | Capacity | 253 MW | 250 MW |
| | Year of Start-up | 1994 | 1996 |
| | Company Involvement | Build, own, operate | Own and operate |
| IGCC Project Cancelled in 2007 | Project | Magnum | Polk – Unit 6 |
| | Date Previously Expected to Start-up | 2013 | 2013 |
| | Capacity | 1,200 MW | 630 MW |
| | Project Comments | Intended to co-fire significant quantities of biomass | Awarded $130 million in US federal tax credits |

Source: Companies, Emerging Energy Research

## ANALYSIS

**TECO latest setback for IGCC in the US.** While the US remains the hottest global IGCC development market, with over 17,000 MW actively in planning, the last year has seen significant numbers of IGCC projects shelved or stalled as developers, IPPs, and utilities have

Emerging Energy Research provides analyst-directed advisory services on an annual subscription basis, providing market intelligence, competitive analysis and strategy advice in response to the specific needs of our clients. These services provide value-added support of clients' competitive and market strategies, and are intended to be interactive, offering clients direct access to EER experts.

Advisory service clients receive a stream of market and company briefs, ongoing market data and forecast support, telephone inquiry privileges, and regular analyst briefings. While much of the content is syndicated, clients also receive ongoing individual support of market assessment and strategy development needs.

For more information, please contact us at:

info@emerging-energy.com

Emerging Energy Research
700 Technology Square
Cambridge, MA 02139 USA
Phone: +1 617 551 8480
Fax: +1 617 551 8481

Emerging Energy Research
Paseo de Gracia 60, 3B
Barcelona 08007 Spain
Phone: +34 93 467 6750
Fax: +34 93 467 6754

Or visit our website:
www.emerging-energy.com

**© 2007 EMERGING ENERGY RESEARCH, LLC.** All rights reserved. Reproduction of this publication in any form without prior written permission is strictly forbidden. The information contained herein is from sources considered reliable but its accuracy and completeness are not warranted, nor are the opinions and analyses which are based upon it.

been unable to justify IGCC investments in the context of spiraling capital costs, lack of satisfactory technology performance guarantees, unavailability of lump sum turnkey contracts, and an uncertain carbon policy environment (see **Exhibit 2**).

**Exhibit 2: Prominent US IGCC Projects Cancelled or Facing Challenges in 2007**

| Developer | US State | Status | Reasons for Stalling |
|---|---|---|---|
| NRG | Connecticut | Canceled | Could not meet RFP timeline for delivery |
| TECO | Florida | Canceled | State carbon policy uncertainty, rising costs |
| Tondu Corp | Texas | Canceled | Rising costs, limited technology guarantees |
| Bowie Power | Arizona | Canceled | Delayed local planning process, environmental opposition |
| Buffalo Energy Partners | Wyoming | Canceled | Transmission constraints, rising costs, limited available technology guarantees and unsuccessful bid for funding |
| Mesaba | Minnesota | On hold | Increased costs have caused regulators to force renegotiation of costs |
| Madison Power | Illinois | On hold | Construction of a nearby supercritical coal plant has hindered power demand and tied up transmission and coal transport infrastructure |
| Tenaska, ERORA | Illinois | On hold | Local opposition to IGCC without carbon capture hampering regulatory proceedings |
| NRG | New York | On hold | Must find cost reductions to maintain state-awarded financial support |

Source: Emerging Energy Research

Of the many companies that announced IGCC projects in the past few years, TECO seemed one of the best positioned to navigate the significant commercial challenges. The company has been able to leverage 10 years of improving operational experience at its existing plant, a close working relationship with key technology suppliers, and a successful bid in 2006 for over $130 million in tax incentives from the US federal government.

However, with costs escalating—estimated at a 30% to 50% increase since the beginning of 2006, and as much as a 100% increase since 2004—TECO could not justify the risk return profile of the project, even considering its financial support (see **Exhibit 3**).

**Exhibit 3: IGCC Capital Cost Increases, 1990s–2007**




Source: Emerging Energy Research

© 2007 EMERGING ENERGY RESEARCH, LLC. All rights reserved. Reproduction of this publication in any form without prior written permission is strictly forbidden. The information contained herein is from sources considered reliable but its accuracy and completeness are not warranted, nor are the opinions and analyses which are based upon it.

Adding to TECO's decision to cancel the project was the mounting uncertainty over carbon policy, both at the state and federal level. Earlier in the year, Florida Governor Charlie Crist signed legislation to establish a target to reduce the state's greenhouse gas emissions from 1990 levels by 80% in 2050. In response, TECO stepped up the consideration of capturing and sequestering $CO_2$ from the plant, but the high associated costs, technology uncertainty, and liability risks made relying on CCS unfeasible for meeting potential future carbon restrictions. Still, with a need for 600 MW of baseload capacity forecasted in 2013, TECO is re-evaluating other generation options, which it will decide upon in 2008.

**Nuon shifts project to CCGT, seeks sequestration demonstration.** Also siting the considerably increased costs of late, Nuon has decided to build a 1,200 MW CCGT plant, while delaying the decision to proceed with IGCC by two years. This new project will be located in the Groningen region, approximately 160 miles north of its existing Buggenum IGCC facility.

Nuon is perhaps the world's biggest utility proponent of IGCC, having operated and continually invested in its 253 MW Buggenum IGCC project. Unique to Nuon's IGCC experience has been the steady increase of biomass co-firing at Buggenum, which has enabled the company to access significant Dutch-specific renewable energy subsidies.

Nuon's original intention was to build a 1,200 MW multi-fuel project at Groningen, with 60% of the output derived from co-gasification of biomass and coal and the remaining 40% derived from natural gas. This configuration would have allowed increased flexibility to provide coal-derived baseload power generation, while leveraging biomass and natural gas to moderate climate emissions and adjust for peak load requirements.

However, given the significant cost barriers for the IGCC component, Nuon has changed course, shifting the 1,200 MW to all natural gas with plans to re-evaluate integrating a gasification element with the new power blocks in 2009, depending on how gas prices and carbon legislation evolve.

Carbon sequestration will also be a key consideration for Nuon regarding proceeding with its gasification plant. To foster its understanding of the costs and challenges, Nuon is initiating a pilot-scale capture and sequestration trial at its Buggenum plant, which it hopes will help determine the viability of this option to address future European climate change regulations.

**IGCC's outlook could sour further in the short-term.** The key factors dampening IGCC's short-term outlook—technology uncertainty, high commodity prices, a tight EPC labor market, and a lack of meaningful carbon policies—seem unlikely to shift significantly in the next 12 months. Considering IGCC's three- to four-year construction cycle, the technology can expect to experience barriers for meeting baseload generation capacity until 2012.

For IGCC plant suppliers such as Mitsubishi, GE, and Siemens, this is unlikely to pose a significant concern as efforts remain focused on standardizing plant designs, integrating newly acquired technologies, and building a select few initial full-scale demonstration projects to define and improve IGCC's operating parameters for future roll-out beyond 2012.

However, with conventional coal combustion stalled virtually everywhere in the developed world due to climate change concerns, and nuclear projects facing very long lead times, utilities in Europe and North America seem certain to continue relying on a combination of CCGT and renewables to plug capacity needs for the next few years. Moreover, as baseload capacity shortfalls mount and concerns of overexposure to natural gas rise, utilities can be expected to pressure carbon policy makers to move forward with legislation to lessen the substantial uncertainty facing the industry.

## ADDITIONAL EER RESOURCES

*Babcock & Brown Explores IGCC to Balance Wind in Texas.* On Point, 30 August 2007
*EOR Demand Brightens CCS Prospects in North America.* On Point, 15 August 2007.
*Carbon Sequestration Challenges Drive Downstream Strategies.* Market Brief, 8 August 2007.
*Global Power Industry Targets Carbon Capture.* Market Brief, 31 July 2007.
*Goldman Sachs Stokes IGCC Growth.* On Point, 13 April 2007.
*IGCC Prospects in US Power Generation.* Market Brief, 13 February 2007.

© 2007 EMERGING ENERGY RESEARCH, LLC. All rights reserved. Reproduction of this publication in any form without prior written permission is strictly forbidden. The information contained herein is from sources considered reliable but its accuracy and completeness are not warranted, nor are the opinions and analyses which are based upon it.

Exhibit 6 (page 3 of 3)

**Public release date: 15-Feb-2008**
[ | | ]

Contact: Christy Lambert
206-914-3669

# Coal gasification -- myths, challenges and opportunities

***PNNL uses technology to advance the understanding of clean coal***

BOSTON -- There is a growing consensus that increased demand for electricity will cement coal's place in the energy portfolio for years to come. In fact, more than half of the electricity produced in the United States comes from coal. With demand for electricity expected to double by 2050 and renewable resources still years away from offsetting increased demand, it is clear -- coal is here to stay.



PNNL research scale gasifier

But can 'dirty' coal be used cleanly" The answer may be a resounding yes if gasification becomes common place, researchers said today at the 2008 Annual Meeting of the American Association for the Advancement of Science (AAAS) in Boston.

