No. 08-373C
(Senior Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENERGY SECURITY OF AMERICA CORP.
and ALBERT CALDERDON,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

August 19, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

DEFENDANT'S MEMORANDUM. . . . . 1

QUESTIONS PRESENTED. . . . . 1

STATEMENT OF THE CASE. . . . . 1

I. Nature Of The Case. . . . . 1

II. Statement Of Facts . . . . . 2

ARGUMENT. . . . . 4

I. Standards Of Review. . . . . 4

A. RCFC 12(b)(1). . . . . 4

B. RCFC 12(b)(6). . . . . 5

II. Plaintiffs' Claims Are Barred By The Statute Of Limitations . . . . . 6

III. Plaintiffs' Claims Fail As A Matter Of Law . . . . . 11

A. Plaintiffs Have No Property Interest In The Award Of A Government Contract. . . . . 13

1. The Bayh-Dole Act Did Not Grant Plaintiffs A Right To The Award Of The Clean Coal Technology Contracts . . . . . 16

2. The Federal Nonnuclear Energy Research And Development Act of 1974 Did Not Grant Plaintiffs A Right To The Award Of The Clean Coal Technology Contracts. . . . . 17

B. Plaintiffs Have Not Stated A Claim For The Taking Of Patent Rights. . . . . 22

CONCLUSION. . . . . 25

## TABLE OF AUTHORITIES

## CASES

Acadia Technology, Inc. v. United States,
458 F.3d 1327 (Fed. Cir. 2006). . . . . . . . . . . 21

Akins v. United States,
- Fed Cl. -,
2008 WL2973951. . . . . . . . . . . 22

American Gen. Leasing Inc. & Infodyne Systems Corp. v. United States,
587 F.2d 54 (Ct. Cl. 1978). . . . . . . . . . . 14

American Pelagic Fishing Co., L.P. v. United States,
379 F.3d 1363 (Fed. Cir. 2004). . . . . . . . . . . 12

Amerisource Corp. v. United States,
525 F.3d 1149 (Fed. Cir. 2008). . . . . . . . . . . 11

Bauer & Cie v. O'Donnell,
229 U.S. 1 (1913).. . . . . . . . . . . 23

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007).. . . . . . . . . . . 5

Bloomer v. McQuewan,
55 U.S 539 (1852). . . . . . . . . . . 23

Briscoe v. LaHue,
663 F.2d 713 (7th Cir.1981). . . . . . . . . . . 15

Campbell Plastics Engineering & Mfg., Inc. v. Brownlee,
389 F.3d 1243 (Fed. Cir. 2004). . . . . . . . . . . 16, 17

City of Boerne v. Flores,
521 U.S. 507 (1997).. . . . . . . . . . . 23

Crocker v. United States,
125 F.3d 1475 (Fed. Cir. 1997). . . . . . . . . . . 20

Daves v. Hawaiian Dredging Co.,
114 F.Supp. 643 (D. Hawaii 1953). . . . . . . . . . . 5

Eldred v. Ashcroft,
537 U.S. 186 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Entines v. United States,
39 Fed. Cl. 673 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Ferreiro v. United States,
350 F.3d 1318 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fisher v. United States,
402 F.3d 1167 (Fed. Cir. 2005) (en banc in relevant part).. . . . . . . . . . . . . . . . . . . . . . . . . 5

Georgeff v. United States,
67 Fed. Cl. 598 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Gonzalez v. Freeman,
334 F.2d 570 (D.C. Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Greenlee County, Ariz. v. United States,
487 F.3d 871 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Holley v. United States,
124 F.3d 1462 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

International Industrial Park, Inc. v. United States,
80 Fed. Cl. 522 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Japanese War Notes Claimants Assoc. v. United States,
373 F.2d 356 (Ct. Cl. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Kowal v. MCI Communications Corp.,
16 F.3d 1271 (D.C. Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lingle v. Chevron U.S.A., Inc.,
544 U.S. 528 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

M & J Coal Co. v. United States,
47 F.3d 1148 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 10

Mitchell Arms, Inc. v. United States,
7 F.3d 212 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

OAO Corporation v. United States,
17 Cl. Ct. 91 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Papasan v. Allain,
478 U.S. 265 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Penn Central Transp. Co. v. New York City,
438 U.S. 104 (1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 19

Perkins v. Lukens Steel Co.,
310 U.S. 113 (1940).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Refine Construction Co., Inc. v. United States,
12 Cl. Ct. 56 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Rith Energy, Inc. v. United States,
247 F.3d 1355 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

Rith Energy, Inc. v. United States,
270 F.3d 1347 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Thermalon Industries Ltd v. United States,
34 Fed. Cl. 411 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Welcker v. United States,
752 F.2d 1577 (Fed. Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10

Westinghouse Electric Corp. v. United States,
41 Fed. Cl. 229 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Young v. United States,
529 F.3d 1380 (Fed. Cir. 2008). . . . . . . . . . 6