"Coal gasification offers one of the most versatile and clean ways to convert coal into electricity, hydrogen and other valuable energy products," said George Muntean, staff scientist at the Department of Energy's Pacific Northwest National Laboratory, during his presentation at the AAAS symposium entitled "Coal Gasification, Myths, Challenges and Opportunities."

PNNL scientists organized the symposium to provide an overview of how coal gasification can help meet the growing demand for clean energy.

"Gasification provides significant economic and environmental benefits to conventional coal power plants," Muntean said. Rather than burning coal directly, gasification breaks down coal into its basic chemical constituents using high temperature and pressure. Because of this, carbon dioxide can be captured from a gas stream far more easily than from the smokestacks of a conventional coal plant.

"If we plan to use our domestic supply of coal to produce energy, and do so in a way that does not intensify atmospheric $CO_2$ concentrations, gasification is critical," Muntean said. "It has the potential to enable carbon capture and sequestration technologies and play an important role in securing domestic sources of transportation fuels."

Many experts predict that coal gasification will be at the heart of clean coal technology if current lifespan and economic challenges are addressed. One significant challenge is the historically short lifespan of refractories, which are used to line and protect the inside of a gasifier. Currently, refractories have a lifespan of 12 to 16 months. The relining of a gasifier costs approximately $1 million and requires three to six weeks of downtime.

"Gasification happens in an extreme environment so the lifespan of refractories is historically low," said S.K. Sundaram, PNNL staff scientist. "Refractory lifespan must be increased before we can realize the promise of clean coal."

**Exhibit 7 (page 1 of 2)**

During the symposium, S.K Sundaram highlighted two advanced gasifier models developed at PNNL that provide a scientific understanding on when and why refractories fail at such high rates. The data collected from these models could enable advanced or alternative gasification technologies to be produced. Use of these models could extend refractory lifespans by 3 years.

"Advances in modeling will help us better understand some of the key challenges associated with coal gasification – refractory durability and lifespan," Sundaram said. "This will help reduce the capital costs of operating a coal gasifier."

During the symposium, researchers at PNNL also highlighted advances in millimeter wave technology that could be used for real-time measurement of critical parameters (temperature, slag viscosity, refractory corrosion) inside a gasifier. The millimeter wave technology, developed at PNNL, has been used for a number of different applications, from airport security to custom fit clothing. Although in the early stages of development for this application, the technology shows promise to increase the efficiency and safety of coal gasifiers.

"Advances in gasification will help us meet demand for clean energy worldwide," Sundaram said. "Science and technology are paving the way for cleaner coal for future generations."

###

During the session titled "Coal Gasification: Myths, challenges, and opportunities" George Muntean, staff scientist, Pacific Northwest National Laboratory will present "What Is the Future of Gasification Science and Technology" and S.K. Sundaram, staff scientist Pacific Northwest National Laboratory will present "Materials and Sensors for Coal Gasification". The session, part of the Future of Energy Track, is on Friday, Feb 15, 2008 from 1:45 to 4:45 p.m. at the Hynes Convention Center, Third level, room 304.

PNNL is a DOE Office of Science national laboratory that solves complex problems in energy, national security and the environment, and advances scientific frontiers in the chemical, biological, materials, environmental and computational sciences. PNNL employs 4,000 staff, has a $760 million annual budget, and has been managed by Ohio-based Battelle since the lab's inception in 1965.

[ Print Article | E-mail Article | Close Window ]

Back to EurekAlert!

**Exhibit 7 (page 2 of 2)**

BRUSH ENGINEERED MATERIALS

Brush Engineered Matierals, Inc.
17876 St. Clair Ave.
Cleveland, OH 44110
216-486-4200

Richard J. Hipple
Chairman, President and
Chief Executive Officer

February 25, 2007

Albert Calderon
Calderon Energy
P O Box 126
Bowling Green, OH 43402

Dear Albert:

As you know as past president of a major steel company, I have a long history of being involved with blast furnaces iron making. With regard to your question regarding refractory life, a blast furnace would typically last 10-12 years before requiring a refractory "reline".

In general practice, the making of iron in blast furnaces entails the charging of mainly coke, iron ore and limestone. What drives the reaction in a blast furnace is a "hot blast" system made-up of 1800°F preheated air that is injected into it via tuyeres.

Best regards,

Richard Hipple




*Typical Modern Blast Furnace*



WORLD'S LARGEST CHARGER AT INLAND STEEL INVENTED BY CALDERON FOR BASIC OXYGEN STEELMAKING PROCESS

Exhibit 9

OFFICE OF THE PRESS SECRETARY
WASHINGTON, DC 20585

DOE NEWS:

FOR IMMEDIATE RELEASE
MAY 31, 1983

# INTERNATIONAL SYNFUELS PROJECT BEGINS OPERATIONS
## FIRST TEST RUNS EXCEED EXPECTATIONS

In its first test runs, an experimental methanol-to-gasoline pilot plant built by the United States and the Federal Republic of Germany is exceeding the expectations of its designers.

The $15 million pilot facility, built during the last two and a half years, is jointly sponsored by the governments of the U.S. and Germany and a three-member industrial group. The industrial partners include the Mobil Research and Development Corp., and the German firms of Uhde, Gmbh; and Union Rheinische Braunkohlen Kraftstoff, AG.

Since it began full test operations five months ago at the URBK facility at Wesseling near Cologne, Germany, the pilot plant has converted about 135 barrels of methanol into high octane gasoline daily. The original design target was 100 barrels per day.

A key measure of the plant's performance, according to project officials, is its capability to manufacture gasoline without producing excessive amounts of other, less useful hydrocarbons. To date the plant's production of gasoline and gasoline feedstocks has exceeded the original target of 88 percent of the total hydrocarbon output.

Operators report that the plant has functioned smoothly with excellent control during the initial tests, including a recent run for six weeks without interruption. Plant start-up in December 1982 was accomplished with little difficulty.

"We are extremely pleased with the smooth start-up and excellent performance of the plant," said Jan W. Mares, the Assistant Secretary for Fossil Energy in the U.S. Department of Energy, which represents the U.S. government in the project. "Given the results of the early test runs at the plant, we believe we have made an excellent start in creating another energy option that both nations can draw upon in the future."

If the methanol-to-gasoline process is eventually commercialized by industry, it would form the second stage of a synthetic fuels plant. Methanol first would be produced by gasifying coal or biomass and chemically recombining the gases using conventional technology. Then, the technology being tested at Wesseling would be used to change the methanol into gasoline. The gasification step is not being used at Wesseling since methanol is available from the URBK methanol synthesis plant located at the same site.

A catalyst, discovered by Mobil in the 1960s, forms the basis for the methanol-to-gasoline conversion by helping rearrange methanol molecules. In effect, the catalyst "squeezes" water molecules out of the methanol, then links the carbon and hydrogen atoms to form gasoline.

The process was pioneered by Mobil scientists and developed further in the 1970s under a joint project with the U.S. government. Originally, the process held the catalyst in a stationary or "fixed" position while methanol vapors were passed through it. This technique is now commercially available for licensing from Mobil and forms the core of a new natural gas-to-gasoline complex being built by the New Zealand Synthetic Fuels Corp. Ltd., a company owned by the New Zealand Government and Mobil.

In the Wesseling pilot plant, the catalyst particles, which look much like fine white powder, are suspended, or "fluidized," in the upward-flowing stream of methanol vapors. They literally "float" inside the reaction vessel.

The mixing action allows heat produced by the conversion process to be removed more easily from the reaction vessel. Catalyst particles can also be removed, regenerated in a separate step, and returned to the main vessel in a continuous operation without interrupting the process. This permits the catalyst to be kept at peak effectiveness, potentially improving gasoline yield and octane rating.

During the test runs at Wesseling, researchers have paid particular attention to the possibility that the fluid action could result in unconverted methanol being passed through the system, potentially lowering the effectiveness of the process. The test runs, however, have shown that complete conversion of the methanol can be accomplished and maintained.

The pilot facility is expected to operate for the next two years to generate sufficient information for private companies to design commercial units.

"The fluid-bed methanol-to-gasoline pilot plant is the final link in a cooperative government-industry development chain," says Mares. "Just as the earlier fixed-bed version of the process is now ready for commercial application, we anticipate that after the test program at Wesseling is completed, the fluid-bed version of the process will be feasible for commercial scale-up."

The international project began when the U.S. Department of Energy and the Federal Republic of Germany's Ministry for Research and Technology signed a bilateral agreement on March 20, 1980. The agreement to build the pilot plant followed successful operation of a four-barrel per day test unit at Mobil's Paulsboro, N.J. laboratories.

The U.S. and German governments are each funding one-third of the project's costs, which will total approximately $30 million, including operation. The remaining third is being borne by the industrial group.

Mobil Research and Development Corp. is the process and catalyst supplier and technical advisor; Uhde Gmbh is the engineering participant, and URBK is the operating agent for the project.