## STATUTES

5 U.S.C. § 552a. . . . . . . . . . 7

5 U.S.C. § 706. . . . . . . . . . 20

5 U.S.C. § 706(2). . . . . . . . . . 20

28 U.S.C. § 1491(b)(4). . . . . . . . . . 20

28 U.S.C. § 1498. . . . . . . . . . 23

28 U.S.C. § 2501. . . . . . . . . . 6

31 U.S.C. §§ 6301-6308. . . . . . . . . . 13

35 U.S.C. § 154(a). . . . . . . . . . 22

35 U.S.C. § 200. . . . . . . . . . 16

35 U.S.C. § 271. . . . . . . . . . 23

42 U.S.C. § 5901. . . . . . . . . . 16

42 U.S.C. § 5902(b)(1). . . . . . . . . . 18

42 U.S.C. §5904(b)(2). . . . . . . . . . 19

42 U.S.C. § 5908. . . . . . . . . . 18

U.S. Const. amend. V, cl. 4. . . . . . . . . . 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY SECURITY OF AMERICA CORP. and ALBERT CALDERDON, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 08-373C (Senior Judge Bruggink) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and (6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully submits this motion to dismiss.

DEFENDANT'S MEMORANDUM

QUESTIONS PRESENTED

1. Whether plaintiffs' complaint is barred by the statute of limitations.

2. Whether the plaintiffs' complaint identifies a property interest protected by the Fifth Amendment.

STATEMENT OF THE CASE

I. Nature Of The Case

Plaintiffs, Energy Security of America Corporation and Albert Calderon, assert a Fifth Amendment takings claims based upon certain alleged actions or inactions of the Department of Energy (DOE) that plaintiffs contend effected a taking of two patents that are known as the "Calderon Process for Synthetic Gasoline and Power Co-Production (or the 'Process')." Complaint (Co.) at ¶1.

II. Statement Of Facts

Although defying easy summary because of its length, the crux of the plaintiffs' complaint appears to be that DOE incorrectly favored technologies different from those contained in plaintiffs' patents and, as result, DOE did not award plaintiffs a sufficient number of contracts for plaintiffs to adequately develop their technology. The plaintiffs do not allege that the Government infringed their patents. Co. ¶2. They contend that the Government actions that constituted the taking began in 1988 and were completed by May 1, 1993. Co. ¶25.

The nature and history of plaintiffs' technology is described at length in pages 39-104 of the complaint. In summary, the plaintiffs allege that "the Process is commercially valuable as a method of producing synthetic gasoline and electric power from coal, and is suited for installation in existing coal-fired power plants." Co. ¶5. Plaintiffs contend that the Process is so effective that, if all coal plants were retrofitted with the Process, the United States would produce enough synthetic gasoline to offset 35-percent of oil imports, while simultaneously reducing emissions from the plants. Id. They contend that the value of the displaced oil imports at $125 per barrel would be $190 billion per year. Id.

Plaintiffs contend that in the "coal gasification area", the industry involved in this case, it is not possible to apply such technology to a commercial project without having built a "first-of-a-kind demonstration project at a commercial or near-commercial scale." Co. ¶13. Such projects typically cost "in the hundreds of millions of dollars . . . and must have a means of funding not only construction costs but of financially covering continued operating costs." Id. They allege that no first-of-a-kind coal gasification project has ever been built in the United States without

direct grant support from DOE, which typically contributes both construction and operating costs on a shared basis with non-Federal participants. Co. ¶14.

Plaintiffs concede that they received two grants (through cooperative agreements (Co. ¶¶43, 303)) from DOE totaling in excess of $17 million. The first cooperative agreement totaled $13.31 million and was paid in fiscal years 1987 to 1992. Co. ¶¶185-88. The purpose of this grant was "to construct and operate a proof-of-concept Process Development Unit (PDU) in Alliance, Ohio, principally to test the Plaintiff's hot gas clean-up technology. . . ." Co. ¶185. The second cooperative agreement provided plaintiffs $3 million in 1995. Co. ¶¶303-04. Plaintiffs describe the subject matter of this agreement as "development and demonstration of critical sub-systems of Plaintiff's gasification process (i.e. Plaintiff's pyrolysis and hot gas cleaning) as applied to cokemaking." Id. at ¶307.

During the 1986 to 1992 time period, plaintiffs also submitted five other funding proposals to DOE. Co. ¶¶183 and 205. Plaintiffs submitted these proposals pursuant to DOE's clean coal technology program. Co. ¶174. The clean coal technology program solicitations "were geared toward the commercial-scale or near commercial-scale demonstrations of clean coal technologies, including coal gasification technology." Co. ¶199. DOE rejected plaintiffs "Round I" clean coal technology program proposal in 1986. Co. ¶183. DOE rejected plaintiffs proposals for rounds two through five in 1988, 1989, 1991, and 1992, respectively. Co. ¶205.

Plaintiffs allege that, after rejection of their round one proposal, DOE told the Ohio Congressional delegation in 1986 that DOE did not consider their gasification and hot cleaning technology to be "technically feasible." Co. ¶184. Much of the complaint is devoted to allegations that plaintiffs' technology is actually superior to those technologies for which DOE

provided grants in the clean coal technology program. E.g., Co. ¶100 ("Plaintiff's Process is a much less expensive method of coal gasification and gas treating than the . . . technologies DOE has supported through its Clean Coal Technology Demonstration Program."). See also Co. ¶¶7, 18, 109-127, 136-143, 145-47; 148-156; 200, 254, 259-61.