-DOE-

News Media Contact: Robert C. Porter, 202/252-6503

R-83-066

Babcock & Wilcox
a McDermott company

Power Generation Group
20 S. Van Buren Avenue
P.O. Box 351
Barberton, OH 44203-0351
(216) 753-4511

January 27, 1986

State House
Columbus, Ohio 43215

Attention: Michael A. Fox,
Representative
56th House District

RE: Calderon ICGCC
Bowling Green

Dear Mike:

We have received your package and have forwarded it to Chuck Baroch who is the Vice President of our Advanced Energy Systems here at Babcock & Wilcox.

Babcock & Wilcox is very interested in Calderon's technology and have had an independent testing firm run qualitative tests at Cast Masters with very positive results. We are continuing on a program which includes quantitative tests, full scale operation of key components (i.e., pyrolysis, crackers) and finally the Bowling Green Cogen Project. Pending the results of the quantitative tests, B&W is currently reviewing the conditions under which a venture could be entered into with Calderon Automation.

We were also pleased to hear of the support that appears to be building in Columbus for Calderon's development. This technology does meet the prime intents of Issue 1.

Following up on our telecon, we think a meeting with key B&W people and Albert Calderon with you and other Columbus representatives could be arranged the first week in March or earlier, if you feel it advisable.

It has also been suggested that B&W Calderon submit a Preliminary Qualification Statement for review which we will plan to have done the first week of February.

We appreciate your call.

Sincerely,

W. A. Kitchen, Manager
Cogeneration & Industrial Marketing

'09WAK:cm
cc: CJ Baroch
A Calderon
EA Kaboth

Exhibit 11 (page 1 of 5)

**Babcock & Wilcox**
a McDermott company

Power Generation Group
20 S. Van Buren Avenue
P.O. Box 351
Barberton, OH 44203-0351
(216) 753-4511

February 6, 1986

Mr. Albert Calderon
President
Calderon Automation, Inc.
P.O. Box 126
Bowling Green, OH 443402

Dear Albert:

Enclosed is a copy of the sulfur sample analysis which you requested Wednesday February 5. As predicted, the condensed sample is mainly elemental sulfur, 97.5% by weight.

Regarding B&W's test preparations, I will need to know the dimensions of the gasifier you are building. Height, ID, OD, and amount of refractory, if any, should be sufficient.

Thank you.

Sincerely,

Rae Ann U. Hallstrom

Rae Ann U. Hallstrom

RUH007:fe
attachment
cc: J. Hallstrom
P. B. Probert

Babcock & Wilcox
a McDermott company

| | |
|---|---|
| To | C. J. BAROCH - VICE PRESIDENT, ADVANCED ENERGY SYSTEMS, BVCE2F |
| From | P. B. PROBERT - NEW PRODUCT DEVELOPMENT, AES, BTEA1C |
| Cust. | CALDERON AUTOMATION, INC. |
| File No. or Ref. | |
| Subj. | DEVOLITIZATION AND HOT GAS CLEAN-UP TESTS AT CAST MASTERS, BOWLING GREEN, OH |
| Date | MARCH 18, 1986 |

This letter to cover one customer and one subject only.

During the period from March 11-17, 1986, instrumentation was installed and performance tests were conducted simulating overall process parameters, including pyrolysis, gasification, and hot gas clean-up. These tests were conducted on the Calderon pilot plant located at Cast Masters, Bowling Green, OH. A B&W test crew from ARC, AES, and Cogen and Industrial Marketing participated with members from Calderon employees in conducting the tests. Ohio high sulfur coal was used in these tests.

A summary of representative data is attached. These data were taken from the laboratory log book for the period. Gas samples were tested for many compounds using a gas chromatagraph.

The *main object of the* tests was to investigate absorption of $H_2S$ by the hot gas clean-up process of Calderon Automation, which is the first series of tests in a sequence addressing absorption and regeneration.

The absorption phase of these tests confirms assumptions made in early predictions of lime absorption capacity and qualitative observations made in the recent past on pilot plant performance. In the 40 hours of testing during this series there was no evidence of $H_2S$ in the cleaned gas leaving the cracker-desulfurizer. The new data verify quantitatively the prior qualitative information.

The second phase of these test is scheduled for next week.

*Paul Probert*
P. B. Probert

PBP300/jw
Attachment
cc: S. C. Datsko
J. Hallstrom - BTAD1A
R. U. Hallstrom
F. L. Kinsinger
A. D. Liang - ARC

Test samples from sample location 12 are at the mid-point from top to bottom. The $H_2S$ concentration measured by gas chromatograph at this location were as follows:

| DATE | TIME | $H_2S$ CONCENTRATION, (VOL. %) | LAB NOTEBOOK PAGES |
|---|---|---|---|
| 3/16/86 | 7:00 a.m. | 0.007 | 143 |
| 3/16/86 | 5:00 p.m. | none | 153 |
| 3/16/86 | 6:00 p.m. | 0.10 | 156 |
| 3/16/86 | 7:00 p.m. | 0.07 | 159 |
| 3/16/86 | 8:00 p.m. | none | 161 |
| 3/16/86 | 9:00 p.m. | none | 165 |
| 3/16/86 | 9:40 p.m. | 6th charge of coal, 164 lb. | 168 |
| 3/16/86 | 10:20 p.m. | [illegible] | [illegible] |
| 3/16/86 | 11:00 p.m. | 0.300 | 171 |
| 3/16/86 | 12:00 p.m. | 0.210 | 174 |

At this time, half of the lime bed in the cracker desulfurizer had treated 6 x 164 = 984 lb. of coal. This would be equivalent to 82 lb. of lime absorbing $H_2S$ from 984 lb. coal or 12 lb. of coal per lb. of lime without regeneration.

**Babcock & Wilcox**
a McDermott company

Power Generation Group
20 S. Van Buren Avenue
P.O. Box 351
Barberton, OH 44203-0351
(216) 753-4511

April 14, 1986

U.S. Department of Energy
Office of Procurement Operations (MA-452.1)
Contract Operations Division "A"
Room Number 11-065
Independence Avenue, N.W.
Washington, D.C. 20585

Attention: Mr. E. Stephen Logan

RE: Program Opportunity Notice No. DE-PS01-86FE60966

Gentlemen:

The Babcock & Wilcox Company has been working with Calderon Automation, Inc. for nearly a year to develop the unique coal gasification process described in the attached Proposal. B&W has been involved in the economic analyses of the overall process and the Bowling Green Integrated Coal Gasification Combined-Cycle project, the conceptual design of the Bowling Green plant, the R&D to provide both quantitative and qualitative data on the process, and in evaluating and developing various scenarios for financing the project.

B&W considers the gasification process unique, and when integrated with a combined-cycle plant, potentially financially competitive with other means of using coal in an environmentally acceptable manner. We are prepared to work closely with Calderon Energy Co. on this project and the eventual commercialization of the technology. B&W is evaluating several alternatives for our involvement in the project, and our exact involvement will be better defined later this year. As a minimum, we will be involved in the R&D program to define the process better, the engineering design of the Bowling Green project, and the design and fabrication of much of the gasification and gas cleaning equipment.

B&W believes the Calderon process and project has potential in meeting our country's long-term energy needs. We support Calderon Energy Co. in its efforts to obtain funding from the Clean Coal Technology Program.

Very truly yours,

C J Baroch

C. J. Baroch
Vice President
Advanced Energy Systems



CJB137:ba

# Conversion Process

## *Cost Effective*

- Efficient
  - Utilizes the Combined Cycle Mode
- No Coal Preparation
- Low Capital Costs
- No Oxygen Plant
- No Water Treatment Plant
- Adaptable to Various Power Capacity Needs
- Needs No Government Subsidy

## *Review*



Secretary Watkins and Albert Calderon at the site in Alliance, Ohio.

Secretary of Energy James Watkins visited the Process Development Unit in Alliance, Ohio, on July 3, 1990. Following his visit, The Alliance Review reported on July 5, the Secretary of Energy referred to the Calderon process as ***"very fascinating technology."***



CALDERON ENERGY CO. OF BOWLING GREEN

P.O. BOX 126, BOWLING GREEN, OHIO 43402
TELEPHONE (419) 354-4632
TELEFAX (419) 353-8293

August 6, 1990

Mr. James D. Watkins, Secretary
U.S. Department of Energy
Independence Avenue
Washington, DC 20545

Dear Mr. Watkins:

I thank you for paying us a visit on July 3, 1990, in Alliance, Ohio, at the Calderon project site. Attached please find two items:

1. A group of photographs taken during your visit; and

2. A materials and energy balance with the equipment list completed on July 13, 1990, by Bechtel, San Francisco, for the generic commercial plant which will be capable of co-producing quite competitively methanol or gasoline, and electric power from coal.

I envision building such generic plants like the "Liberty" ships built during World War II by the United States.

As I mentioned to you during your visit, if we contract to sell the electric power at 5¢/kWh, we can produce methanol from coal in an environmentally acceptable manner for the equivalent of $13.00/barrel of crude oil. In converting the methanol to gasoline via the known MTG process, the price would increase to the equivalent of $18.60/barrel of crude.

Please refer to pages 3 and 4 of Bechtel's materials and energy balance showing the respective methanol and gasoline products yielded by our process.

In view of what is happening in the Middle East, it is evident that we must work towards energy independence, and a process like ours may be one good way to help attain it. I therefore recommend that you form a task force at DOE to work with us to put our development on a fast track. We are prepared to recruit the necessary manpower to work around the clock.