Following rejection of their round five proposal in 1992, plaintiffs allege that they spent the next 16 years attempting to persuade power and industrial companies to invest in their technology. Co. ¶295. Plaintiffs also pursued other means of obtaining financing. Co. ¶296. None of these efforts were successful. Id.

## ARGUMENT

### I. Standards Of Review

#### A. RCFC 12(b)(1)

In deciding a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted). When this Court's subject matter jurisdiction is placed into issue, the non-moving party bears the burden of establishing jurisdiction. International Industrial Park, Inc. v. United States, 80 Fed. Cl. 522, 526 (2008). "Where a motion to dismiss challenges the truth of the jurisdictional facts alleged in the complaint, the court is not restricted to the face of the pleadings, but may consider all relevant evidence in order to resolve the factual dispute." Id. (citing Ferreiro v. United States, 350 F.3d 1318, 1324 (Fed. Cir. 2003)).

B. RCFC 12(b)(6)

The Tucker Act both confers jurisdiction on the Court of Federal Claims and waives the sovereign immunity of the United States for claims for money damages founded on, inter alia, acts of Congress. Greenlee County, Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007). However, "[t]he Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Id. (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

There are two different grounds upon which the Government may file a motion to dismiss for failure to state a claim in a Tucker Act case: 1) failure to state a claim upon which relief can be granted due to lack of a money-mandating source; and 2) failure to state a claim upon which relief can be granted because the plaintiff is ultimately not entitled to recover money damages under the statute. Greenlee, 487 F.3d at 876 (quoting Fisher, 402 F.3d at 1172-73).

As the Supreme Court recently explained in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007), the factual allegations pled in the complaint must be enough to raise a right to relief above the speculative level. Thus, "when the factual allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" Id. at 1966 (quoting 5 Wright & Miller § 1216 at 233-34 (quoting Daves v. Hawaiian Dredging Co., 114 F.Supp. 643, 645 (D. Hawaii 1953))).

## II. Plaintiffs' Claims Are Barred By The Statute Of Limitations

Pursuant to the Tucker Act, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Because the complaint concedes that the Government actions that constituted the taking were completed as of May 1, 1993 (Co. ¶25), the complaint is barred by the statute of limitations.

In an attempt to avoid the statute of limitations, the plaintiffs state that the Court should suspend accrual of the statute of limitations. Co. ¶¶394-397. Accrual suspension suspends or tolls the running of the statute of limitations until the plaintiff knew or should have known that a claim existed. Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc); Accord Young v. United States, 529 F.3d 1380 (Fed. Cir. 2008). "The 'accrual suspension' rule is 'strictly and narrowly applied: ... [The plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Martinez, 333 F.3d at 1319 (quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985)).

Plaintiffs argue that the Court should apply the accrual suspension rule because they were "not in a position to be able to show that DOE's actions in precluding commercial demonstration project funding damaged its property right in its '430 and '732 patents" until 2007 when there were multiple cancellations of projects of the type DOE funded in the clean coal technology program. Co. ¶396. Until that time, they also contend that they were not in a position to ascertain or prove their damages. Co. ¶397.

These arguments lack merit because they conflate a difficulty in gathering evidence with a claim that is inherently unknowable. For example, in Welcker, the plaintiff, an Air Force employee, was suspended from Government service because of "disloyalty to the Government pursuant to Public Law 77-808" because of his activities at a club where the Government believed that there was communist activity. Welcker, 752 F.2d at 1579. Mr. Welcker contended that he had joined the club at the request of the Government so that he could report on the activities of the club. Id. The loyalty security board held a hearing at which Mr. Welcker was not allowed to examine reports by the Federal Bureau of Investigation (FBI), nor was he allowed to cross examine witnesses. Id. The board recommended that the Government terminate Mr. Welcker in the interest of national security; the Government ultimately adopted this recommendation and permanently removed Mr. Welcker from Government employment. Id.

Many years later, Congress enacted the Privacy Act, 5 U.S.C. § 552a, which allowed Mr. Welcker to obtain copies of portions of his FBI files. Welcker, 752 F.2d at 1579. Mr. Welcker filed suit in this Court, contending that the files demonstrated that the FBI and Department of Justice had withheld from the Air Force the true nature of his activities at the club. Id. He argued that the statute of limitations should not begin to run until after Congress had passed the Privacy Act which allowed him for the first time to obtain a copy of his file from the Federal Bureau of Investigation and obtain the proof of his claims. Welcker, 752 F.2d at 1580. The Federal Circuit rejected this argument. It explained that "[d]efendant is not required to wait until plaintiff has started substantiating his claims by the discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run." Id. at 1580 (quoting Japanese War Notes Claimants Assoc. v. United States, 373 F.2d 356, 358-59 (Ct. Cl. 1967).