I would appreciate knowing your thoughts.

Sincerely,

Albert Calderon

Albert Calderon
President

/lss

Enclosures




Early 1944 Victory ship construction, with May 1945 war tonnage production chart

Exhibit 12 (page 3 of 6)



"Photograph of first shift workers exiting the J. A. Jones Construction Company shipyard, Brunswick, GA, 1943-1945?"

**The Secretary of Energy**
Washington, DC 20585

October 12, 1990

Mr. Albert Calderon
President
Calderon Energy Company of Bowling Green
P.O. Box 126
Bowling Green, Ohio 43402

Dear Mr. Calderon:

Thank you for your letters of August 6, 1990, to me and of August 13, 1990, to Mr. Robert H. Gentile regarding our recent visit and your further thoughts on making methanol from coal. We certainly enjoyed our visit of July 3, 1990, to your coal gasification Process Development Unit (PDU) at Alliance, Ohio. We also appreciate your thoughtfulness in sending us copies of the photographs taken during our visit.

As mentioned in your letter, the Middle East situation points out our vulnerability and emphasizes our need for energy security. Energy security is one of the major goals of our evolving National Energy Strategy; and over the long term, technologies which utilize coal, our most abundant fossil energy resource, are expected to play a greater role in providing this security along with a mix of conservation, renewables, and nuclear technologies.

Thank you for sharing your views with us on the production of methanol. As you are aware, in addition to your project, we have also been involved with other projects and studies related to methanol production and utilization. Processes to produce synthetic and alternate fuels from coal by direct and indirect liquefaction are being developed within Fossil Energy's Research and Development Program. We anticipate that these technologies will progress to the point that large-scale demonstration activities with private sector support and cost share are warranted. The Department's Clean Coal Technology Demonstration Program was created to provide a path to early commercialization of emerging coal technologies that have been developed through the "proof-of-concept" stage.

In your letters, you enclosed copies of material and energy balance data and an equipment list which was marked Confidential. For your protection, these documents are being returned as enclosures with this letter.

Congratulations on the completion of construction of your PDU. With regard to your suggestion that we form a task force at the Department of Energy to put the further development on a fast track, it seems more appropriate to consider the next steps after successful operation of the PDU. We wish you good luck in the ensuing 18-month period of operation and evaluation of this unit, and look forward to hearing of the success of the Calderon process.

Sincerely,

James D. Watkins
Admiral, U.S. Navy (Retired)

Enclosures

# The Making, Shaping and Treating of Steel

## 11th Edition
## Ironmaking Volume

David H. Wakelin, Ph.D.
Editor

The AISE Steel Foundation

An economic evaluation of capital and operating costs for a large-scale plant indicates that cost savings may be realized compared to conventional cokemaking.

## 7.8.4 Calderon Cokemaking

Calderon Energy Company has developed an integrated, continuous cokemaking process comprised of sealed coking reactors discharging coke to a sealed quenching system and cleaning of the foul coke oven gas in a sealed hot gas cleanup (HGC). Only two raw materials are required for the process, metallurgical coal and limestone. The only products are coke, coke breeze, desulfurized syngas and elemental sulfur.

Being completely sealed, the process requires no doors, chuck doors, offtakes, lids, pushing emission control, charging emission control, quenching station, wastewater treatment plant, byproducts plant or gas blanketing. Syngas desulfurization is accomplished in the (HGC) and does not require a separate unit such as Stretford, Sulfiban or Still. No Claus or acid plant is necessary. A condenser condenses the sulfur from the tail gas leaving the HGC. The chemistry is summarized in Table 7.8 by the following reactions.

The entire system is designed to operate at elevated pressure with no gas exhausters or boosters required. Depending on the final use of the syngas, the operating pressure will be no lower than 0.97 bar (14 psig) and may be designed to operate as high as required for the consuming process. A prototype unit was designed to operate at 24 bars (350 psig) and was operated as high as 12.5 bar (180 psig).

In previous test work, Calderon produced coke with quality equal to or greater than coke produced from the same coal blend in conventional slot ovens. Based on this work Calderon has designed a modular, full-sized commercial coking reactor to demonstrate continuous cokemaking. Included in the demonstration is an HGC module designed with all the operating parameters (temperatures, pressures, flows, etc.) of a commercial plant. After demonstration, the coking reactor will be replicated and installed side-by-side in batteries. Space required for the process is less than half that of conventional ovens.

Current design data indicate that sixteen reactors are required to produce 0.9 million tonnes per year or 1.0 million tons per year at a 90% operating rate. Annual production at a 100% operating rate would be 1.0 million tonnes (1.1 million tons).

## 7.8.5 Antaeus Energy Cokemaking Process

Converting coal to coke involves devolatilization over a wide temperature range under controlled heating conditions. The average time to convert coal to coke varies from 18–24 hours in conventional processes. However, if the devolatilization patterns for most coals are examined, it can be seen that there are two distinct zones in the coal devolatilization process. One is at relatively low temperatures (300–600°C or 570–1110°F) and the other is at higher temperatures (800–1100°C or 1470–2010°F). These two zones are separated by a non–reactive region, as shown in Fig. 7.122. Coke quality is mostly controlled by the second phase of the devolatilization zones.

**Table 7.8 Chemical Reactions in Calderon Cokemaking**

| | |
|---|---|
| Cracking | $2C_xH_y + 1100°C \rightarrow yH_2 + 2xC$ |
| Desulfurization | $CaO + H_2S \rightarrow CaS + 2H_2O$ |
| Regeneration | $2\,CaS + 3O_2 \rightarrow 2CaO + 2SO_2$ |
| | $2\,C + O_2 \rightarrow 2CO$ |
| | $2\,CO + SO_2 \rightarrow 2CO_2 + S$ |
| Water Gas | $H2O + C + 760°C \rightarrow H_2 + CO$ |

**Statement of**
**Malcolm J. Roberts**
**Vice President & Chief Technology Officer**
**Bethlehem Steel Corporation**

**Submitted to the**

**U.S. House of Representatives**
**Appropriations Subcommittee on**
**Interior and Related Agencies**

**for**

**Fiscal Year 2000 Appropriations to**
**Demonstrate the Commercial Feasibility of**
**The Calderon Cokemaking Process**

**April 15, 1999**

Mr. Chairman and Members of the Subcommittee:

Thank you for the opportunity to submit this statement describing the US steel industry's need for an advanced and environmentally friendly cokemaking process.

Coke is an essential element in the steelmaking process. The current annual demand for coke in the United States is approximately 25 million tons. The annual capacity to produce coke domestically has been reduced to about 21.5 million tons. To make up for this shortfall, coke is being imported from countries such as Japan and China which adds to the US's trade deficit with these countries. Tighter environmental regulations placed on domestic producers, in particular the Clean Air Act Amendments of 1990, have resulted in significant coke plant shutdowns and will force more shutdowns in the future. This will further add to the trade deficit and reward less environmentally focused countries. The public policy benefits of an environmentally friendly cokemaking process definitely exist. A team of engineers from Bethlehem Steel, LTV Steel, Bechtel, Alliance Machine and Calderon Energy has been working to advance the development of a new cokemaking process which has the potential to drastically reduce air emissions as compared to currently available cokemaking technologies. However, both private and federal funds are needed to assure the technology is developed on a timely basis.

## Background

Coke is the main reductant for the ironmaking blast furnace which, in turn, provides liquid iron for steelmaking in a basic oxygen furnace (BOF). The blast furnace and BOF processes are the most productive and most efficient method of producing steel from iron ore. Steel can be produced by melting scrap in electric arc furnaces. However, a significant portion of the steel made in this country must be produced from iron ore because there is not enough scrap to satisfy our steel requirements and the highest quality of steels cannot be produced from only scrap. Most importantly, the integrated steel sector continues to be very competitive with scrap-based producers, in large part due to the efficient and low cost blast furnace and BOF operations.

Because of steelmaking capacity reductions and technology advances that allow the use of other reductants in blast furnaces, the annual demand for coke in the US has decreased in the past 20 years from over 50 million tons to around 25 million tons. The annual US capacity to produce coke has decreased from over 50 million tons to about 21.5 million tons, thus leaving us with a national shortfall of about 3.5 million tons per year. Much of this shortfall is being imported from China and Japan.

Our domestic coke shortfall will increase in the next few years. Most cokemaking operations in the US use the slot-oven technology that has been the standard throughout the world for many years. Tighter environmental regulations mandated by the 1990 Clean Air Act Amendments have caused many slot-oven batteries to be closed, and many of the currently operating batteries will likely be shutdown because of the significant capital expenditures that will be required to meet the regulations. It is unlikely that any new slot-oven batteries will be installed in the US because of environmental regulations. Thus, there is a strong and growing need for a new cokemaking process that is environmentally friendly and still produces high quality coke at competitive costs.

## Calderon Cokemaking Process

A new cokemaking process has been invented by Albert Calderon and is called the Calderon Cokemaking Process. The process utilizes a large ceramic tube where coal is charged in one end of the tube and hot coke is discharged from the other end. The coking operation is continuous and totally enclosed. As a result, the emissions from the process are much less than either the slot-oven technology or the non-recovery technology that is now being used in two locations.