The distinction between a claim that is inherently unknowable and a claim that can be prosecuted only with extreme difficulty is further illustrated in Entines v. United States, 39 Fed. Cl. 673 (1997). In Entines, Filipino veterans of World War II sought compensation for fighting under American command during the war. Id. at 676. In support of their argument that the statute of limitations should be tolled during the period of World War II and the post-war years, the plaintiffs argued that:

> Filipinos in this era faced invasion and occupation of their homeland, guerrilla warfare against the invaders, and, after the defeat of the Japanese, a period of intense rebuilding. . . . Compounding the situation was the fact that the claims had to be asserted in a foreign legal system, in a nation located on the other side of the world. According to plaintiffs, it was simply unimaginable to the average Filipino soldier that he had a claim against the United States.

Id. at 680. The Court was not persuaded. It explained that "[i]t is important to remember that tolling is not appropriate for claims that are simply burdensome or inconvenient to discover. Instead, a claim must be 'inherently unknowable' before it is proper to toll the statute of limitations." Id.[1] Thus, the Court granted the Government's motion to dismiss.

The central contention of plaintiffs' complaint is that DOE maintained a "de facto" technology policy that improperly favored inferior technology to that of plaintiffs, which resulted in the award of grants in rounds one to five of the clean coal technology program to other contractors. Co. at e.g., ¶¶7-8, 183, 205. As discussed in more detail in section III below, they allege that DOE acted improperly in awarding these contracts to other offerors because the

---

[1] As the Federal Circuit noted in Martinez, although accrual suspension is a separate concept from equitable tolling, the term "tolling" is sometimes used to describe accrual suspension. Martinez, 333 F. 3d at 1319.

technologies of those offerors "were already in commercial use, not new, and inconsistent with binding statutory principles incumbent upon the agency . . . ." Co. ¶2. They allege that DOE's actions were inconsistent with the Federal Nonnuclear Energy Research And Development Act of 1974 because the technology for which DOE awarded contracts did not meet the criteria for funding pursuant to that statute. Co. ¶7. Many paragraphs in the complaint allege facts that purport to show the superiority of plaintiffs' technology over those technologies for which DOE awarded contracts. E.g., Co. ¶100.

In their complaint, plaintiffs do not contend that they were unaware that DOE awarded the clean coal technology contracts to other contractors. They do not contend that they were unaware of the costs of building a commercial scale demonstration project, nor do they allege that they were unaware that Government funding would be necessary to build such a project. They do not contend that the alleged superiority of their technology over that of the awardees was inherently unknowable in the 1986 to 1992 time frame, nor do they contend that the types of technology for which DOE awarded the contracts was inherently unknowable. They do not contend that DOE policies were inherently unknowable at that time. Finally, more than 40 paragraphs of the complaint (¶¶188-233) are devoted to the history and a discussion of certain language contained in plaintiffs' 1987 cooperative agreement with DOE. Plaintiffs apparently found this language objectionable, notwithstanding the bilateral nature of the contract, and contend that it proves their claim against DOE. E.g., Co. ¶233. However, plaintiffs do not contend that they were unaware of this contract provision in 1987.

The only facts alleged by plaintiffs in support of their claim that the Court should apply suspension accrual is the cancellation of contracts by third parties in 2007. However, plaintiffs

never tie this one fact back to all of the facts alleged in the preceding 392 paragraphs of the complaint that catalogued DOE's purported errors and statutory violations. The alleged cancellation of these contracts is nothing more than one piece of evidence that may (or may not) tend to support their allegations concerning the alleged superiority of their technology compared to that of the awardees. It does not somehow render that alleged superiority unknowable in 1993. For example, the alleged fact that the other projects were eventually cancelled did not make unknowable the "facts" that, compared to other contractors, plaintiffs' technology is "less expensive" (¶100) and "can utilize any type of coal." Co. ¶109. Finally, the alleged cancellation of these projects does not render unknowable DOE's alleged violations in the 1986 to 1992 time frame of the Federal Nonnuclear Energy Research And Development Act of 1974.

As the complaint demonstrates, plaintiffs are Government contractors involved in a complex technical field who possess knowledge of Government contracting procedures, as well as the means of obtaining funding from Congress for those contracts through earmarks. E.g., Co. ¶¶186-195. The complaint demonstrates that they have intimate knowledge of the strengths and weaknesses of the various technologies, as well as the activities of DOE and Congress. Thus, by 1993 they were on inquiry notice of their claim at least as much as the Air Force employee who could not obtain the key records from the FBI in Welcker, and were in a much better position to pursue their claims than the Filipino soldiers in Entines.

Accordingly, this is not a case that meets the strict and narrow requirements for the application of accrual suspension. Martinez, 333 F.3d at 1319. The Court should dismiss the complaint for lack of subject matter jurisdiction.

III. Plaintiffs' Claims Fail As A Matter Of Law

The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. "The language of this clause does not prohibit the government from taking private property altogether; rather, it prohibits the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123 (1978)). The "clause does not entitle all aggrieved owners to recompense, only those whose property has been 'taken for a public use.'" Amerisource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008). For example, "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." Id. at 1153.

The Federal Circuit has developed a two-part test to evaluate claims that a Governmental action constitutes a taking of private property without just compensation. Maritrans, 342 F.3d at 1351 (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995). First, the Court must determine whether a protected property interest existed, that is, whether the property interest "was a 'stick in the bundle of property rights' acquired by the owner." M & J Coal, 47 F.3d at 1154 (quoting Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027 (1992)). Second, if the claimant can establish the existence of such an interest, the Court must then determine whether the Governmental action at issue constituted a compensable taking of that "stick." Id.