An industry team composed of engineers from Bechtel, Bethlehem Steel, LTV Steel, Alliance Machine Co. and Calderon Energy has been working to advance the demonstration of the process over the past two years. Engineering design studies for both a process demonstration unit (PDU) and a commercial-scale plant to make 1.6 million tons per year have been completed. Cokemaking trials have been conducted in a small one ton per day pilot plant and the results of these trials verified that high quality coke can be produced in a continuous coking tube. In addition, an operating analysis by the industry team has shown that the Calderon process could produce coke for $10-20 per ton lower in cost than existing technology.

A detailed engineering analysis of environmental emissions from commercial-scale operations using standard slot-oven batteries, non-recovery batteries and the proposed Calderon process has been completed. As a result of this analysis, it was concluded that the Calderon process would operate at a greatly reduced level of emissions compared to the standard slot- ovens or the non-recovery technology. For instance, we have estimated that there would be a 70% reduction in the sulfur dioxide emissions and a 90% reduction in nitrogen oxides emissions from a Calderon plant versus a non-recovery coke plant. The Environmental Protection Agency (EPA) has observed the pilot plant operation and also believes that the Calderon process would be much better environmentally than conventional cokemaking as stated in the attached letter and report. The Ohio EPA has also visited the pilot plant and their observations are noted in another attached letter.

The next step in the development program is the design, construction and operation of a 200 ton per day PDU. This PDU size is appropriate because commercial-scale plants would be made up of multiples of the 200 ton per day coking reactor. For instance, a commercial-scale plant to make 1.2 million tons per year would have sixteen 200 ton per day coking reactors. This is equivalent to the annual production of 100 standard slot-ovens or 250 non-recovery ovens.

The main objectives for the PDU are to test the equipment designs, to determine product quality and production rates, to make environmental measurements and, finally, to produce enough coke for a blast furnace trial. A blast furnace trial with coke produced in the PDU is needed in order to confirm coke quality and its suitability for continuous blast furnace operations.

The total cost of the PDU, including design engineering, construction and operation for two years is estimated to be $40 million. As with any new process, there is considerable risk in scaling from a small pilot plant to a commercial scale. The industrial partners involved in this technology development understand the risk, but because of the strategic importance of coke to the steel industry, they have committed $20 million to the PDU effort.

We estimate that 3½ years will be needed for the PDU design, construction and test operations. Bechtel will be responsible for the design and construction phase of the program. It is planned to locate the PDU at LTV's Cleveland, Ohio plant. The blast furnace trial is also planned at this location. We have developed a strong industrial team to carry out this difficult assignment, and we believe that this is an excellent opportunity to develop a totally new and environmentally friendly method of making coke for the 21st Century.

Calderon Energy has had a Cooperative Agreement with DOE since 1995 for the purpose of developing and demonstrating this new cokemaking process. Additional Federal funding of $20 million, commencing in FY2000, is needed to design, construct and operate a PDU. Federal funding support will help significantly to assure that the new process is developed in a timely manner.

Thank you for your serious consideration of this technology that is important to cokemaking and the domestic steelmaking industry.

U. S. Steel
600 Grant Street
Pittsburgh, PA 15219-2749
412 433 2330
Fax: 412 433 1131
email: bahaines@uss.com

**Bruce A. Haines**
Vice President
Technology and
Management Services

January 23, 2001

Mr. Robert S. Kripowicz
Principal Deputy Assistant Secretary
for Fossil Energy
U. S. Department of Energy
Forrestal Building, Room 4G084
1000 Independence Avenue, S.W.
Washington, DC 20585

FAX: 202/586-7847

Re: Calderon Process for Ironmaking

Dear Mr. Kirpowicz:

This letter will confirm the meeting scheduled for Monday, January 29, 2001, at 1:00 p.m. in your office. Unfortunately, I will be at USX Corporation's Annual Meeting of Officials and cannot meet with you at this time. Attending on behalf of U.S. Steel will be Dr. Edward J. Patula, General Manager-Research, and Dr. Frederick J. Mannion, Division Manager-Process Technology; from Calderon will be Albert Calderon, President, and Reina Calderon, Vice President and General Counsel.

As you are aware, U.S. Steel Group, a unit of USX Corporation, has entered into a Project Teaming Agreement with Calderon Energy Company regarding a development program for making iron units using the Calderon technology. We urgently need to develop, demonstrate, and commercialize an innovative and cost-effective, environmentally friendly, coal-based method of producing directly reduced iron (DRI) from iron ore fines or concentrate which can also have positive implications for the production of hot metal.

U.S. Steel has assessed the Calderon technology in relation to other alternative ironmaking processes and believes that this technology could meet industry requirements for such a low-cost, environmentally friendly, coal-based alternative ironmaking process. We are aware that Calderon Energy has an existing Cooperative Agreement with the Department of Energy (DOE) under which it has been advancing application of its technology for coke. In 1997, U.S. Steel, together with Bethlehem Steel, participated in cokemaking trials conducted under this Cooperative Agreement at Calderon's Alliance, Ohio pilot plant, with positive results. However, the U.S. Steel appraisal is that the Calderon technology is of potentially greater benefit to the steel industry as an efficient coal-based alternative ironmaking process than as a technology for cokemaking. We believe that the Calderon technology could enable the industry to ultimately bypass traditional coke-based ironmaking.



America's Steel Most Recycled Material

USS



The Project Teaming Agreement we have entered into with Calderon Energy looks to a phased development and demonstration program, with DOE support, to advance the Calderon technology for DRI and hot metal, beginning with pilot-level work to be conducted at Calderon's Alliance pilot plant in Spring 2001. The proposed Development Program (and work to be conducted at Alliance) is consistent with Congress' purpose in appropriating $12.9 million in fiscal years 2000 and 2001 funds to the Fossil Energy account for a steelmaking feedstock program. We understand that a portion of these appropriations are presently obligated to Calderon's existing DOE Cooperative Agreement.

Calderon Energy requested in their November 2000 letter that DOE-NETL approve project revisions under the Cooperative Agreement and amend it to permit the pilot-level ironmaking work to proceed at the Alliance pilot plant. Given the competitive significance of low-cost iron units to the United States steel industry and the critical need for a high-impact, "leap-frog" alternative ironmaking process which is both coal based and environmentally friendly, it is very important that this initiative be funded and that pilot-level work begin on schedule this Spring.

I thank you in advance for your earnest consideration of this important initiative jointly undertaken by U.S. Steel and Calderon.

Very truly yours,

Bruce A. Haines

Bruce A. Haines

Copy: Congressman John P. Murtha (Fax: 202/225-5709)
Congressman Ralph Regula (Fax: 202/225-3059)
Ms. Lori Rowley, House Appropriations Subcommittee for Interior
(Fax: 202/225-3059)
Ms. Loretta Beaumont, House Appropriations Subcommittee for Interior
(Fax: 202/225-9069)
Reina A. Calderon
Edward J. Patula
Frederick J. Mannion
Charles A. Rea



Steel the recycled material

# DAMAGES

JUSTIFICATION OF DAMAGES BASED ON PRODUCTION OF BARRELS/DAY AS REFINED GASOLINE MADE FROM METHANOL WHICH, IN TURN, WAS CO-PRODUCED BY MAKING USE OF PATENTS 4,927,430 AND 5,036,732 USING A MULTITUDE OF STANDARD UNITS WITH EACH UNIT HAVING A CAPACITY OF 20,000 BARRELS/DAY, FOR WHICH A ROYALTY OF $5.472 (10%) IS COMPUTED PER BARREL.

# JUSTIFICATION OF DAMAGES

Cost of a gallon of gasoline in 1993 averaged $1.75 (adjusted for inflation) plus a royalty of 10%, amounting to $1.864/gallon at the pump.

| | |
|---|---|
| Cost of barrel of crude basis | $39.36 |
| Cost of refining/barrel | $15.36 |
| Subtotal | $54.72 |
| Royalty @ 10% | $ 5.472 |

| YEAR | BARRELS/ DAY | OPERATING UNITS | ROYALTIES IN $1,000 |
|---|---|---|---|
| 1993 | 0 | 0 | $ 0 |
| 1994 | 0 | 0 | $ 0 |
| 1995 | 0 | 0 | $ 0 |
| 1996 (in part) | 20,000 | 1 Unit | $ 39,946 |
| | 80,000 | 4 New Units | |
| 1997 | 100,000 | 5 Units production | $ 199,728 |
| | 140,000 | 7 New Units | |
| 1998 | 240,000 | 12 Units production | $ 479,347 |
| | 300,000 | 15 New Units | |
| 1999 | 540,000 | 27 Units production | $ 1,078,531 |
| | 300,000 | 15 New Units | |
| 2000 | 840,000 | 42 Units production | $ 1,677,715 |
| | 300,000 | 15 New Units | |
| 2001 | 1,140,000 | 57 Units production | $ 2,276,899 |
| | 300,000 | 15 New Units | |
| 2002 | 1,440,000 | 72 Units production | $ 2,876,083 |
| | 300,000 | 15 New Units | |
| 2003 | 1,740,000 | 87 Units production | $ 3,475,267 |
| | 300,000 | 15 New Units | |
| 2004 | 2,040,000 | 102 Units production | $ 4,074,451 |
| | 300,000 | 15 New Units | |
| 2005 | 2,340,000 | 117 Units production | $ 4,673,635 |
| | 330,000 | 15 New Units | |
| 2006 | 2,670,000 | 125 Units production | $ 5,332,738 |
| | 300,000 | 15 New Units | |
| 2007 | 2,970,000 | 140 Units production | $ 5,931,922 |
| | 180,000 | 9 New Units | |
| 2008 (in part) | 1,312.500[1] | 149 Units production | $ 2,621,992 |
| | | GROSS DAMAGE: | $34,737,692 |