In determining whether any compensable taking occurred, "it is important to decide at the outset whether the alleged taking was 'categorical' or not." American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (citing Rith Energy, Inc. v. United States, 247 F.3d 1355, 1362 (Fed. Cir. 2001) (on rehearing)). The Supreme Court has explained that there are two types of categorical (or "*per se*") takings. First, when the Government causes the owner to suffer a permanent physical invasion of its property - no matter how small - the owner is entitled to just compensation. Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538 (2005). Second, when Governmental regulation "denies all economically beneficial or productive use of land," the owner is also entitled to just compensation. Lucas, 505 U.S. at 1015.

"Outside these two relatively narrow categories . . . regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104, . . . (1978)." Lingle, 544 U.S. at 538. In Penn Central, the Supreme Court acknowledged that it has been unable to identify any set formula for evaluating regulatory takings claims, but identified three factors of primary importance: (I) the character of the Governmental action, (ii) the economic impact of the action on the claimant, and (iii) the extent to which the action interfered with the claimant's reasonable investment-backed expectations. Id. at 539. Each inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539. Thus, each "focuses directly upon the severity of the burden that government imposes upon private property rights." Id.

A. Plaintiffs Have No Property Interest In The Award Of A Government Contract

Plaintiffs contend that in their industry a commercial scale or near commercial scale demonstration project must first be built for the technology to be commercially viable. Such projects require "hundreds of millions of dollars" in funding, and none have ever been built without DOE financial support of both construction and operation costs. Co. ¶¶13-15. Thus, although plaintiffs concede that they received more than $17 million from DOE through the course of two cooperative agreements (Co, ¶¶185-188, 303), they contend that this amount was not nearly enough to develop their patents.

Grants such as those at issue here are provided by agencies pursuant to the Federal Grant and Cooperative Agreement Act Of 1977, codified at 31 U.S.C. §§ 6301-6308. In administering this statute, agencies use a grant agreement or a cooperative agreement as the legal instrument reflecting the relationship between the Government and the recipient of the grant. Id. at §§ 6304-6305. This Court has held that such agreements are contracts for purposes of the Tucker Act. Thermalon Industries Ltd v. United States, 34 Fed. Cl. 411 (1995).

This Court has rejected previous attempts to allege takings claims arising out of an agency's refusal to award a contract because a contractor does not have a property right in the award of a Government contract that is protected by the Fifth Amendment. For example, in OAO Corporation v. United States, 17 Cl. Ct. 91 (1989), the agency accepted a verbal offer from the plaintiff for the award of a contract to OAO Corporation (OAO). Id. at 95. OAO thereafter began incurring performance costs, but the agency ultimately declined to enter into a contract. Id. at 96-98. OAO filed suit, contending that the Government's failure to award the promised contract constituted a taking. Id. at 105.

This Court rejected the claim. The Court pointed out that "[e]very economic interest or expectancy is not necessarily property within the meaning of the fifth amendment." Id. In addition, it noted the "settled law that no assurance exists that a contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder." Id. (quoting American Gen. Leasing Inc. & Infodyne Systems Corp. v. United States, 587 F.2d 54, 58-59 (Ct. Cl. 1978)). Accordingly, the Court held that, although the plaintiff may have had an expectation based upon the verbal agreement that a contract would be awarded, that expectation did not rise to the level of property under the Fifth Amendment. Id.

The Court has rejected comparable claims in other cases. In Westinghouse Electric Corp. v. United States, 41 Fed. Cl. 229 (1998), the Court rejected a takings claim by a contractor that contended it had a right to the award of a subsequent contract after it completed its current contract. The Court dismissed the claim for failure to state a claim because there was no evidence that the contractor possessed such a right and the Government "could not have 'taken' what plaintiff did not possess in right or fact." Id. at 242.

In Refine Construction Co., Inc. v. United States, 12 Cl. Ct. 56 (1987), the Veterans Administration (VA) decided not to award a contract to the plaintiff because of a conflict of interest. Id. at 59. The plaintiff contended that the VA had denied it procedural due process pursuant to the Fifth and Fourteenth Amendments because it contended that it had a property right in the award of the contract. Id. at 67. The Court rejected this argument, holding that the plaintiff's "premise" that it had such a property right "is false." Id. The Court explained that "[t]here is no property right to the award of a public contract. No citizen has a 'right' in the

sense of a legal right to do business with the government." Id. (quoting Gonzalez v. Freeman, 334 F.2d 570, 574 (D.C. Cir. 1964) (citing Perkins v. Lukens Steel Co., 310 U.S. 113 (1940)).