[1] $\frac{3{,}150{,}000 \text{ barrels} \times 5 \text{ months}}{12 \text{ months}} = 1{,}312{,}500$ barrels/day

valuation.xls
05/19/08
04:37 PM

# DISCOUNTED CASH FLOW METHOD
## May 1, 1993

| FYE | FORECASTED ROYALTIES | DISCOUNT FACTOR 10.00% | PRESENT VALUE |
|---|---|---|---|
| 12/31/93 | | | 0 |
| 12/31/94 | | | 0 |
| 12/31/95 | | | 0 |
| 12/31/96 | 39,946,000 | 0.705061 | 28,164,375 |
| 12/31/97 | 199,728,000 | 0.640965 | 128,018,605 |
| 12/31/98 | 479,347,000 | 0.582695 | 279,313,203 |
| 12/31/99 | 1,078,531,000 | 0.529723 | 571,322,592 |
| 12/31/00 | 1,677,715,000 | 0.481566 | 807,930,992 |
| 12/31/01 | 2,276,899,000 | 0.437788 | 996,798,009 |
| 12/31/02 | 2,876,083,000 | 0.397989 | 1,144,648,452 |
| 12/31/03 | 3,475,267,000 | 0.361808 | 1,257,378,996 |
| 12/31/04 | 4,074,451,000 | 0.328916 | 1,340,153,173 |
| 12/31/05 | 4,673,635,000 | 0.299015 | 1,397,485,938 |
| 12/31/06 | 5,332,738,000 | 0.271832 | 1,449,606,797 |
| 12/31/07 | 5,931,922,000 | 0.247120 | 1,465,894,502 |
| 12/31/08 | 2,621,430,000 | 0.224654 | 588,915,337 |
| Gross Damages | $34,737,692,000 | Discounted Cash Flow | $11,455,630,971 |

# DISCOUNTED CASH FLOW METHOD
## May 1, 1993

| FYE | FORECASTED ROYALTIES | DISCOUNT FACTOR 0.100000 | PRESENT VALUE |
|---|---|---|---|
| 12/31/1993 | | | 0 |
| 12/31/1994 | | | 0 |
| 12/31/1995 | | | 0 |
| 12/31/1996 | 39,946,000 | 0.705061 | 28,164,375 |
| 12/31/1997 | 199,728,000 | 0.640965 | 128,018,605 |
| 12/31/1998 | 479,347,000 | 0.582695 | 279,313,203 |
| 12/31/1999 | 1,078,531,000 | 0.529723 | 571,322,592 |
| 12/31/2000 | 1,677,715,000 | 0.481566 | 807,930,992 |
| 12/31/2001 | 2,276,899,000 | 0.437788 | 996,798,009 |
| 12/31/2002 | 2,876,083,000 | 0.397989 | 1,144,648,452 |
| 12/31/2003 | 3,475,267,000 | 0.361808 | 1,257,378,996 |
| 12/31/2004 | 4,074,451,000 | 0.328916 | 1,340,153,173 |
| 12/31/2005 | 4,673,635,000 | 0.299015 | 1,397,485,938 |
| 12/31/2006 | 5,332,738,000 | 0.271832 | 1,449,606,797 |
| 12/31/2007 | 5,931,922,000 | 0.247120 | 1,465,894,502 |
| 12/31/2008 | 2,621,430,000 | 0.224654 | 588,915,337 |
| **Gross Damages** | **34,737,692,000** | **Discounted Cash Flow** | **11,455,630,971** |
| | | **Compounded Interest** | **3,692,420,148** |
| | | **Total Damages** | **15,148,051,119** |

**COMPOUNDED INTEREST**

| CALENDAR YEAR | BASE | INTEREST RATE% | INTEREST AMOUNT | CUMULATIVE |
|---|---|---|---|---|
| 1996 | 28,164,375 | 6.4375 | 1,813,082 | 29,977,457 |
| 1997 | 29,977,457 | 6.5625 | 1,967,271 | 31,944,728 |
| 1998 | 31,944,728 | 6.1250 | 1,956,615 | 33,901,343 |
| 1999 | 33,901,343 | 5.7500 | 1,949,327 | 35,850,670 |
| 2000 | 35,850,670 | 7.0000 | 2,509,547 | 38,360,217 |
| 2001 | 38,360,217 | 6.1250 | 2,349,563 | 40,709,780 |
| 2002 | 40,709,780 | 5.3750 | 2,188,151 | 42,897,931 |
| 2003 | 42,897,931 | 3.6875 | 1,581,861 | 44,479,792 |
| 2004 | 44,479,792 | 4.2500 | 1,890,391 | 46,370,183 |
| 2005 | 46,370,183 | 4.3750 | 2,028,696 | 48,398,879 |
| 2006 | 48,398,879 | 5.4375 | 2,631,689 | 51,030,568 |
| 2007 | 51,030,568 | 5.5000 | 2,806,681 | 53,837,249 |
| 2008 | 53,837,249 | 5.5000 | 2,961,049 | 56,798,298 |
| TOTAL | | | 28,633,923 | |
| 1997 | 128,018,605 | 6.5625 | 8,401,221 | 136,419,826 |
| 1998 | 136,419,826 | 6.1250 | 8,355,714 | 144,775,540 |
| 1999 | 144,775,540 | 5.7500 | 8,324,594 | 153,100,134 |
| 2000 | 153,100,134 | 7.0000 | 10,717,009 | 163,817,143 |
| 2001 | 163,817,143 | 6.1250 | 10,033,800 | 173,850,943 |
| 2002 | 173,850,943 | 5.3750 | 9,344,488 | 183,195,431 |
| 2003 | 183,195,431 | 3.6875 | 6,755,332 | 189,950,763 |
| 2004 | 189,950,763 | 4.2500 | 8,072,907 | 198,023,670 |
| 2005 | 198,023,670 | 4.3750 | 8,663,536 | 206,687,206 |
| 2006 | 206,687,206 | 5.4375 | 11,238,617 | 217,925,823 |
| 2007 | 217,925,823 | 5.5000 | 11,985,920 | 229,911,743 |
| 2008 | 229,911,743 | 5.5000 | 12,645,146 | 242,556,889 |
| TOTAL | | | 114,538,284 | |
| 1998 | 279,313,203 | 6.1250 | 17,107,934 | 296,421,137 |
| 1999 | 296,421,137 | 5.7500 | 17,044,215 | 313,465,352 |
| 2000 | 313,465,352 | 7.0000 | 21,942,575 | 335,407,927 |
| 2001 | 335,407,927 | 6.1250 | 20,543,736 | 355,951,663 |
| 2002 | 355,951,663 | 5.3750 | 19,132,402 | 375,084,065 |
| 2003 | 375,084,065 | 3.6875 | 13,831,225 | 388,915,290 |
| 2004 | 388,915,290 | 4.2500 | 16,528,900 | 405,444,190 |
| 2005 | 405,444,190 | 4.3750 | 17,738,183 | 423,182,373 |
| 2006 | 423,182,373 | 5.4375 | 23,010,542 | 446,192,915 |
| 2007 | 446,192,915 | 5.5000 | 24,540,610 | 470,733,525 |
| 2008 | 470,733,525 | 5.5000 | 25,890,344 | 496,623,869 |
| TOTAL | | | 217,310,666 | |