In this case, plaintiffs' are aware that they had no property right to the award of a Government contract and attempt to plead around this problem. In paragraph 55 of the complaint they state that they do "not assert any property right in federal financial assistance . . . ." Instead, they contend in paragraph 56 that "the government action constituting a taking of property is the intentional preclusion and obstruction of the Plaintiff from exploiting its patented property. . . ." Although this is a Rule 12(b)(6) motion, the Court need not accept as true these allegations because "[c]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Georgeff v. United States, 67 Fed. Cl. 598, 602 (2005) (quoting Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir.1981)). By itself, plaintiffs' allegation in paragraph 56 of DOE's "intentional preclusion and obstruction" is conclusory. The specific allegations that flesh out paragraph 56 in the remaining 395 paragraphs of the complaint purport to show that DOE acted in violation of the law by awarding the clean coal technology contracts to contractors with inferior technology, which deprived plaintiffs of the hundreds of millions of dollars they needed to build a commercial scale demonstration project. E.g., Co. ¶¶2, 100. Yet, this is inconsistent with paragraph 55 which admits that they had no right to these contracts. Where the plaintiffs themselves admit that they had no right to these contracts, their creative phraseology in paragraphs 55-56 does not save the claim and the complaint fails as a matter of law.

1. The Bayh-Dole Act Did Not Grant Plaintiffs A Right To The Award Of The Clean Coal Technology Contracts

The complaint contains repeated references to two statutes: the Bayh-Dole Act, 35 U.S.C. § 200 *et seq.* (Co. ¶¶ 6, 11, 17, 21, 42, 235-36, and 375) and the Federal Nonnuclear Energy Research And Development Act of 1974, 42 U.S.C. § 5901, *et seq.* (Co. ¶¶7, 15, 21, 56, 174, 234, 255, and 375). Neither of these statutes granted plaintiffs a property right in the clean coal technology program contracts. As we establish below, the complaint contradicts itself as to whether or not DOE acted in compliance with these statutes. The allegations in the complaint that DOE violated these statutes, which plaintiffs attempt to buttress with numerous paragraphs describing the superiority of their technology, make the complaint tantamount to a bid protest of contracts awarded in 1992 and preceding years.

The Bayh-Dole Act "allows nonprofit organizations and small business firms to elect to retain title to any invention by the contractor developed pursuant to a government contract." Campbell Plastics Engineering & Mfg., Inc. v. Brownlee, 389 F.3d 1243, 1247 (Fed. Cir. 2004). In this Act, "Congress required that each government contract entered into pursuant to the Act shall contain provisions that require the contractor to 'disclose each subject invention to the Federal agency within a reasonable time after it becomes known to contractor personnel responsible for the administration of patent matters, and that the Federal Government may receive title to any subject invention not disclosed to it within such time.'" Id. (quoting 35 U.S.C. § 202(c)(1) (1988)). The Act gives small business the right to elect to retain title to a patent, but "also vests in the government the right to a paid-up license to practice the invention when the contractor elects to retain title, id. § 202(c)(4), and the right to receive title to the invention in the

United States or any other country in which the contractor has not filed a patent application on the invention prior to any pertinent statutory bar date, id. § 202(c)(3)." Id.

The plaintiffs point to no specific language in the Bayh-Dole Act that created a property right to award of the clean coal technology program contracts. They identify no provision in the Act that required DOE to select them, instead of other offerors, for the award of the clean coal technology contracts. In fact, nothing in the Bayh-Dole Act promises small businesses that the Government will provide future funding to develop patents to which they gained title pursuant to this Act. Yet, the construction of the Bayh-Dole Act that they put forth in the complaint seems to be that if the Government fails to provide money to contractors who own patents through the Bayh-Dole Act but do not have the resources to develop them, then the Government has committed a taking because the patents eventually will expire. See Co. ¶¶235-36, 375. However, nothing in the Act supports the notion that Congress intended to make such an open ended funding commitment to small businesses.

2. The Federal Nonnuclear Energy Research And Development Act of 1974 Did Not Grant Plaintiffs A Right To The Award Of The Clean Coal Technology Contracts

The purpose of the Federal Nonnuclear Energy Research And Development Act of 1974 is:

> to establish and vigorously conduct a comprehensive, national program of basic and applied research and development, including but not limited to demonstrations of practical applications, of all potentially beneficial energy sources and utilization technologies, within the Department [of Energy].

42 U.S.C. § 5902(b)(1). The complaint focuses upon section 5904 (Co. ¶¶7, 8, 15, 21, 56, 375) and section 5905(b)(3) (Co. ¶¶8, 21, 56, 255) of this statute.[2] Section 5904 provides "that the comprehensive program in research, development, and demonstration required by this chapter shall be designed and executed according to" various principles enumerated in section 5904. For example, in paragraph seven of the complaint, plaintiffs cite section 5904(a)(1), which provides:

> Energy conservation shall be a primary consideration in the design and implementation of the Federal nonnuclear energy program. For the purposes of this chapter, energy conservation means both improvement in efficiency of energy production and use, and reduction in energy waste.

Section 5905(b)(3) provides further requirements for this comprehensive program. For example, pursuant to section 5905(b)(3)(C) (cited at Co. ¶ 56), the program designed by DOE must include projects designed to demonstrate "improved methods for the generation, storage, and transmission of electrical energy through (I) advances in gas turbine technologies, combined power cycles, [and] the use of low British thermal unit gas . . . ."