## COMPOUNDED INTEREST

| CALENDAR YEAR | BASE | INTEREST RATE% | INTEREST AMOUNT | CUMULATIVE |
|---|---|---|---|---|
| 1999 | 571,322,592 | 5.7500 | 32,851,049 | 604,173,641 |
| 2000 | 604,173,641 | 7.0000 | 42,292,155 | 646,465,796 |
| 2001 | 646,465,796 | 6.1250 | 39,596,030 | 686,061,826 |
| 2002 | 686,061,826 | 5.3750 | 36,875,823 | 722,937,649 |
| 2003 | 722,937,649 | 3.6875 | 26,658,326 | 749,595,975 |
| 2004 | 749,595,975 | 4.2500 | 31,857,829 | 781,453,804 |
| 2005 | 781,453,804 | 4.3750 | 34,188,604 | 815,642,408 |
| 2006 | 815,642,408 | 5.4375 | 44,350,556 | 859,992,964 |
| 2007 | 859,992,964 | 5.5000 | 47,299,613 | 907,292,577 |
| 2008 | 907,292,577 | 5.5000 | 49,901,092 | 957,193,669 |
| TOTAL | | | 385,871,077 | |
| 2000 | 807,930,992 | 7.0000 | 56,555,169 | 864,486,161 |
| 2001 | 864,486,161 | 6.1250 | 52,949,777 | 917,435,938 |
| 2002 | 917,435,938 | 5.3750 | 49,312,182 | 966,748,120 |
| 2003 | 966,748,120 | 3.6875 | 35,648,837 | 1,002,396,957 |
| 2004 | 1,002,396,957 | 4.2500 | 42,601,871 | 1,044,998,828 |
| 2005 | 1,044,998,828 | 4.3750 | 45,718,699 | 1,090,717,527 |
| 2006 | 1,090,717,527 | 5.4375 | 59,307,766 | 1,150,025,293 |
| 2007 | 1,150,025,293 | 5.5000 | 63,251,391 | 1,213,276,684 |
| 2008 | 1,213,276,684 | 5.5000 | 66,730,218 | 1,280,006,902 |
| TOTAL | | | 472,075,910 | |
| 2001 | 996,798,009 | 6.1250 | 61,053,878 | 1,057,851,887 |
| 2002 | 1,057,851,887 | 5.3750 | 56,859,539 | 1,114,711,426 |
| 2003 | 1,114,711,426 | 3.6875 | 41,104,984 | 1,155,816,410 |
| 2004 | 1,155,816,410 | 4.2500 | 49,122,197 | 1,204,938,607 |
| 2005 | 1,204,938,607 | 4.3750 | 52,716,064 | 1,257,654,671 |
| 2006 | 1,257,654,671 | 5.4375 | 68,384,973 | 1,326,039,644 |
| 2007 | 1,326,039,644 | 5.5000 | 72,932,180 | 1,398,971,824 |
| 2008 | 1,398,971,824 | 5.5000 | 76,943,450 | 1,475,915,274 |
| TOTAL | | | 479,117,265 | |
| 2002 | 1,144,648,452 | 5.3750 | 61,524,854 | 1,206,173,306 |
| 2003 | 1,206,173,306 | 3.6875 | 44,477,641 | 1,250,650,947 |
| 2004 | 1,250,650,947 | 4.2500 | 53,152,665 | 1,303,803,612 |
| 2005 | 1,303,803,612 | 4.3750 | 57,041,408 | 1,360,845,020 |
| 2006 | 1,360,845,020 | 5.4375 | 73,995,948 | 1,434,840,968 |
| 2007 | 1,434,840,968 | 5.5000 | 78,916,253 | 1,513,757,221 |
| 2008 | 1,513,757,221 | 5.5000 | 83,256,647 | 1,597,013,868 |
| TOTAL | | | 452,365,416 | |

# COMPOUNDED INTEREST

| CALENDAR YEAR | BASE | INTEREST RATE% | INTEREST AMOUNT | CUMULATIVE |
|---|---|---|---|---|
| 2003 | 1,257,378,996 | 3.6875 | 46,365,850 | 1,303,744,846 |
| 2004 | 1,303,744,846 | 4.2500 | 55,409,156 | 1,359,154,002 |
| 2005 | 1,359,154,002 | 4.3750 | 59,462,988 | 1,418,616,990 |
| 2006 | 1,418,616,990 | 5.4375 | 77,137,299 | 1,495,754,289 |
| 2007 | 1,495,754,289 | 5.5000 | 82,266,486 | 1,578,020,775 |
| 2008 | 1,578,020,775 | 5.5000 | 86,791,143 | 1,664,811,918 |
| TOTAL | | | 407,432,922 | |
| 2004 | 1,340,153,173 | 4.2500 | 56,956,510 | 1,397,109,683 |
| 2005 | 1,397,109,683 | 4.3750 | 61,123,549 | 1,458,233,232 |
| 2006 | 1,458,233,232 | 5.4375 | 79,291,432 | 1,537,524,664 |
| 2007 | 1,537,524,664 | 5.5000 | 84,563,857 | 1,622,088,521 |
| 2008 | 1,622,088,521 | 5.5000 | 89,214,869 | 1,711,303,390 |
| TOTAL | | | 371,150,217 | |
| 2005 | 1,397,485,938 | 4.3750 | 61,140,010 | 1,458,625,948 |
| 2006 | 1,458,625,948 | 5.4375 | 79,312,786 | 1,537,938,734 |
| 2007 | 1,537,938,734 | 5.5000 | 84,586,630 | 1,622,525,364 |
| 2008 | 1,622,525,364 | 5.5000 | 89,238,895 | 1,711,764,259 |
| TOTAL | | | 314,278,321 | |
| 2006 | 1,449,606,797 | 5.4375 | 78,822,370 | 1,528,429,167 |
| 2007 | 1,528,429,167 | 5.5000 | 84,063,604 | 1,612,492,771 |
| 2008 | 1,612,492,771 | 5.5000 | 88,687,102 | 1,701,179,873 |
| TOTAL | | | 251,573,076 | |
| 2007 | 1,465,894,502 | 5.5000 | 80,624,198 | 1,546,518,700 |
| 2008 | 1,546,518,700 | 5.5000 | 85,058,529 | 1,631,577,229 |
| TOTAL | | | 165,682,727 | |
| 2008 | 588,915,337 | 5.5000 | 32,390,344 | 621,305,681 |
| TOTAL | | | 32,390,344 | |

## Selection of an Appropriate Discount Rate

Discount rates vary among particular types of businesses and investments and from one period of time to another. Discount rates are expressed as a percentage and represent the risk of receiving a benefit stream over time. The Discount rate is the total annually compounded expected rate of return that the investor requires over the economic life of the investment. It reflects the riskless cost of money plus a premium for risk.

In valuation theory and practice, two common procedures have evolved to estimate equity discount rates: The Capital Asset Pricing Model (CAPM) and the Build-Up Method. Unlike most valuation assignments, neither procedure is appropriate in this instance. The Calderon Process is a unique, tested and proven system with the following attributes:

- Co-produces liquid transport fuel and power, and not power only
- Reduces capital costs.
- Uses air and not 95% pure oxygen for gasification, which increases the overall efficiency by not having an oxygen-making plant
- High conversion efficiency to syngas (89.7%)
- Does not use water slurry, saving large quantities of water
- Does not use pulverized coal
- Produces syngas at the appropriate ratio of $H_2$ to CO to make methanol without shift reaction
- Provides long lining life, increasing availability
- Uses hot gas cleanup that greatly contributes to efficiency
- Cleans up existing coal-fired plants
- Makes existing coal-fired plants more efficient
- Cost of repowering coal-fired plants is absorbed by the profits from the co-production of transportation fuel.

While investing in Intangibles is generally riskier than purchasing large-cap publicly traded common stocks, such risk is substantially mitigated in this situation. After considering the factors involved, a discount rate of 10% has been used for discounted cash flow (DCF) purposes.

**Discount Rate for DCF Calculations** **10%**

# Gas Prices Approaching Historically High Levels

Retail price of unleaded regular gasoline, monthly data*




Source: "Soaring Gas Prices Hit Washington." The Wall Street Journal. 29-30 April 2006; A7.

Exhibit 16 (page 9 of 17)

*April uses the average of weekly price data

# Where the Dollars Go

## Components of the retail price of regular grade gasoline, 2004




Source: "Soaring Gas Prices Hit Washington." The Wall Street Journal. 29-30 April 2006; A7.

# CALDERON INVENTION

Coal to clean gases for co-production of methanol/gasoline and electric power

METHOD STEPS



• <u>COAL CONDITION</u>: Run-of-mine coal is used as delivered.



• <u>FORCE FEED CHARGING:</u> With no preparation, the run-of-mine coal is charged and force fed by compression ram to cause the movement of the coal within a horizontal pyrolizer.



• <u>COAL PYROLYSIS:</u> The compressed coal is heated by the injection of oxygen into the coal in the pyrolizer to drive off its volatile content (a rich gas consisting of an abundant source of low cost $H_2$) and co-produces a hot char.



• <u>RICH GAS:</u> Rich gas prior to cleanup being flared.



• <u>OXYGEN INJECTION:</u> The injection of the oxygen into the coal is carried out by means of a water cooled lance to devolatilize it.

Lance



• <u>DESTRUCTION OF HEAVY HYDROCARBONS:</u> A hot chamber at the exit end of the pyrolizer in the form of an elbow is maintained above 1700°F to crack some hydrocarbons and entrain the rest in the volatile matter.



• <u>CHAR GASIFICATION:</u> The hot char from the pyrolysis is gasified with air by partial combustion to yield a hot, low-BTU-content gas (a lean gas with mass for low NOx formation and high turbine efficiency). The ash content of the coal is converted to a molten glassy slag. The lean gas produced has minimal $CO_2$ content as a result of its discharge through hot char, which converts it to CO.



• <u>LEAN GAS:</u> Lean gas prior to cleanup being flared.

# CALDERON INVENTION
# METHOD STEPS—CONT'D.



- **SLAG REMOVAL:** Molten slag from the gasifier is quenched in water and settled as a non-leaching grit.