The purpose of plaintiffs' citations to the Federal Nonnuclear Energy Research And Development Act of 1974 appears to be an attempt to demonstrate that the contracts actually awarded by DOE pursuant to the clean coal technology program were inconsistent with the provisions of sections 5904 and 5905. However, the complaint is inconsistent with respect to

---

[2] In paragraph 234 of the complaint, plaintiffs also state that DOE's actions contravened "the Congressional directive at 42 U.S.C. § 5908 that small businesses be provided a reasonable opportunity to participate in energy technology demonstration projects." This argument lacks merit. Section 5908 provides that title to patents made in the course of a DOE contract vests in the United States under certain circumstances. 42 U.S.C. § 5908(a). However, DOE may waive its rights, and must consider the small business status of an applicant for a waiver of DOE's rights or a license to use the patent. 42 U.S.C. § 5908(j). This statute confers no right to the award of a contract to the plaintiffs.

DOE's compliance with this Act. Almost the entire complaint alleges that DOE failed to comply with this Act because plaintiffs' technology was better than the awardees. However, in two places in the complaint, in an apparent attempt to circumvent the holding in Rith Energy (discussed below), plaintiffs incongruently allege that DOE acted lawfully. Compare paragraph 2 (alleging that DOE's actions were "inconsistent with binding statutory principles incumbent upon the agency"); paragraph 7 ("DOE's CCTD Program . . . is inconsistent with the Nonnuclear Energy Act"), paragraph 8 ("DOE's project selections are inconsistent with 42 U.S.C. § 5904(b)(2) . . ."), the first sentence of paragraph 23 ("The failure of DOE to abide by mandatory directives of Congress applicable to the clean coal technology demonstration project area . . . has special relevance under two Penn Central factors . . .") and the first sentence of paragraph 372 ("The failure of DOE to abide by mandatory directives of Congress . . ."), with the second sentences of paragraphs 23 and 372 ("Plaintiff does not maintain that DOE's actions were necessarily unlawful . . . .") (citing Rith Energy v. United States, 247 F.3d 1355, 1356-66 (Fed. Cir. 2001)).

Plaintiffs' first contentions concerning the inferiority of the technologies selected for award by DOE appear in paragraph 7 of the complaint. They then develop these allegations in depth in paragraphs 100 to 160. Among other things, plaintiffs allege that their technology: is "much less expensive" than those chosen by DOE (Co. ¶100); can use, unlike the technologies chosen by DOE, "any type of coal" (¶¶109-10); does not require coal preparation or pre-treatment, unlike the technologies chosen by DOE (¶¶114-116); and does not require an air separation unit (Co. ¶¶139-40).

The problem with these allegations arises from the nature of the analysis to be performed by the Court. Plaintiffs' allegations might be appropriate if this were a bid protest, but have no relevance to a takings claim. In defining this Court's bid protest jurisdiction, the Tucker Act, at 28 U.S.C. § 1491(b)(4), specifically incorporates the standard of review contained in the Administrative Procedure Act (APA), 5 U.S.C. § 706. See 5 U.S.C. § 706(2)(A) (providing that a court may set aside agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law). Pursuant to this APA standard, the Court may set aside an award if: (1) the decision of the procurement official lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The second prong of this test conceivably would be implicated by the arguments set forth in the complaint if this were a bid protest.

The Court performs no comparable analysis when considering a takings claim. Outside of the bid protest context, this Court does not possess jurisdiction to perform judicial review of the agency's actions. Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) ("the [Court of Federal Claims] correctly held that it lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act. . ."). Rather, the analysis in this Court must start from the premise that DOE correctly awarded the contracts.

As the Federal Circuit has explained:

> [I]n a takings case we assume that the underlying action was lawful and we decide only whether the governmental action in question constituted a taking for which compensation must be paid. [The

> appellant's] complaints about the wrongfulness of the [government action] are therefore not properly presented in the context of its takings claim. The only question before us is whether [the appellant] was entitled to be compensated for the effects of that action.

Acadia Technology, Inc. v. United States, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (quoting Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352-53 (Fed. Cir. 2001) (on petition for rehearing)); see also Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993) (identifying the issue upon review as "whether the presumptively correct actions of ATF in suspending and revoking the permits constituted a compensable taking under the Fifth Amendment.").

Accordingly, plaintiffs allegations that its technology was better than the awardees of the clean coal technology program, and that DOE violated either the Bayh-Dole Act or the Federal Nonnuclear Energy Research Act of 1974 in awarding contracts to those contractors, have no place in this action. The Court must presume that DOE acted properly. Once the Court starts with this presumption, the plaintiffs' cause of action disappears because one could not seriously contend that the Government is liable for just compensation to disappointed bidders where it has properly awarded the contract. If the Government could be held liable for a taking to disappointed bidders, it seems doubtful that the Government could ever enter into a contract because each solicitation would expose it to exponential liability beyond the value of the awarded contract.

Finally, the plaintiffs' isolated statements that they are not maintaining that DOE's actions "were necessarily unlawful" does not save the complaint even in the context of a Rule 12(b)(6) motion. As this Court recently explained, it "is not required to 'accept inferences drawn

by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.'" Akins v. United States, Fed Cl. , 2008 WL2973951 at 2 (quoting Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir.1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The plaintiffs' vague statements concerning the lawfulness of DOE's action is merely their characterization of their complaint or a legal conclusion that does not cure the allegations made in the remaining 395 paragraphs of the complaint that DOE acted unlawfully.