- **HOT GAS CLEANUP OF RICH GAS:** The rich gas is passed through a moving bed of hot lime (2100°F CaO) where essentially all hydrocarbons are cracked and substances like ammonia and compounds of sulfur are destroyed. The sulfur meanwhile is absorbed by the lime and moisture is converted to $H_2$ and CO, $CO_2$ to CO and the CaO is converted to CaS, a spent sorbent, which is impregnated with carbon.




- **HOT GAS CLEANUP OF LEAN GAS:** The lean gas is also passed through a moving bed of hot lime which captures the sulfur content of the gas to become sulfidated.




- **SULFUR RECOVERY:** The spent lime in the form of carbon impregnated CaS is regenerated by partial combustion with air in a highly reducing atmosphere, releasing sulfur vapor and converting the CaS to CaO. The sulfur vapor is condensed and recovered in molten form as elemental sulfur while producing an off-gas which is used as the carrier gas to pneumatically transport the sulfidated CaS to be regenerated.



Spent sorbent, CaS carbon impregnated



Regenerated sorbent, CaO



Elemental Sulfur




# CALDERON GASIFICATION PILOT IN BOWLING GREEN, OHIO

ISSUED PATENT # 6,911,058

washingtonpost.com

# Five Shipyards Too Many

## The Pentagon Should Focus on Paring Down Private-Sector Facilities

By John Shephard Jr. and Harvey Sapolsky
Tuesday, November 8, 2005; A19

The latest base realignment and closure (BRAC) plan has prompted the usual round of complaints and disputes over which military bases should be closed, as well as sighs of relief from supporters of the bases that were spared. But a bigger question has been overlooked in arguments over the plan: Why doesn't the BRAC process also focus on the private-sector operations that the government supports at great and often wasteful expense?

These are the arsenals, assembly lines and shipyards that build and overhaul the nation's weapons -- and do essentially nothing else. They are too costly to maintain at a time when there is no need for them, and yet they go unconsidered in the periodic BRAC processes.

For example, four large government-owned shipyards and six large private shipyards work on warships. The government-owned yards do only repair and overhauls; the private ones do new construction. All are underutilized, having been geared for the Navy's Cold War fleet. The government yards tend a Navy that is roughly half the size it was in 1990. The private yards are able to build more than five times the number of ships that the Navy is ordering now. Maine's Portsmouth Naval Shipyard, which specializes in nuclear submarine overhauls, was on this year's BRAC plan, and its eleventh-hour reprieve blew an opportunity. Yet closing Portsmouth would have made only a small dent in the problem: There would still be too many yards building and maintaining too few ships.

The merger wave that has swept the defense industries has done nothing to reduce excess capacity in shipbuilding. The Big Six private yards were once owned by six different corporations, but now they are owned by just two: General Dynamics and Northrop Grumman. While there have been some savings from consolidating component purchases, the post-Cold War era yielded a change only in corporate logos.

The warship-building market won't fix the problem; there is essentially only one customer: the U.S. Navy, which has a taste for fast, complex and expensive ships. No naval combat ship costs less than a billion dollars, and most cost a lot more. For practical, political and strategic reasons, the Navy can't seriously opt for foreign sourcing. Moreover, the Big Six yards have few options besides the Navy; most other navies buy locally or get their ships used from the United States. Commercial shipbuilding, which uses capital-intensive, mass-production methods and cheap labor, is a hyper-competitive, unprofitable business that already has too many yards chasing a handful of ship orders.

The private yards are wards of the Navy: public yards with private ownership. As long as they stay open, they get some Navy business. The Big Six are capable of delivering 20 to 25 ships a year and were building at nearly that rate during the Reagan administration's defense buildup. In the 1990s the rate dropped to seven or eight a year. Recently, it's been as low as four or five. No wonder shipbuilding costs have skyrocketed. With the costs of running all these facilities apportioned to fewer ships, and Congress making sure that each yard has a project, the government reaps no economies of scale. Worse, the underuse of each facility will prevent enough new capital investment to ensure that the best yards stay modern and technologically robust. Because these shipyards employ thousands of people, often in areas where their economic presence is dominant, they are hard to close. As with large military bases, closure means significant local economic hardship and a war with the local congressional delegation.

But hard decisions need to be made. In the end, the number of yards should be halved. The Navy spends about $10 billion a year on shipbuilding and major refits, and the total is not likely to grow, given fiscal constraints. Sharing the appropriation among five yards instead of 10 would be more efficient and less costly. Three construction yards can easily accommodate the eight to 10 ships a year needed to sustain a fleet of 250 to 275 ships that seems to be the Navy's future.

Yet there must be compensation for the corporations that own the private yards, the laid-off workers and the communities that will face significant unemployment and potential decline. The communities will need money to start new industries and rebuild their economic lives. These restructuring costs, normal for any business, should have been paid a decade ago. It is better to pay them now than to have continuing underutilization in naval construction, with its higher unit costs and debilitating politics.

*John Shephard Jr. is a former senior vice president of Northrop Grumman. Harvey Sapolsky is director of the Security Studies Program at the Massachusetts Institute of Technology.*

1670 Drayton Avenue, Suite 100 • North Charleston, SC 29405
843.554.5009 • 843.554.0403 (Fax)

CMMC, LLC

March 20, 2001

Robert S. Kripowicz
Acting Assistant Secretary
For Fossil Energy
U. S. Department of Energy
F.E.-1, 4G-084
Washington DC 20585

Dear Mr. Kripowicz,

In 1993 the Charleston community was shocked by news that its largest employer, the U. S. Navy, was closing major facilities in the Charleston area. This was devastating to a community that had long depended on the Naval Complex to provide well paying industrial jobs to. At that time, several businessmen in the community formed a consortium of companies to privatize the former Naval Shipyard. The lead company, Charleston Marine Manufacturing Corporation (CMMC) developed and submitted a business plan to privatize the Shipyard by using the Shipyard assets to perform commercial ship repair as well as heavy industrial manufacturing. The Shipyard had never been used as a commercial manufacturing base, but it contained numerous large fabricating buildings that were ideal for the manufacture of heavy industrial parts. In addition, the workforce that had been at the Shipyard had been trained to repair naval vessels including nuclear powered submarines, thus they were a well-qualified and trained workforce.

After a lengthy process of selecting prospective tenants for the Naval Complex, CMMC was awarded a five-year lease for the facility in 1995. After a successful start up phase, CMMC now has been awarded a 30-year contract and have on a daily basis, somewhere between 1200 and 1500 employees operating in the facility. In fact, the Charleston Naval Complex has been cited as the most successful privatization effort in the entire Base Realignment and Closure (BRAC) process. Much of the success that CMMC has enjoyed has resulted from using those facilities originally intended for Naval ship repair as a facility to perform commercial ship repair and to perform heavy fabrication work in the large steel fabrication buildings. The Shipyard buildings have heavy floor capacity, large cranes and are located next to deep water port facilities, thus offer excellent opportunity for manufacture of large structures and shipping directly from the docks adjacent to the manufacturing sites.

In CMMC's initial proposal for facilities at the Naval Complex, we cited Calderon Energy as a prospective customer of CMMC. We were impressed with Calderon Energy's vision in converting high sulfur low-grade coal into gas to provide fuel for power plants that currently were using coal as a fuel source. At the time, in 1995, there was a considerable interest in South Carolina for the Calderon process and it was seriously considered by power users in the State as well as engineering companies that do energy programs. Unfortunately, the Calderon process was just ahead of itself in time. The utilities were not ready for such an innovative program. While they showed great interest, they did not move forward with affirmative action.

As we all know, things have changed since 1995 and natural gas and oil have become increasingly more expensive and coal, as a fossil fuel, continues to offer problems in the environmental area. CMMC has been in touch with Calderon Energy and we are still very interested in manufacturing equipment for the conversion of low-grade coal to clean gas. We have facilities available at the former Shipyard and have the capability to produce the equipment required in the conversion process. In addition, we have a work force available that can perform the high quality work required in the fabrication of pressure vessels used in the process. In short, we are ready to build the product required by Calderon Energy to produce gas. In so doing, the project would increase the labor force at the Shipyard and provide additional jobs to employees that were formerly employed at the Complex prior to its closing.

I urge the Department of Energy to encourage the development of the Calderon process and to move forward, as soon as possible, in an effort to commercialize the coal-to-gas fuel process that Calderon has developed. In so doing, it would provide a valuable use for low-grade coal, of which there is almost unlimited supply, while producing jobs at a defense facility that was closed as a result of the BRAC process. Whatever you could do to help this effort would be greatly appreciated, or if you have thoughts on how CMMC might assist you, I would appreciate your thoughts and comments.

The entire privatization of the Naval facilities in Charleston has been watched very closely by the South Carolina Congressional Delegation, including our two U. S. Senators and our Senior House Members. I would be more than happy to submit comments to them, regarding this program, if you felt that would be appropriate.

I thank you for whatever you may do to move this very exciting project along to the production phase of development.

Very truly yours,

Richard K. Gregory

Richard K. Gregory
Member