B. Plaintiffs Have Not Stated A Claim For The Taking Of Patent Rights

Plaintiffs contend in paragraph 32 of the complaint that the Government took two of their patents, the 430 patent ("Method of Producing and Treating Coal Gases") and the 732 patent ("Method for Repowering Existing Electric Power Plant"). In paragraph 54, they re-allege that the Government took these patents, but also add a third property interest that they contend is protected by the Fifth Amendment and was taken by the Government: "the natural right of the inventor to exploit his invention, recognized as an independent property interest apart from the patent." The complaint fails to state a cause of action for a taking of any of the listed items.

With respect to the plaintiffs' claim that the Government took the two patents, the complaint fails to state a cause of action because it does not plead facts that the Government took the right to exclusivity conveyed by the patent. The statute that generally defines the nature of the patent grant is 35 U.S.C. § 154(a), which provides:

> (1) Contents.--Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process,

> of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

(Emphasis added). The exclusive rights of the patent are further defined by 35 U.S.C. § 271 (defining infringement) and 28 U.S.C. § 1498 (which provides compensation for manufacture or use of inventions claimed in United States patents by or for the Government).

The Supreme Court has repeatedly defined patent rights in terms of their exclusivity. For example, in Bloomer v. McQuewan, 55 U.S 539, 549 (1852), the Supreme Court stated:

> The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent.

Similarly, in Bauer & Cie v. O'Donnell, 229 U.S. 1, 10 (1913), the Supreme Court, citing Bloomer, 55 U.S. at 549, stated:

> The right to make, use, and sell an invented article is not derived from the patent law. This right existed before and without the passage of the law, and was always the right of an inventor. The act secured to the inventor the *exclusive* right to make, use, and vend the thing patented, and consequently to prevent others from exercising like privileges without the consent of the patentee.

(Emphasis in original).[3]

---

[3] We note that the "right to make, use, and sell" discussed in Bauer & Cie is not a "right" in the legal sense, but the philosophical concept of a "natural right" or the freedom to do that which is not prohibited. Cf. City of Boerne v. Flores, 521 U.S. 507, 540 (1997) (Scalia, J., concurring) (stating that at the understanding of the authors of the Constitution would have been "in accord with the background political philosophy of the age (associated most prominently with John Locke)," defining "freedom as the right 'to do only what was not lawfully prohibited,'" citing West, The Case Against a Right to Religion-Based Exemptions, 4 Notre Dame J. L., Ethics & Pub. Pol'y 591, 624 (1990)).

In this case, the plaintiffs make no allegation that the Government has taken the exclusivity rights (that is, the right to exclude others from making, using or selling) that they possessed through the patents. They make two inconsistent allegations to attempt to avoid this defect. In paragraph 11, they contend that a taking will occur because, once the patents expire, anyone, including the Government, will then be able to use their technology. Although it is undoubtedly true that anyone can use patented inventions once the patents expire, plaintiffs do not contend that the Government has done so here, nor do they contend that the Government has provided the necessary hundreds of millions of dollars for someone else to build a demonstration project of the plaintiffs' technology. Thus, to the extent that the complaint relies upon this allegation, the complaint is not ripe. However, even if these events were to happen, there still would be no taking because, as discussed in section A above, the plaintiffs had no property right in the award of grants which would allow them to develop their patents before they expired.

Much later in the complaint, at paragraph 360, plaintiffs' contend that the mere disclosure of the patents to the Government, taken in light of the Government's alleged preclusion of their development through funding refusal, by itself constitutes a *per se* taking of their property. The problem with this allegation is two-fold. First, they still have the overarching problem that they had no property right to funding. Second, the mere fact that their patent information has been disclosed to the Government hardly means that the Government has taken their patents for public use. If the plaintiffs are correct that the Government's mere possession of this information at the Patent and Trademark Office may constitute a taking of the patent if the Government refuses to finance development of the patent, then the Government would face an unknown but likely

enormous liability for any patents that fall in this category. Plaintiffs cite no statutory language that evidences such an intent by Congress.

Finally, the plaintiffs attach considerable significance to Justice Stevens' dissenting opinion in Eldred v. Ashcroft, 537 U.S. 186, 226 (2003), in which Justice Stevens opined that the Government would be liable for a taking if, after the disclosure of the patent to the Government, the Government shortened the term of the patent. Co. ¶¶20, 22, 33. The plaintiffs argue that the situation in this case is comparable to shortening the term of a patent because the Government has precluded plaintiffs from commercial application of their patents. Co. ¶2. However, as discussed above, the only way that the Government has "precluded" plaintiffs from application of their patents is by not giving them the hundreds of millions of dollars they claim they need to develop those patents, which is not a taking.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss plaintiffs' complaint for lack of subject matter jurisdiction or failure to state a claim.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/ Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

August 19, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 19th day of August, 2008, a copy of the foregoing motion for enlargement was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Michael N. O'Connell